STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE
COUNTY OF HYDE              SUPERIOR COURT DIVISION
                               09 CVS 70
                               CODE: COMP: OTHR

REX T. GILBERT, JR. and       )
DANIELA L. GILBERT,         )
             Plaintiffs,    )
                       )

FILED
JUNE 10:15 Am

SEP 1 1 2009

CLERK SUPERIOR COURT
HYDE COUNTY
CLERK

v.                              )
                       )
DEUTSCHE BANK TRUST COMPANY   )
AMERICAS, *As Trustee for*,      )
RESIDENTIAL ACCREDIT LOANS, INC,   )
DAVID A. SIMPSON, P.C., Substitute Trustee, )
RESIDENTIAL FUNDING, LLC, and    )
GMAC MORTGAGE, LLC,        )
             Defendants.   )
_____ )

## COMPLAINT

NOW COME the plaintiffs by and through their counsel of record and allege and say as follows:

### JURISDICTION

This action is instituted pursuant to N.C. Gen. Stat. § 45-21.34 for the purpose of enjoining the foreclosure sale authorized by Order of the Honorable Marvin Blount in Hyde County File 09-SP-09 and raising legal and equitable defenses, including but not limited to, rescission pursuant to rights granted under the federal Truth in Lending Act, material disclosures violations of the federal Truth in Lending Act, unfair and deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et. seq, and the charging and collecting of usurious interest in violation of N.C. Gen. Stat. § 24-2, et. seq.

### PARTIES

1.     The plaintiffs are citizens and residents of Hyde County North Carolina.



2.    Defendant, Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 (hereinafter Deutsche) is, upon information and belief, an entity that serves as Trustee for securitized pools of mortgage loans that are secured by North Carolina real property and regularly uses the North Carolina Courts for purposes of foreclosing mortgage loans that it holds as Trustee. Defendant Deutsche purports to be the owner and holder of the Adjustable Rate Note (hereinafter Promissory Note) and Deed of Trust that are the subject of this complaint and has, upon information and belief, instructed the Substitute Trustee of a Deed of Trust signed by plaintiffs, to file the foreclosure action known as 09 SP 09 in the Superior Court of Hyde County, North Carolina.

3.    Defendant, David A. Simpson, P.C. (hereinafter Simpson) is a professional corporation organized under the laws of the State of North Carolina which, upon information and belief, contracts with financial services companies to provide Substitute Trustee services for prosecution of foreclosures in North Carolina and, upon information and belief, purports to have been appointed as a Substitute Trustee under the Deed of Trust that secures the mortgage loan that is the subject of this complaint.

4.    Defendant Residential Funding, LLC (hereinafter Residential Funding) is, upon information and belief, a limited liability company which purports to be the master servicer for the Note and Deed of Trust which is the subject of this complaint.

5.    Defendant, GMAC Mortgage, LLC (hereinafter GMAC) is, upon information and belief, a limited liability company which regularly services loans secured by real property located in North Carolina. GMAC purports to be the current subservicer of the Note and Deed of Trust which is the subject of this complaint.

2

## FACTUAL ALLEGATIONS

6.    All paragraphs of this complaint are incorporated herein as if fully set forth.

7.    Plaintiffs, Rex T. Gilbert, Jr. and Daniela L. Gilbert, are husband and wife and reside upon a tract of land that is titled in their name as tenants by the entirety on Ocracoke Island, Hyde County, North Carolina.

8.    During the late winter or early spring of 2006, plaintiff, Daniela Gilbert, telephoned First Flight Mortgage, LLC office located at 2503 North Croatan Highway in Kill Devil Hills, North Carolina.

9.    During the months of March and April of 2006, plaintiff, Daniela L. Gilbert spoke on many occasions with Emily Berry-Belvin, who represented herself to be the loan officer for First Flight Mortgage, LLC who would handle the mortgage loan transaction for plaintiffs.

10.    Upon information and belief, Emily Berry-Belvin, was, at all times pertinent to the transactions described in this complaint, the employee or agent of First Flight Mortgage, LLC, with full actual and apparent authority to act for First Flight Mortgage, LLC.

11.    During the spring of 2006, plaintiffs were struggling to make the payments on an adjustable rate mortgage loan and wanted to refinance to cash out money until they were able to sell their home and borrow money to build another home on an adjacent parcel of land.

12.    Plaintiff, Daniela L. Gilbert, talked with Emily Berry-Belvin and explained that plaintiffs wanted to refinance their mortgage loan with a loan that would allow them to cash out money until they sold their home and built a new lower cost home.

13.    Plaintiff, Daniela L. Gilbert, provided Emily Berry-Belvin with copies of plaintiffs' bank statements to show their income.

14.    The income documentation provided by plaintiffs does not show monthly income of $10,950.00 each month.

15.    At some point, Emily Berry-Belvin called plaintiffs to advise of the need for an appraisal. After some discussion, Emily Berry Belvin represented to plaintiffs that their home needed to appraise at $700,000.00 in order for them to get the loan.

16.    When plaintiff, Daniela L. Gilbert, offered to contact John W. Hunter, a licensed appraiser who has considerable experience appraising residential properties on Ocracoke, Emily Berry-Belvin advised plaintiff that they needed someone "more aggressive with the numbers."

17.    On information and belief, Ms. Berry-Belvin contacted Marco P. Garcia with Appraisal Group Outer Banks, Inc. who conducted, prepared and signed a Uniform Residential Appraisal Report which valued the plaintiff's property at $700,000.00.

18.    Plaintiffs did not receive a copy of aforementioned appraisal under sometime after the loan transaction which is the subject matter of this complaint was completed. The copy received by plaintiffs is inserted into a plastic binder with a green spine which matches the color of the First Flight Mortgage logo and includes a cover sheet with First Flight Mortgage letterhead.

4

19.    When the appraisal came in, Emily Berry-Belvin represented to plaintiffs that they would close before the end of April, 2006.

20.    Emily Berry-Belvin told plaintiff, Daniela L. Gilbert, not to make further payments to the lender that currently held plaintiffs' mortgage loan because the refinance loan would be closing during the month of April.

21.    In reasonable reliance upon the statements and assurances of Emily Berry-Belvin, that the refinance loan would close during the month of April, plaintiffs followed her instruction and withheld the May 2003 mortgage payment and plaintiffs proceeded to use the money that would otherwise have been used for the May mortgage payment for other necessary household expenses.

22.    The mortgage loan finally closed late on the afternoon of May 5, 2006.

23.    During the month of May, 2006 and shortly before the May 5, 2006, loan closing, plaintiff, Daniela L. Gilbert, received a telephone call from Emily Berry-Belvin who stated that because the plaintiffs were planning to sell their home, the refinance they would be getting would be an interest only loan. No other option was presented to plaintiffs.

24.    Plaintiffs voiced objections to the interest-only loan; however, plaintiffs were reassured by Emily Berry-Belvin that this was the best option for them given their financial situation and she led plaintiffs to believe that they would be able to refinance the terms of the loan in a year or so.

25.    On May 5, 2006, plaintiffs traveled to Nags Head to the office of a lawyer for the loan closing.

26. Upon arrival at the lawyer's office, plaintiffs were advised that they would have to wait because the paper work had not arrived.

27. After waiting several hours and having to make calls to Ocracoke to arrange for unplanned after school child care, the plaintiffs were finally ushered into a back office to sign the paper work beginning at approximately 5:50 p.m.

28. Plaintiffs did not meet the lawyer who was supposed to be handling the closing. Instead, plaintiffs met with an assistant who sat across the table from the plaintiffs with a stack of papers marked with stickies indicating where their signatures were needed.

29. The assistant did not review the documents with the plaintiffs nor did she explain the contents or purpose of any of the documents. The assistant hurried plaintiffs through the signing process by showing plaintiffs where to sign and instructing them to sign. Plaintiffs did look at several of the documents but did not have an opportunity to review the full extent of the contents of all of the documents.

30. Once the plaintiffs had signed each of the documents in the place indicated by the assistant, the meeting was over. Plaintiffs did not receive any of the documents or copies of any of the documents after they had completed the signing process.

31. Among other documents, plaintiffs executed a Promissory Note in the amount of $525,000.00 and a Deed of Trust securing the Promissory Note for the benefit of the original lender, First National Bank of Arizona.

32. The copy of the Promissory Note presented at the foreclosure hearing in the matter 09 SP 09 in Hyde County Superior Court bore an additional page entitled

"Allonge to Note" (hereinafter Allonge) The Allonge purports to meet the requirements of N.C. Gen. Stat. § 25-1-201(21) by showing indorsements, authorized signatures, by the various and multiple entities purporting to assign and transfer the Promissory Note and Deed of Trust from the original lender, First National Bank of Arizona through to present purported holder and owner, defendant Deutsche. (Exhibit 1)

33.     The Allonge shows an indorsement by First National Bank of Arizona to First National Bank of Nevada.

34.     The Allonge shows an indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact wherein it purports to have authority to indorse on behalf of First National Bank of Nevada to Residential Funding Corporation.

35.     Plaintiffs have requested documentation to substantiate the authority of Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact to act on behalf of First National Bank of Nevada; no such information has been provided; therefore, on information and belief, there is no underlying documentation to substantiate the indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact for First National Bank of Nevada to Residential Funding Corporation.

36.     The Allonge shows an indorsement from Residential Funding Corporation to Deutsche Bank Trust Company Americas as Trustee.

37.     With respect to Residential Accedit Loans, Inc., the Allonge bears no indorsement to Residential Accredit Loans, Inc. which is the entity which purports to be the owner and holder of the note.

38.    The Allonge bears the indorsement "Deutsche Bank Trust Company of Americas Trustee". The indorsement does not state for whom Deutsche Bank is acting as Trustee.

39.    The Promissory Note executed by plaintiff provides for interest to be charged at a yearly rate of 7.375% and for the first *84 monthly payments in the amount of $4,391.32*. (Exhibit 2) This same Promissory Note indicates on its face that there was an interest-only addendum to the note.

40.    The interest-only addendum states that it superseded certain sections of the Promissory Note; to wit: *the first 120 payments in the amount of $3226.57 and the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the note over the remaining term of the Note in equal monthly payments.* (Exhibit 3)

41.    The federal Truth in Lending disclosure statement provided to plaintiffs at closing disclosed the following:

| APR: | Finance charge | Amount Financed | Total of Payments |
|---|---|---|---|
| 7.953% | $943469.57 | $507,473.43 | $1,450,943.00 |

Payment Schedule:

84 payments @ $3226.57
36 payments @ $3500.00
239 payments @ $4391.32
1 payment @ $4385.64

(Exhibit 4)

42.    The payment schedule disclosed on the Truth in Lending Disclosure Statement does not match the payment schedule set forth in the Promissory Note or the interest only addendum to the Promissory Note.

43.    To date, plaintiffs have failed to receive a Truth in Lending Disclosure Statement which accurately discloses the payment schedule for the transaction which is the subject of this Complaint.

44.    The three day right to cancel the transaction is extended until plaintiffs receive the Truth in Lending disclosures or the expiration of three years whichever is later.

45.    On April 5, 2009, plaintiffs by and through their counsel exercised their extended right to rescind the loan transaction by giving written notice. (Exhibit 5)

46.    By letter dated April 24, 2009, Kathy Priore, Associate Counsel for GMACM, advised that it "would not rescind the Loan transaction at this time." (Exhibit 6)

47.    The payment schedule set forth on the Truth in Lending Disclosure Statement charges plaintiffs more than $100,000.00 in hidden finance charges.

48.    Beginning in the summer of 2008, plaintiffs attempted to negotiate with defendant GMAC for a loan modification by submitting detailed financial documentation.

49.    Plaintiffs were told that they needed to make two consecutive regular mortgage payments before they would be considered for a loan modification.

50.    Plaintiffs spent untold hours on hold on the telephone attempting to contact representatives of defendant GMAC sometimes with success but many times without success. Plaintiffs never spoke to the same representative twice.

50. On or about August 27, 2008, plaintiffs received a letter from defendant GMAC returning their last mortgage payment and informing plaintiffs that they had failed to honor the trial period.

51. In a state of near panic, plaintiff telephoned defendant GMAC and after a long wait on hold plaintiff was told that the representative responsible for processing their request for loan modification had been fired for failing to process loan modifications.

52. Plaintiff was assured by a representative of defendant GMAC that he would place a hold on the foreclosure status and work with them to process the loan modification. Plaintiff was subsequently unable to reach this representative again.

53. On or after September 5, 2008, plaintiffs received an overnight envelope from defendant GMAC regarding a loan modification.

54. Plaintiff learned that they had been approved for a loan modification which modified the interest rate to 5.7500% on a new principal balance of $541,036.08, on a term of 332 months with a maturity date of June 1, 2026.

55. The loan modification also required them to make a lump sum payment of $8051.40 by October 1, 2008 and begin making the modified payments on November 1, 2008.

56. The loan modification reduced plaintiffs' monthly mortgage payment by 4429.99. Plaintiffs were unable to make the lump sum payment required to qualify for the loan modification.

57. Beginning in October, 2008, plaintiffs attempted by and through counsel to negotiate with defendant GMAC.

58. On October 14, 2008, plaintiffs faxed releases of information authorizing defendant GMAC to discuss their account with counsel.

59. Defendant GMAC advised plaintiffs that it would take up to five days for verification of the release of information to post to plaintiffs account and until such time defendant GMAC was not authorized to speak with counsel.

60. On October 20, 2008, plaintiffs through counsel again attempted without success to speak with representatives of defendant GMAC regarding plaintiffs' account.

61. On November 2, 1008, plaintiffs through counsel wrote to defendant GMAC regarding options for a real loan modification. Plaintiffs did not receive a response to this letter.

62. On November 14, 2008, plaintiffs through counsel spoke with defendant GMAC's representative Jay Graves regarding their account. Plaintiffs were advised that the modification had been denied because of the failure to make the lump sum payment.

63. On January 9, 2009, plaintiffs again through counsel wrote to defendant GMAC regarding a loan modification. Plaintiffs did not receive a response to this letter.

63. On February 10, 2009, plaintiffs again through counsel wrote to defendant GMAC regarding their account.

64. On February 20, 2009, defendant GMAC by letter advised plaintiffs' counsel that until she submitted written permission from the plaintiffs, defendant GMAC could not speak with counsel.

## CLAIMS FOR RELIEF

## STATEMENT OF NATURE OF CLAIMS ASSERTED

65. This action is filed, in part, to enjoin the mortgage foreclosure sale ordered in 09 SP 09, Hyde County, on equitable and legal grounds pursuant to N.C. Gen. Stat. §45-21.34. All claims asserted affirmatively by plaintiffs in this action are also asserted, in the alternative, in defense and recoupment against any claim of indebtedness arising from the mortgage loan obligations and transactions that are the subject of this complaint.

## FIRST CLAIM FOR RELIEF
## VIOLATIONS OF TRUTH IN LENDING
## AGAINST DEFENDANTS DEUTSCHE, RESIDENTIAL FUNDING AND GMAC

66. All paragraphs of this complaint are incorporated herein as if fully restated.

67. This consumer credit transaction was subject to the Plaintiffs' right of rescission as described by 15 U.S.C. § 1635 and Regulation Z § 226.23 (12 C.F.R. § 226.23).

68. Defendants Deutsche, Residential Funding and GMAC as purported assignees of First National Bank of Arizona and servicers and subservicers of the purported holder of the Promissory Note are liable to plaintiffs for violations 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b) for failure to timely deliver to the Plaintiffs two copies of the notice of the right to rescind which clearly and conspicuously disclosed the date the rescission period expired.

69. Defendants Deutsche, Residential Funding and GMAC as purported assignees of First National Bank of Arizona and servicers and subservicers of the purported holder of the Promissory Note are liable to plaintiffs for failing to deliver all "material" disclosures required by the Act and Regulation Z, including the following:

a. By failing to properly and accurately disclose the "amount financed," using that term in violation of Regulation Z § 226.18(b) and 15 U.S.C. §1638(a)(2)(A).
b. By failing to clearly and accurately disclose the "finance charge," using that term, in violation of Regulation Z §§ 226.4 and 226.18(d) and 15 U.S.C. §1638(a)(3).

c. By failing to clearly and accurately disclose the "annual percentage rate," using that term, in violation of Regulation Z § 226.18(e) and 15 U.S.C. § 1638(a)(4).

d. By failing to properly disclose the number, amounts, and timing of payments scheduled to repay the obligation, in violation of Regulation Z § 226.18(g) and 15 U.S.C. § 1638(a)(6).

e. By failing to clearly and accurately disclose the "total of payments," using that term, in violation of Regulation Z § 226.18(h) and 15 U.S.C. § 1638(a)(5).33.

70.     These material disclosure violations are apparent from the face of the disclosure statement and other documents assigned pursuant to the requirements of 15 U.S.C. § 1641(a).

71.     Plaintiffs have a continuing right to rescind the transaction until the third business day after receiving both the notice described in paragraph 50 and all "material" disclosures described in paragraph 69, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3), up to three years after consummation of the transaction.

72.     On April 5, 2009, Plaintiffs by and through counsel rescinded the transaction by sending to a notice of rescission addressed to "Holder of Loan # , c/o Ms. Lauren S. Thurmond, Kellam & Pettit, P.A. , 2701 Coltsgate Road, Suite 300, Charlotte, North Carolina 28211.

73.     Counsel for defendants forwarded the plaintiffs' letter of rescission to GMAC.

74.     More than 20 calendar days have passed since the Defendants received copies of the Plaintiff's notice of rescission.

75.     Defendants have failed to take any action necessary or appropriate to reflect the termination of the security interest created under this transaction as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

76.     Defendants have failed to return to plaintiffs any money or property given by the plaintiffs to anyone, including the defendants, as required by 15 U.S.C. §1635(b) and Regulation Z § 226.23(d)(2).

77.     As a result of the aforesaid violations of the Act and Regulation Z, pursuant to 15 U.S.C. §§ 1635(a), 1640(a), and 1641(c), defendants are liable to plaintiffs for:

a. Rescission of this transaction.
b. Termination of any security interest in Plaintiff's property created under the transaction.
c. Return of any money or property given by the Plaintiff to anyone, including the Defendant, in connection with this transaction.
d. Statutory damages of $2000 for the disclosure violations.
e. Statutory damages of $2000 for Defendants' failure to respond properly to Plaintiff's rescission notice.
f. Forfeiture of return of loan proceeds.
g. Actual damages in an amount to be determined at trial.
h. A reasonable attorney fee.

## SECOND CLAIM FOR RELIEF
## USURY

78.     All paragraphs of this complaint are incorporated herein as if fully restated.

79.     With willful and corrupt intent to charge and collect a greater rate of interest than allowed by law, defendants charged and collected interest in excess of the agreed rate or limits set forth in Chapter 24 of the North Carolina General Statutes, including without limitation, the charge, collection and imposition of hidden finance charges contained in the erroneous payment schedule set forth in the Truth in lending disclosure statement.

80.     These acts and practices entitle plaintiffs to the remedies set out in N.C.G.S. § 24-2 *et seq.*, and defendant, Deutsche, as purported holder of the loan and by reason of its joint venture relationship with defendants, Residential Funding and

GMAC is jointly and severally liable with defendants, Residential Funding and GMAC, for all damages pursuant to this Claim.

## THIRD CLAIM FOR RELIEF
## UNFAIR TRADE PRACTICES PURSUANT TO N.C. GEN. STAT. 75-1.1

81.   All paragraphs of this complaint are incorporated herein as if fully restated.

82.   Defendants have engaged in unfair methods of competition in or affecting commerce or unfair or deceptive acts or practices in or affecting commerce in at least but not limited to the following:

   a.   disclosing, charging and collecting usurious rates of interest;

   b.   failing to make material disclosures pursuant to the requirements of the federal Truth in Lending Act;

   c.   failing to take affirmative steps to cancel the plaintiffs' Deed of Trust upon their notice of rescission;

   d.   falsely representing to be the owner and holder of plaintiffs' note and deed of trust;

83.   These acts and omissions proximately damaged plaintiffs, are in and affecting commerce, violate public policy, have the capacity to deceive an ordinary consumer, are unscrupulous, immoral, and oppressive, and constitute unfair and/or deceptive trade practices under  N.C.G.S. § 75-1.1, thereby entitling plaintiffs to three times their actual damages plus a reasonable attorney's fee pursuant to N.C.G.S.§§ 75-16 and 75-16.1.

## FOURTH CLAIM FOR RELIEF
## VIOLATIONS OF NORTH CAROLINA'S PROHIBITED ACTS BY DEBT COLLECTORS PURSUANT TO N.C. GEN. STAT. § 75-50 ET. SEQ.

84.   All paragraphs of this complaint are incorporated herein as if fully restated.

85. Plaintiffs are consumers within the meaning of N.C. Gen. Stat. § 75-50 et seq.

86. Defendants are debt collectors within the meaning of N.C. Gen. Stat. § 75-50 et. seq.

87. Defendants have attempted to collect a debt within the meaning of N.C. Gen. Stat. § 75-50(2).

88. Defendants have engaged in acts of debt collection in violation of N.C. Gen. Stat. § 75-50 et. seq. in at least but not limited to the following:

a. communicating with plaintiffs after the defendants had been notified by the plaintiff's attorney that she represents said plaintiffs;

b. falsely representing the character, extent, or amount of debt against a consumer pursuant to N.C. Gen. Stat. § 75-54(4) to wit: all attempts to collect money from plaintiffs after plaintiffs forwarded their notice of rescission to the noteholder;

c. falsely representing to be owner and holder of the plaintiffs' Promissory Note;

d. attempting to foreclose on plaintiffs' property without legal authority.

89. Defendants are liable to plaintiffs for actual damages and a statutory penalty of $2000.00 for each violation proved at trial and reasonable attorney's fees.

## FIFTH CLAIM FOR RELIEF
## BREACH OF CONTRACT

90. All paragraphs of this complaint are incorporated herein as if fully restated.

91. On or about May 5, 2006, plaintiff executed a Promissory Note in favor of First National Bank of Arizona.

92.     The federal Truth in Lending disclosure statement provided to plaintiffs at closing disclosed the following payment schedule:

84 payments @ $3226.57
36 payments @ $3500.00
239 payments @ $4391.32
1 payment @ $4385.64

93.     The payment schedule set forth in paragraph 74 is a breach of the contract between plaintiff and the original lender.

94.     Plaintiffs are entitled to actual damages and reasonable attorney's fees.

SIXTH CLAIM FOR RELIEF

95.     All paragraphs of this complaint are incorporated herein as if fully restated.

96.     On or about May 5, 2006, plaintiff executed a Promissory Note in favor of First National Bank of Arizona.

97.     Defendant, Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. purports to be the owner and holder of the Promissory Note executed by plaintiff to First National Bank of Arizona by and through various indorsements.

98.     Under N.C. Gen. Stat. § 25-3-301, the holder of a negotiable instrument may enforce payment in his own name.

99.     N. C. Gen. Stat. § 25-1-201(21) defines a holder of an instrument as one who is in possession of an instrument "drawn, issued, or indorsed to him or to his order or to bearer or in blank.

100.    Where a negotiable instrument is made payable to order, one becomes a holder of the instrument when it is properly indorsed and delivered.

101. Mere possession of a note payable to order does not suffice to prove ownership or holder status. . Econo-Travel Motor Hotel Corp. v. Taylor, 301 N.C. 200, 271 S.E.2d 54 (1980).

102. The Allonge under and by which Defendant Deutsche claims to hold is defective in at least the following:

a. on information and belief, the indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact on behalf of First National Bank of Nevada is not duly authorized;

b. the indorsement to Defendant Deutsche is in its representative capacity as trustee not to Defendant Deutsche in its own name. No principal's name appears in the indorsement.

103. Defendant Deutsche is without authority and capacity to enforce the Promissory Note executed by plaintiff to First National Bank of Arizona.

104. The Court should strike the Order allowing foreclosure by sale entered by Judge Blount as void.

105. Defendants are liable to plaintiffs for an amount to be proven at trial.

**PLAINTIFFS' FIRST MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANTS**
TO PRESERVE THE STATUS QUO AND TO PREVENT DELAYING TACTICS BY PROHIBITING THE ASSIGNMENT OF THE MORTGAGE OR SERVICING RIGHTS DURING THE COURSE OF THE LITIGATION

106. All paragraphs of this complaint are incorporated herein as if fully restated.

107. Plaintiffs, pursuant to Rule 65(b) of the North Carolina Rules of Civil Procedure, move this Court for an Order granting a Preliminary Injunction, enjoining these defendants  from conveying or assigning any interest in the mortgage loan that is the subject of this litigation until and unless otherwise allowed by Court Order.

108.   As grounds for said Motion, plaintiffs reallege and incorporate herein by reference the facts of this verified complaint and state  additionally that they will suffer immediate and irreparable harm if said defendants undertake to delay these proceedings by forcing addition or joinder of parties who may subsequently obtain an interest in plaintiffs' loan.   The prospect of prolonged delay by virtue of sale or assignment of interests in this loan is not without precedent by similarly situated lender-defendants and would cause great harm to the plaintiffs.

109.   Plaintiffs show the court that the relief requested is for the purpose of preserving the status quo and that the burden imposed upon the defendants is reasonable and necessary for purposes of preserving the status quo and that the burden is far less than would be suffered by the plaintiffs if the status quo is not maintained during the course of the litigation.

110.   Plaintiffs respectfully request that the Court accept this verified complaint as their affidavit for purposes of this Motion for Preliminary Injunction.

## PLAINTIFFS' SECOND MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANTS
## TO PRESERVE THE STATUS QUO AND TO RESTRAIN A FORECLOSURE SALE DURING THE COURSE OF THIS LITIGATION, WHICH WOULD OTHERWISE CAUSE IRREPARABLE HARM TO PLAINTIFFS.

111.   All paragraphs of this complaint are incorporated herein as if fully restated.

112.   Plaintiffs, through counsel and pursuant to Rule 65 of the North Carolina Rules of Civil Procedure, respectfully move this Court for a Temporary Restraining Order prohibiting defendants  from proceeding toward the foreclosure sale of plaintiffs' home and, in support of this motion, show the following: (i) plaintiffs have shown

through their Complaint and Affidavit, and will show at the hearing of this Motion, claims which have a substantial likelihood of success on the merits; (ii) that plaintiffs will suffer immediate and irreparable harm by virtue of losing title to their home through foreclosure sale before the adverse parties or their counsel can be heard in opposition to this Motion; (iii) that the potential injury to the plaintiffs is of such a nature that compensation alone will not make plaintiffs whole; (iii) that the restraint ordered imposes no undue burden or risk of harm to defendants; (iv) that balancing the risk of harm between the parties favors injunctive relief in favor of plaintiffs; (v) that time is of the essence, and that the bond, if applicable, will adequately protect defendants from any reasonable risk of harm by the restraint ordered while the underlying claims determining the rights of the parties are decided.

113. Plaintiffs' counsel undersigned certifies to the Court the efforts that have been made to give notice of this Motion to the adverse parties and the reasons supporting the claim that notice should not be required as follows:

114. Wherefore plaintiffs respectfully request that a Temporary Restraining Order be entered by the Court prohibiting the defendants from pursuing further proceedings toward the foreclosure sale of plaintiffs' home or otherwise ordering relief as the Court determines appropriate.

### REQUEST FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1. Assume jurisdiction of this case;

2. Declare the security interest in Plaintiff's home void;

3. Rescind the transaction of May 5, 2006;

4.   Order defendants to take all action necessary to terminate any security interest in plaintiffs' property created under the transaction and that the Court declare all such security interests void, including but not limited to the mortgage related to the transaction of May 5, 2006;

5.   Order the return to the plaintiffs of any money or property given by the plaintiffs to anyone, including the defendants, in connection with the transaction;

6.   Enjoin defendants during the pendency of this action, and permanently thereafter, from instituting, prosecuting, or maintaining foreclosure proceedings on the plaintiffs' property, from recording any deeds or mortgages regarding the property or from otherwise taking any steps to deprive plaintiffs of ownership of that property;

7.   Award the plaintiffs statutory damages for the disclosure violations, in the amount of twice the finance charge in connection with this transaction, but not less than $200 or more than $2000 as provided under 15 U.S.C. § 1640(a);

8.   Award the plaintiffs statutory damages for defendants' failure to respond properly to the plaintiffs' rescission notice, in the amount of twice the finance charge in connection with this transaction, but not less than $200 or more than $2000 as provided under 15 U.S.C. § 1640(a);

9.   Order that, because the defendants failed to respond to the plaintiffs' notice of rescission, plaintiffs have no duty to tender, but in the alternative, if tender is required, determine the amount of the tender obligation in light of all of the plaintiffs' claims, and order the defendants to accept tender on reasonable terms and over a reasonable period of time;

10.   Award actual damages in an amount to be established at trial;

11.  Award the plaintiff costs and a reasonable attorney fee as provided under 15 U.S.C. § 1640(a);

12.  Award treble damages pursuant to N.C. Gen. Stat. §75-16;

13.  Order a forfeiture of all interest under the loan transaction;

14.  Award twice the amount of usurious interest pursuant to N.C. Gen. Stat. § 24-2, et. seq.;

15.  Grant plaintiffs injunctive relief as requested above;

16.  Strike the Order of allowing the foreclosure sate;

17.  Award such other and further relief as the Court deems just and proper.

This the 14th day of September 2009.

Katherine S. Parker-Lowe
Attorney for Plaintiffs
NC Bar # 13318
35 Miss Elecia Lane, Suite 101
Post Office Box 730
Ocracoke, North Carolina 27960
252-928-1000
252-928-3037

# VERIFICATION

I, Rex T. Gilbert, Jr., being duly sworn, depose and say the following:

That the contents of the foregoing instrument are true to my own knowledge except matters stated on information and belief and as to those matters I believe them to be true.

This the 12th day of _Sept_, 20 09

_____
Rex T. Gilbert, Jr.

Sworn and subscribed to before me
this 12th day of _Sept_, 20 09.

_____
Notary Public

My Commission Expires:
3-20 14
_____



# BANK OF ARIZONA

1665 W. Alameda Drive
Tempe, AZ 85282
Office (480) 224-8321 Fax 480-224-8522

### ALLONGE TO NOTE

LOAN NUMBER: 5300000843
BORROWER: Gilbert JR
IN THE AMOUNT OF: $525,000.00

PAY TO THE ORDER OF:

First National Bank of
Nevada

WITHOUT RECOURSE BY:

_____
AMY HAWKINS, ASSISTANT VICE PRESIDENT
FIRST NATIONAL BANK OF ARIZONA

Pay to The order Of
RESIDENTIAL FUNDING CORPORATION

Without Recourse
First National Bank of Nevada

By:
Deutsche Bank National Trust
Company, F/K/A Bankers Trust
Company of California, N. A.,
as Custodian as Attorney in
Fact

Christopher Corcoran
Vice President

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

BY _____
Judy Faber, Vice President

# ADJUSTABLE RATE NOTE

### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| May 5, 2006 | MCLEAN | VA |
|---|---|---|
| [Date] | [City] | [State] |

134 West End Road, Ocracoke, NC  27960
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 525,000.00                (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **First National Bank of Arizona**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          7.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **July 1, 2006** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **June 1, 2036**                , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. BOX 62768, PHOENIX, AZ 85085-2768**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments   See Attached Interest-Only Addendum here to and made a part here of.

Each of my initial monthly payments will be in the amount of U.S. $ 4,391.32                . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

5300000843

---

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) -
Single Family - Fannie Mae UNIFORM INSTRUMENT

*VMP*-838N (0210)          Form 3520 1/01

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 4          Initials:

*P* Ex. 2

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of June, 2013 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 13.375 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.375 %, OR LESS THAN 2.750 .

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

5300000843


-838N (0210)

Form 3520 1/01
Initials: RTL

## 7. BORROWER'S FAILURE TO ᴀY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **4.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

5300000843

-838N (0210)

Form 3520 1/01
Initials: _KTG_

**Transfer of the Property a Beneficial Interest in Borrower.** As used this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CAUTION-IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Rex T. Gilbert, JR                  -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                        -Borrower

*[Sign Original Only]*


Case 4:09-cv-00181-D   Document 1-1   Filed 10/13/09   Page 28 of 100

Loan Number: ___5300000843___

Property Address: ___134 West End Road, Ocracoke, NC  27960___

**THIS ADDENDUM** is made this _5th_ day of _May, 2006_, and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed by the undersigned and payable to First National Bank of Arizona (the "Lender").

**THIS ADDENDUM** supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note. None of the other provisions of the Note are changed by this addendum.

3.    **PAYMENTS**

  **(A)    Time and Place of Payments**
          I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. I will pay principal and interest by making payments every month thereafter for the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

          I will make my monthly payments on the first day of each month beginning on July 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on June 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

          I will make my payments at 1165 West Alameda Drive, Tempe, AZ 85282 or at a different place if required by the Note Holder.

  **(B)    Amount of My Initial Monthly Payments**
          Each of my initial monthly payments will be in the amount of U.S. $3,226.57. This payment amount is based on the original principal balance of the Note. This payment amount may change.

4.    **INTEREST RATE AND MONTHLY PAYMENT CHANGES**

  **(C)    Calculation of Changes**

          Before each Change Date, the Note Holder will calculate my new interest rate by adding _two and three-quarters_ percentage point(s) (_2.750%_) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

          During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance. At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

7.    **BORROWER'S FAILURE TO PAY AS REQUIRED**

  **(A)    A Late Charge for Overdue Payments**

          If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be _4.000%_ of my overdue payment of interest during the interest-only period, _4.000%_ of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

Dated: _5/5/06_

Rex T. Gilbert, JR

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:

    First National Bank of Arizona
    1760 Old Meadow Road
    Mc Lean, VA 22102

BORROWERS:

☐ Preliminary   ☒ Final
*DATE:* 05/05/2006
*LOAN NO.:* 5300000843
*Type of Loan:* ARM

ADDRESS:
CITY/STATE/ZIP:
PROPERTY: 134 West End Road Ocracoke NC 27960

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br><br>The dollar amount the credit will cost you. | Amount Financed<br><br>The amount of credit provided to you or on your behalf. | Total of Payments<br><br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.953 % | $ 943,469.57 | $ 507,473.43 | $ 1,450,943.00 |

**PAYMENT SCHEDULE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE<br>MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE<br>MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 84 | $3,226.57 | 07/01/2006 | | | |
| 36 | $3,500.00 | 07/01/2013 | | | |
| 239 | $4,391.32 | 07/01/2016 | | | |
| 1 | $4,385.64 | 06/01/2036 | | | |

**DEMAND FEATURE:**   ☒ This loan does not have a Demand Feature.     ☐ This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:**
☒ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

# KATHERINE S. PARKER-LOWE

ATTORNEY AT LAW
2 BEACH LANE
OCRACOKE, NORTH CAROLINA 27960

MAILING ADDRESS
POST OFFICE BOX 730
OCRACOKE, NC 27960
E-MAIL: katherine@parker-lowe.net

TELEPHONE
(252) 928-1000
FACSIMILE
(252) 928-3037

April 5, 2009

Holder of Loan # 0810012713
c/o Ms. Lauren S. Thurmond
Kellam & Pettit, P.A.
2701 Coltsgate Road
Suite 300
Charlotte, North Carolina 28211

Re: In the Matter of the Foreclosure....Gilbert
Hyde County File 09-SP-9
Rex T. Gilbert, Jr.
134 West End Road
Post Office Box 754
Ocracoke, North Carolina 27960

Dear Ms. Thurmond:

As you are aware, I represent Mr. Gilbert concerning the loan transaction which he entered into with First National Bank of Arizona on May 5, 2006. I have been authorized by my clients to rescind this transaction and hereby exercise that right pursuant to the Federal Truth in Lending Act, 15 U.S.C. § 1635, Regulation Z § 226.23.

The disclosure statement failed to provide all the required material disclosures correctly, including, but not limited to:

    (a)    The disclosed payment schedule does not match the note;
    (b)    The stated APR is more than one-eighth of one-percent off;
    (c)    The total of payments is not correct;
    (d)    The total of payments results in a higher APR than the disclosed APR
    (e)    The disclosures do not match the note or the addendum to the note.

The security interest is void upon our rescission. See 15 U.S.C. § 1635; Regulation Z § 226.23. Pursuant to the Regulation, you have twenty days after receipt of this notice of rescission to return to my client all monies paid and to take action necessary or appropriate to reflect termination of the security interest.

We are prepared to discuss a tender obligation, should it arise, and satisfactory ways in which my client may meet this obligation. Please be advised that if you do not cancel

the security interest and return all consideration paid by my client within 20 days of receipt of this letter, you will be responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).

Please send me a copy of my client's payment history and other documents showing the loan disbursements, loan charges, payments made, and current principal balance due.

Sincerely,

Katherine S. Parker-Lowe

KPL/mpc

cc: Mr. and Mrs. Rex T. Gilbert, Jr.

**GMAC ResCap**

April 24, 2009

Katherine Parker-Lowe
Attorney at Law
2 Beach Lane
Ocracoke, NC 27960

Re:  Rex Gilbert, Jr.
     Loan number #0810012713 ("Loan")

Dear Ms. Parker-Lowe:

We are writing in response to your correspondence to GMAC Mortgage, LLC requesting rescission of the loan transaction your client entered into with First National Bank of Arizona on May 5, 2006.

We have reviewed your client's loan file and find no basis to conclude that there were any material disclosure errors that would give rise to an extended right of rescission.

Consequently, we will not rescind the Loan transaction at this time.

If you have any documents or further information that sets forth the basis of the demand, please contact me at the address below.

Sincerely,

Kathy Priore
Associate Counsel

cc: Lauren Thurmond, Kellam & Pettit, PA

GMAC ResCap
One Meridian Crossings  Suite 100  Richfield, MN 55423
952.857.7000  gmacrescap.com



LENDER: First National Bank of Ariz.

DATE 5/5/

LOAN NO. 5300. J843

TYPE Conventional

BORROWERS/OWNERS Rex T. Gilbert, JR

ADDRESS 134 West End Road
CITY/STATE/ZIP Ocracoke, NC 27960
PROPERTY 134 West End Road, Ocracoke, NC 27960

## YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1) The date of the transaction, which is
or
(2) The date you received your Truth In Lending disclosures;
or
(3) The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**First National Bank of Arizona**
**MS AZ-4003-078**
**1665 W. Alameda Drive**          Or Fax to: **(602) 636-7096**
**Tempe, AZ 85282-3200**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of
(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

### I WISH TO CANCEL

_____          _____
CONSUMER'S SIGNATURE                              DATE

Each of the borrowers/owners in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective as to all borrowers/owners.

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL.

X _____   5/5/06   X _____
BORROWER/OWNER Rex T. Gilbert, JR        DATE      BORROWER/OWNER                    DATE

X _____   5/5/06   X _____
BORROWER/OWNER Daniela L. Gilbert        DATE      BORROWER/OWNER                    DATE

─────────── **CONFIRMATION CERTIFICATE** ───────────
**DO NOT SIGN UNTIL THREE BUSINESS DAYS HAVE ELAPSED**

**Three business days have elapsed** since the undersigned have received two copies of this document. Each of the undersigned hereby certify and warrant that they have not exercised any right which they may have to rescind the transaction, that they do not desire to do so, and that they ratify and confirm the transaction in all respects.

_____   _____   _____   _____
BORROWER/OWNER Rex T. Gilbert, JR    DATE      BORROWER/OWNER                    DATE

_____   _____   _____   _____
BORROWER/OWNER Daniela L. Gilbert    DATE      BORROWER/OWNER                    DATE

5300000843

 -66 (0305).01
VMP Mortgage Solutions (800)521-7291          10/00

PEX 7

# STATE OF NORTH CAROLINA

HYDE County

File No. 09 CVS 70

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| Name Of Plaintiff<br>REX T. GILBERT, JR. AND DANIELA L. GILBERT | **CIVIL SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS** |
| Address<br>C/O POST OFFICE BOX 730 | |
| City, State, Zip<br>OCRACOKE, NC 27960 | G.S. 1A-1, Rules 3, 4 |

**VERSUS**

| | |
|---|---|
| Name Of Defendant(s)<br>DEUTSCHE BANK TRUST COMPANY AMERICAS, As Trustee for, RESIDENTIAL ACCREDIT LOANS, INC., DAVID A.SIMPSON, P.C., Substitute Trustee, RESIDENTIAL FUNDING, LLC, and GMAC MORTGAGE, LLC, ⊞ | Date Original Summons Issued<br><br>Date(s) Subsequent Summons(es) Issued |

## To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1<br>RESIDENTIAL FUNDING, LLC<br>C/O KELLAM & PETTIT, P.A. AND JOHN T. BENJAMIN<br>AND DAVID A. SIMPSON, P.A. | Name And Address Of Defendant 2<br>GMAC MORTGAGE, LLC<br>C/O KELLAM & PETTIT, P.A. AND JOHN T. BENJAMIN<br>AND DAVID A. SIMPSON, P.A. |
|---|---|

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| | | |
|---|---|---|
| Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)<br>Katherine S. Parker-Lowe<br>35 Miss Elecia Lane, Suite 101<br>Post Office Box 730<br>Ocracoke, NC 27960 | Date Issued<br>9-14-09 | Time<br>10:15 ☒ AM ☐ PM |
| | Signature<br>*Maria A. Slade* | |
| | ☒ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| | | |
|---|---|---|
| ☐ ENDORSEMENT<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Date Of Endorsement | Time<br>☐ AM ☐ PM |
| | Signature | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 10/01
© 2001 Administrative Office of the Courts

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (Type Or Print) |
| | |
| Date Of Return | County Of Sheriff |
| | |

# STATE OF NORTH CAROLINA

HYDE ___ County

File No. 09CVS 70

In The General Court Of Justice
☐ District ☒ Superior Court Division

Name Of Plaintiff
REX T. GILBERT, JR. AND DANIELA L. GILBERT

Address
C/O POST OFFICE BOX 730

City, State, Zip
OCRACOKE, NC 27960

**VERSUS**

Name Of Defendant(s)
DEUTSCHE BANK TRUST COMPANY AMERICAS, As Trustee for, RESIDENTIAL ACCREDIT LOANS, INC., DAVID A. SIMPSON, P.C., Substitute Trustee, RESIDENTIAL FUNDING, LLC, and GMAC MORTGAGE, LLC.

## CIVIL SUMMONS
☐ ALIAS AND PLURIES SUMMONS

G.S. 1A-1, Rules 3, 4

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

### To Each Of The Defendant(s) Named Below:

Name And Address Of Defendant 1
DEUTSCHE BANK TRUST COMPANY AMERICAS,
AS TRUSTEE FOR RESIDENTIAL ACCREDIT LOANS, INC.
C/O KELLAM & PETTIT, P.A. AND JOHN T. BENJAMIN

Name And Address Of Defendant 2
DAVID A. SIMPSON, P.A.
7804 Fairview Road, #225
Charlotte, NC 28226

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)
Katherine S. Parker-Lowe
35 Miss Elecia Lane, Suite 101
Post Office Box 730
Ocracoke, NC 27960

Date Issued
9-14-09

Time
10:15    ☒ AM    ☐ PM

Signature
Maria H Slade
☒ Deputy CSC    ☐ Assistant CSC    ☐ Clerk Of Superior Court

☐ ENDORSEMENT
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

Date Of Endorsement

Time
☐ AM    ☐ PM

Signature
☐ Deputy CSC    ☐ Assistant CSC    ☐ Clerk Of Superior Court

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev 10/01
© 2001 Administrative Office of the Courts

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (Type Or Print) |
| | |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 10/01
© 2001 Administrative Office of the Courts

STATE OF NORTH CAROLINA
COUNTY OF HYDE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 70

REX T. GILBERT, JR. and
DANIELA L. GILBERT,
          Plaintiffs,

v.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, *As Trustee for,*
RESIDENTIAL ACCREDIT LOANS, INC.,
DAVID A. SIMPSON, P.C., Substitute Trustee,
RESIDENTIAL FUNDING, LLC, and
GMAC MORTGAGE, LLC,
          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)



FILED
10:15 AM
SEP 1 4 2009
CLERK SUPERIOR COURT
HYDE COUNTY
Deputy

## AFFIDAVIT OF KEITH PARKER-LOWE

I, Keith Parker-Lowe, being first duly sworn, aver and say as follows:

1.    I am President and CEO of KPL, Inc. a software development company and system integrator for county governments in the mid-Atlantic located and doing business in Ocracoke, North Carolina.

2.    I completed training for the business planning department of AETNA Life and Casualty. This course of study included calculations, financial yields, actuarial tables, compound interest tables, statistics, and financial plotting and modeling.

3.    I completed training for and obtained a Securities and Exchange Commission Brokers License

4.    I am a licensed Realtor in North Carolina. The course study included not only the study of financial calculations for mortgage loans and installment loans but the

actual preparation of the financial calculations required for making these loans and making accurate disclosures to consumers on these loans.

5.   I completed Canon's computer programming school in 1973.

6.   I wrote the financial programs and several operating manuals for Sharp Electronics on installment loan calculations and amortization schedules.

7.   I created computer programs for installment loan calculations to meet the compliance requirements of Truth in Lending for various banks and lending institutions including The Federal Land Bank, PCA and Southern National Bank and Bank of Montgomery, Bank of Raeford and NCNB.

8.   I created computer programs to calculate installment loans, amortization schedules, mortgage loans, APR's, and special compound interest calculations for Canon, Sharp and the Federal Reserve.

9.   I have created and used various programs to review and check the finance charges against the stated APR, terms, interest, payments and repayment schedule.

10.   I worked closely with the Federal Reserve to implement the Federal Truth in Lending Act and Regulation Z to assist many banks in meeting compliance requirements.

11.   Over the last several years I have gained experience in drafting and understanding compliance issues for profit sharing and various investment vehicles. This experience has proven invaluable in checking and verifying financial accounts of all types.

12.    I previously testified on behalf of Ms. Parker-Lowe in <u>Irene Britt v. Thomas</u> <u>Jones,</u> 123 N.CApp. 108, 472 S.E.2d 199 (1996). This case was originally filed in Hertford County, North Carolina.

13.    Based upon my testimony, the Court of Appeals upheld the application of monthly payments to interest first and principal second.

14.    Since February 1990, I have reviewed numerous loan agreements, promissory notes, schedules of payments on notes, mortgages, Truth in Lending Disclosure Statements (TIL), and related documents related to actions pending in the North Carolina trial courts and before the U.S. Bankruptcy Court for the Eastern District of North Carolina.

15.    I have reviewed ledgers, amortization schedules, repayment schedules, deeds, deeds of trust, land surveys, paper documents, and electronic records for compliance with Truth in Lending and the state usury laws.

16.    At Ms. Parker-Lowe's request, I have familiarized myself with the Gilberts' promissory note, interest only addendum to the promissory note and the federal Truth in Lending disclosure statement.

17.    At Ms. Parker-Lowe's request, I compared the payment schedules set forth in the promissory note, the addendum to the promissory note and the one set forth in the federal Truth in Lending disclosure statement.

18.    The payment schedule set forth in the Truth in Lending disclosure statement does not match either the promissory note or the interest only addendum to the promissory note.

19.    After reviewing the documents and determining that the TIL payment schedule did not match either the promissory note or the interest only addendum to the promissory note, I examined the other Truth in Lending mandated disclosures and calculated the APR.

20.    The APR using the information disclosed in the TIL results in an APR of 9% not the 7.953% as disclosed to the Gilberts.

21.    The Gilberts could have had a repayment schedule with 240 equal successive installments after the interest only period of approximately $4189.33. The APR would have been incorrect in this case also.

22.    The Truth in Lending disclosure statement payment schedule results in an additional $100,000.00+ interest.

23.    In the Interest-Only Addendum to the Gilbert promissory note, Loan 5300000843, in paragraph 4.(C), the Addendum states: After the end of the Interest-only Period, my payment amount will not be reduced due to voluntary prepayments. This statement results in a contradiction:  voluntary prepayments after the interest only period will either not be allowed or will not reduce the amount of principal. In my opinion, this is contrary to existing law.

24.    Whereas in the Fannie Mae Uniform Instrument note allows for voluntary prepayment by stating that the maturity date will be accelerated as follows: "However, if the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest as well as during the time that my payments consist of principal and interest. If the partial Prepayment is made during the

period when my payments consist of principal and interest, the amount of my monthly payment will not decrease; however, the principal and interest required under this Note will be paid prior to the Maturity Date.

This the _15_ day of September 2009.

_____
Keith Parker-Lowe

Hyde County, North Carolina
Sworn to and subscribed before me this day by _Keith  Parker-Lowe_

Date: _September 15, 2009_

_____
Notary Public Signature
Notary's printed or typed name: _Laura Dunlow Belch_
(SEAL)
My Commission Expires: _10·13·2013_

STATE OF NORTH CAROLINA
COUNTY OF HYDE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS _10_

REX T. GILBERT, JR. and
DANIELA L. GILBERT,
                    Plaintiffs,

v.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, *As Trustee for*,
RESIDENTIAL ACCREDIT LOANS, INC,
DAVID A. SIMPSON, P.C., Substitute Trustee,
RESIDENTIAL FUNDING, LLC, and
GMAC MORTGAGE, LLC,
                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

## RESTRAINING ORDER

This cause was heard by the undersigned judge upon the application of

plaintiffs for a restraining order. It appears that this Court should grant a Temporary

Restraining Order prohibiting defendants from proceeding toward the foreclosure sale of

plaintiffs' home; plaintiff have shown the following: (i) plaintiffs have shown through their

Complaint and Affidavit, and will show at the hearing of this Motion, claims which have a

substantial likelihood of success on the merits; (ii) that plaintiffs will suffer immediate

and irreparable harm by virtue of losing title to their home through foreclosure sale

before the adverse parties or their counsel can be heard in opposition to this Motion; (iii)

that the potential injury to the plaintiffs is of such a nature that compensation alone will

not make plaintiffs whole; (iii) that the restraint ordered imposes no undue burden or risk

of harm to defendants; (iv) that balancing the risk of harm between the parties favors

injunctive relief in favor of plaintiffs; (v) that time is of the essence, and that the bond, if

applicable, will adequately protect defendants from any reasonable risk of harm by the

restraint ordered while the underlying claims determining the rights of the parties are decided.

Further, the court should enjoin these defendants from conveying or assigning any interest in the mortgage loan that is the subject of this litigation until and unless otherwise allowed by Court Order.

It further appears that plaintiff has made bond, with sufficient surety, in the amount of $~~250.00~~ 3,000.00 Dollars to secure the defendant from damages for the restraining order prayed.

IT IS THEREFORE ORDERED that the defendant be and hereby are restrained from proceeding toward the foreclosure sale of plaintiffs' home and from conveying or assigning any interest in the mortgage loan.

IT IS FURTHER ORDERED that a copy of this Restraining Order be served upon the defendants in the manner now provided for service of process.

This restraining order shall expire ~~within~~ on _Sept. 25, 2009_ unless extended by further order of court or by consent.

This the 14 day of September 2009. at 2:29pm

_Wayland J Sermons Jr._

The Honorable Wayland J. Sermons, Jr.
Resident Superior Court Judge Presiding

STATE OF NORTH CAROLINA
COUNTY OF HYDE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 70___

REX T. GILBERT, JR. and
DANIELA L. GILBERT,
                 Plaintiffs,

v.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, *As Trustee for,*
RESIDENTIAL ACCREDIT LOANS, INC,
DAVID A. SIMPSON, P.C., Substitute Trustee,
RESIDENTIAL FUNDING, LLC, and
GMAC MORTGAGE, LLC,
                 Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

### NOTICE OF HEARING

Please be notified that a hearing will be held at the Pitt County Courthouse, Greenville, North Carolina on Thursday, September 24, 2009 at 2:00 p.m., or as soon thereafter as the matter may be reached by the Court, upon the Plaintiff's Motion for Preliminary Injunction and return on Temporary Restraining Order entered on September 14, 2009. You are notified to attend and present evidence to the Court. Your failure to attend this hearing may result in an adverse ruling by the Court in your absence.

This the 10th day of September, 2009.

*Kath. S. Parker-Lowe*

Katherine S. Parker-Lowe
Attorney for Plaintiffs
NC State Bar #13318
35 Miss Elecia Lane, Suite 101
Post Office Box 730
Ocracoke, North Carolina 27960
252-928-1000
252-928-3037 fax

# CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause by:

____ Hand delivering a copy hereof to each said party or his/her attorney.

_X_ Depositing a copy hereof, postage prepaid in the United States Mail, properly addressed as disclosed by the pleadings on record herein to each said party or his/her attorney.

_X_ Telefacsimile transmittal, which was received by 5:00 p.m. Eastern time, as evidenced by the attached telefacsimile receipt confirmation to each said party or his/her attorney.

Ms. Lauren S. Thurmond
Kellam & Pettit, P.A.
2701 Coltsgate Road
Suite 300
Charlotte, North Carolina 28211

David A. Simpson
Kellam Simpson Loflin & Poe
2901 Coltsgate Road, Suite 102
Charlotte, North Carolina 28211

John T. Benjamin, Jr.
712 West North Street
Raleigh, North Carolina 27602

This the 10th day of September, 2009.

Katherine S. Parker-Lowe

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
COUNTY OF HYDE               SUPERIOR COURT DIVISION
                                 BEFORE THE CLERK
                                   09 SP 9

|  |  |
|---|---|
| IN THE MATTER OF THE FORECLOSURE by | ) |
| David A. Simpson, P.C., Substitute Trustee, of | ) |
| Deed of Trust Executed by Rex T. Gilbert, Jr. | ) |
| and Daniela L. Gilbert, Husband and Wife and | ) |
| recorded on May 10, 2006, in Book 219 at Page | ) |
| 53 of the Hyde County Public Registry | ) |
|  | ) |

### REVISED CERTIFICATE OF SERVICE

    I, Katherine S. Parker-Lowe, Attorney at Law, attorney for Plaintiffs, do hereby certify that I have served a copy of this Notice of Appeal to the North Carolina Court of Appeals by U.S. Mail in the manner prescribed by Rule 5 of the North Carolina Rules of Civil Procedure upon opposing counsel as follows:

Ms. Lauren S. Thurmond
Kellam & Pettit, P.A.
2701 Coltsgate Road
Suite 300
Charlotte, North Carolina 28211

David A. Simpson
Kellam Simpson Loflin & Poe
2901 Coltsgate Road, Suite 102
Charlotte, North Carolina 28211

John T. Benjamin, Jr.
712 West North Street
Raleigh, North Carolina 27602

This the 23th day of Sept , 2009.

                            _Katherine A. Parker-Lowe_
                            Katherine S. Parker-Lowe

STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE
COUNTY OF HYDE            SUPERIOR COURT DIVISION
                                BEFORE THE CLERK
                                  09 SP 9

| | |
|---|---|
| IN THE MATTER OF THE FORECLOSURE by | ) |
| David A. Simpson, P.C., Substitute Trustee, of | ) |
| Deed of Trust Executed by Rex T. Gilbert, Jr. | ) |
| and Daniela L. Gilbert, Husband and Wife and | ) |
| recorded on May 10, 2006, in Book 219 at Page | ) |
| 53 of the Hyde County Public Registry | ) |
| | ) |

NOTICE OF APPEAL
TO THE HONORABLE COURT OF APPEALS OF NORTH CAROLINA
*****************************************

NOW COME Respondents, Rex T. Gilbert, Jr. and Daniela L. Gilbert, pursuant to

N.C. Gen. Stat. § 1-279.1 and Rule 3 of the North Carolina Rules of Appellate

Procedure and give notice of appeal to the Court of Appeals of North Carolina of

the order in this action which was entered on August 18, 2009, allowing

Foreclosure Sale.

Respectfully submitted this the 16th day of September 2009.

_Katherine S. Parker-Lowe_

Katherine S. Parker-Lowe
Attorney for Respondents
NC State Bar #13318
Post Office Box 730
Ocracoke, North Carolina 27960
252-928-1000
katherine@parker-lowe.net

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
COUNTY OF HYDE                        SUPERIOR COURT DIVISION
                                                    09 CVS 70

REX T. GILBERT, JR. and                    )
DANIELA L. GILBERT,                        )
                         Plaintiffs,            )
                                                    )
v.                                                  )
                                                    )
DEUTSCHE BANK TRUST COMPANY      )
AMERICAS, *As Trustee for*,              )
RESIDENTIAL ACCREDIT LOANS, INC,    )
DAVID A. SIMPSON, P.C., Substitute Trustee, )
RESIDENTIAL FUNDING, LLC, and        )
GMAC MORTGAGE, LLC,                      )
                         Defendants.           )
_____ )

## NOTICE OF HEARING

Please be notified that a hearing will be held at the Pitt County Courthouse, in

Superior Court Room #1, Greenville, North Carolina, on Thursday, October 1, 2009 at

11:00 a.m., or as soon thereafter as the matter may be reached by the Court, upon the

Plaintiffs' Motion for Preliminary Injunction and return on Temporary Restraining Order

entered on September 14, 2009. You are notified to attend and present evidence to the

Court. Your failure to attend this hearing may result in an adverse ruling by the Court in

your absence.

This the 15th day of September, 2009.

                                        *Katherine S. Parker-Lowe*
                                        _____
                                        Katherine S. Parker-Lowe
                                        Attorney for Plaintiffs
                                        NC State Bar #13318
                                        35 Miss Elecia Lane, Suite 101
                                        Post Office Box 730
                                        Ocracoke, North Carolina 27960
                                        252-928-1000
                                        252-928-3037 fax

STATE OF NORTH CAROLINA
COUNTY OF HYDE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 70

REX T. GILBERT, JR. and
DANIELA L. GILBERT,
            Plaintiffs,

v.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, *As Trustee for,*
RESIDENTIAL ACCREDIT LOANS, INC,
DAVID A. SIMPSON, P.C., Substitute Trustee,
RESIDENTIAL FUNDING, LLC, and
GMAC MORTGAGE, LLC,
            Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

## CERTIFICATE OF SERVICE

I, Katherine S. Parker-Lowe, Attorney at Law, attorney for Plaintiffs, do hereby certify that I have served a copy of this Notice of Hearing by facsimile, electronic transmission and U.S. Mail in the manner prescribed by Rule 5 of the North Carolina Rules of Civil Procedure upon opposing counsel as follows:

John T. Benjamin, Jr.
712 West North Street
Raleigh, North Carolina 27602

This the 25th day of ____September____, 2009

                         *Katherine S. Parker-Lowe*
                         Katherine S. Parker-Lowe

NORTH CAROLINA

HYDE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 70

REX T. GILBERT, JR. AND )
DANIELA L. GILBERT, )
)
    PLAINTIFFS, )
)
v. )
)
DEUTSCHE BANK TRUST COMPANY )
AMERICAS, AS TRUSTEE FOR )
RESIDENTIAL ACCREDIT LOANS, )
INC. DAVID A SIMPSON, P.C., )
SUBSTITUTE TRUSTEE, )
RESIDENTIAL FUNDING, LLC )
AND GMAC MORTGAGE, LLC )
    DEFENDANTS. )
)
)
)

**AFFIDAVIT**

       Scott Zeitz, first being duly sworn, deposes and says as follows:

    1.  I am over the age of 21 and competent to testify as to all matters contained in this affidavit.

    2.  I have personal knowledge of all matters contained in this affidavit.

    3.  I work for GMAC Mortgage, LLC (herein "GMAC") in the capacity as Litigation Analyst.  GMAC is the current sub-servicer of the note and deed of trust at issue in this matter. Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 (herein "Deutsche") is the

current owner and holder of the note and deed of trust at issue in this matter.

4.    In the course of my day-to-day duties, I work with documents that relate to account histories and account balances of particular loans.  I am familiar with the account of Rex T. Gilbert, Jr. (herein collectively the "Borrower" or "Gilbert") which has a loan number of 810012713 (herein "Mortgage Loan Account").

5.    On May 5, 2006 Gilbert borrowed $525,000.00 to re-finance the lien on certain property located in Hyde County, North Carolina at 134 West End Road, Ocracoke, NC 27960.

6.    As part of this transaction the Borrower signed a note Herein "Note").  A true and accurate copy of the note is attached hereto as **EXHIBIT 1**.

7.    On May 5, 2006 the Borrower signed an addendum to the Note.  The addendum supersedes sections 3(A), 3(B), 4(c), and 7(A) of the Note.  A true and accurate copy of the addendum to the Note is attached and incorporated hereto as **EXHIBIT 2**.

8.    The addendum to the Note contains a provision in Paragraph 3(A) entitled "Time and Place of Payments" which reads in pertinent part:

> I will pay interest by making payments every month for the first 120 months in the amount sufficient to pay interest as it accrues.  I will pay principal and interest by making payments every month thereafter for the next 240 months in an amount sufficient to fully amortize the outstanding

principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

I will make my monthly payments on the 1st day of each month beginning on July 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on June 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date"...

9.     The addendum to the Note also contains a provision in Paragraph 3(B) entitled "Amount of My Initial Monthly Payments" which reads:

Each of my initial monthly payments will be in the amount of U.S. $3226.57. This payment amount is based on the original principal balance of the Note. This payment amount may change.

10.     The Note contains a provision in Paragraph 3(c) entitled "Monthly Payment Changes" which reads:

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

11.     The Note is an adjustable rate note. Paragraph 4(A) of the Note provides that the interest rate may change on June 1, 2013 (herein "first change date"), which would be the first possible change date. If the interest rate does change then the amount for each monthly payment will change accordingly.

12. There is a provision in Paragraph 7(B) entitled "Default" which reads:

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

13. The Borrower and his wife, Daniela L. Gilbert, also signed a deed of trust on May 5, 2006, that secured the loan amount of $525,000.00 on the subject property and lists First National Bank of Arizona as the Lender (herein "Deed of Trust"). This Deed of Trust was recorded on May 10, 2006 in Book 219, Page 53 in the Hyde County Register of Deeds. A true and accurate copy of the Deed of Trust is attached and incorporated hereto as **EXHIBIT 3.**

14. First National Bank of Arizona sold, assigned and transferred all of its right, title and interest in and to the Note and Deed of Trust to First National Bank of Nevada. This is reflected on the Allonge to the Note, a true and accurate copy of which is attached and incorporated hereto as **EXHIBIT 4.**

15. First National Bank of Nevada sold, assigned and transferred all of its right, title and interest in and to the Note and Deed of Trust to Residential Funding Corporation. This is reflected on the Allonge to the Note, a true and accurate copy of which is attached and incorporated hereto as **EXHIBIT 4.**

16. Residential Funding Corporation sold, assigned and transferred all of its right, title and interest in and to the

Note and Deed of Trust to Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6. This is reflected on the Allonge to the Note, a true and accurate copy of which is attached and incorporated hereto as **EXHIBIT 4**.

17. Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 is the current owner and holder of the Note and Deed of Trust. It currently has possession of the original Note and has provided such to its counsel. The original Note will be available at the Preliminary Injunction Hearing in this matter for the Court's inspection and the Borrower's inspection.

18. Deutsche purchased this loan from the previous owner and holder of the Note and Deed of Trust, Residential Funding Corporation.

19. The origination file for the Mortgage Loan Account contained a "Truth in Lending Disclosure Statement." A true and accurate copy of the "Truth in Lending Disclosure Statement" is attached and incorporated hereto as **EXHIBIT 5**.

20. The origination file for the Mortgage Loan Account contained a "Notice of Right to Cancel." A true and accurate copy of the "Notice of Right to Cancel" is attached and incorporated hereto as **EXHIBIT 6**.

21. The "Notice of Right to Cancel" attached as **EXHIBIT 6** has a provision within it that states:

> The undersigned each acknowledge receipt of two copies of NOTICE OF RIGHT TO CANCEL

22. The origination file for the Mortgage Loan Account contained a "Variable Rate Mortgage Program Disclosure." A true and accurate copy of the "Variable Rate Mortgage Program Disclosure" is attached and incorporated hereto as **EXHIBIT 7**.

23. The origination file for the Mortgage Loan Account contained a "HUD-1 Settlement Statement." A true and accurate copy of the "HUD-1 Settlement Statement" is attached hereto as **EXHIBIT 8**.

24. The origination file for the Mortgage Loan Account contained a "First Payment Letter." A true and accurate copy of the "First Payment Letter" is attached and incorporated hereto as **EXHIBIT 9**

25. The Borrowers are currently in the "interest only" period of their note.

26. The amount of their interest only payments had not yet changed.

27. They are currently required to make monthly interest only payments of $3226.57.

28.   They are required to make one hundred and twenty (120) interest only payments.  Payment eight-five (85) will be due on or after the First Change Date.

29.   Payment eight-five (85) will be either higher or lower depending on the interest rate change on the First Change Date.

30.   I have reviewed the business records of the Mortgage Loan Account and determined that there has been a default in the payments required under the Note and Deed of Trust.   The last payment prior to acceleration of the amount due under the Mortgage Loan Account was received and accepted on or about July 9, 2008.   This payment was applied to the monthly interest payment amount of Three Thousand Two Hundred Twenty-Six Dollars and Fifty-Seven cents ($3,226.57) that was due on April 1, 2008. I have attached the Mortgage Loan Account History showing how payments were made and applied as **EXHIBIT 10**.

31.   Further affiant sayeth not.

This the 22__ day of September, 2009

_____
Scott Zett

Sworn to and subscribed before
me this the 22 day of _September_ , 2009.

_____
Notary Public
My commission expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Aixo M. Torres, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Aug. 3, 2010
Member, Pennsylvania Association of Notaries

CERTIFICATE OF SERVICE

I, John T. Benjamin, Jr., of The Law Office of John T. Benjamin, Jr., P.A., attorney for Deutsche Bank Trust Company Americas as Trustee for Residential Credit Loans, Inc, Residential Funding, LLC and GMAC Mortgage, LLC do hereby certify that I served a copy of the foregoing document upon the other parties in this action by hand delivery on Thursday, September 24, 2009 as follows:

> Katherine S. Parker-Lowe
> Attorney at Law
> 35 Miss Elecia Lane, Ste. 101
> Post Office Box 730
> Ocracoke, North Carolina 27960

This the 25th day of September, 2009.

_____
John T. Benjamin, Jr.
*Attorney for Deutsche Bank Trust Company,*
*Residential Funding, LLC and*
*GMAC Mortgage, LLC*

# ADJUSTABLE RATE NOTE

(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

| May 5, 2006 | MCLEAN | VA |
|:---:|:---:|:---:|
| [Date] | [City] | [State] |

134 West End Road, Ocracoke, NC  27960
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 523,000.00                (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **First National Bank of Arizona**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of               7.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on July 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on June 1, 2036             , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 62768, PHOENIX, AZ 85005-2768

or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments   See Attached Interest-Only Addendum here to and made a part here of.

Each of my initial monthly payments will be in the amount of U.S. $ 4,391.32                . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

5300000843

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) -
Single Family - Fannie Mae UNIFORM INSTRUMENT

838N (0310)          Form 3520 1/01

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 4                    Initials:



EXHIBIT
1

4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may change on the first day of June, 2013                , and on that day every 6th         month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters                      percentage points (                     2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than             13.375 % or less than          2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one                    percentage point(s) (          1.000 %) from the rate of interest I have been paying for the preceding 6          months. My interest rate will never be greater than         13.375 %, OR LESS THAN 2.750 .

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

5300000843

VMP®-838N (0210)                    Page 2 of 4                    Form 3520 1/01
Initials: R.T.L

7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

5300000843

VMP-838N (0210)
Page 3 of 4
Form 3520 1/01
Initials: KTG

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**CAUTION-IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)                    _____ (Seal)
Rex T. Gilbert, JR        -Borrower                                            -Borrower


_____ (Seal)                    _____ (Seal)
                          -Borrower                                            -Borrower


_____ (Seal)                    _____ (Seal)
                          -Borrower                                            -Borrower


_____ (Seal)                    _____ (Seal)
                          -Borrower                                            -Borrower


*[Sign Original Only]*

5300000843

83BN (0210)                        Page 4 of 4                        Form 3520 1/01



## BANK OF ARIZONA

1451 W. Alameda Drive
Tempe, AZ 85232
Office (480) 224-8521 Fax 480-224-8522

### ALLONGE TO NOTE

LOAN NUMBER: 5300000843
BORROWER: Gilbert JR
IN THE AMOUNT OF: $525,000.00

PAY TO THE ORDER OF:

First National Bank of
Nevada

WITHOUT RECOURSE BY:

_____
AMY HAWKINS, ASSISTANT VICE PRESIDENT
FIRST NATIONAL BANK OF ARIZONA

Pay to The order Of
RESIDENTIAL FUNDING CORPORATION

Without Recourse
First National Bank of Nevada

By:_____
Deutsche Bank National Trust
Company, f/k/a Bankers Trust
Company of California, N. A.
as Custodian as Attorney In
Fact

Christopher Corcoran
Vice President

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

BY _____
Judy Faber, Vice President

Loan Number: 1300000842

Property Address: 414 West End Road, Conecka, NC 37662

THIS ADDENDUM is made this 5th day of May, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed by the undersigned and payable to First National Bank of Arizona (the "Lender").

THIS ADDENDUM supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note. None of the other provisions of the Note are changed by this addendum.

3. PAYMENTS

(A) Time and Place of Payments

I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. I will pay principal and interest by making payments every month thereafter for the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

I will make my monthly payments on the first day of each month beginning on July 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on June 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my payments at 1165 West Alameda Drive, Tempe, AZ 85282 or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $3,226.57. This payment amount is based on the original principal balance of the Note. This payment amount may change.

4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage point(s) (2.750%) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance. At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) A Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 4.000% of my overdue payment of interest during the interest-only period, 4.000% of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

Dated: 5/5/06

Rex T. Gilbert, JR

EXHIBIT
2

1/2003

INT Only Addendums / ARMS (603E)
01/27/2004

# DEED OF TRUST

MAY 1 1 2006

Return To: First National Bank of Arizona
P.O. Box 66604, Phoenix, AZ 85082
Prepared By: Ngoc Chu

and Casey, Grimsley & Ragaller, PLLC

MIN 100135553000008637

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated May 5, 2006 together with all Riders to this document.

(B) "Borrower" is Rex T. Gilbert, JR and Daniela L. Gilbert, Husband and Wife

Borrower is the trustor under this Security Instrument.

(C) "Lender" is First National Bank of Arizona

Lender is a NATIONAL BANKING ASSOCIATION
organized and existing under the laws of The United States of America
5300000843

NORTH CAROLINA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3034 1/01

-6A(NC) (0307).01

Page 1 of 16                                Initials: RTG
                                                   DLG
VMP MORTGAGE FORMS - (800)521-7291

EXHIBIT
3

Lender's address is 1760 Old Meadow Road, 3rd Floor, Mc Lean, VA 22102

(D) "Trustee" is MATTHEW J. RACILER.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated May 5, 2006

The Note states that Borrower owes Lender five hundred twenty-five thousand and 00/100                                                                 Dollars

(U.S. $ 525,000.00                ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than June 1, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider  [ ] Condominium Rider        [ ] Second Home Rider
[ ] Balloon Rider          [ ] Planned Unit Development Rider  [ ] 1-4 Family Rider
[ ] VA Rider               [ ] Biweekly Payment Rider   [X] Other(s) [specify]
                                                        Interest Only Rider

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

5300000843

-6A(NC) (0207).01                    Page 2 of 15          Initials: RTL DTa          Form 3034  1/01

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Z) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee and Trustee's successors and assigns, in trust, with power of sale, the following described property located in the

| COUNTY | of | Hyde | : |

[Type of Recording Jurisdiction]     [Name of Recording Jurisdiction]

SEE ATTACHED LEGAL DESCRIPTION

Parcel ID Number: 207592                              which currently has the address of
134 West End Road                                                              [Street]
Ocracoke                              [City], North Carolina 27960         [Zip Code]
("Property Address"):

TO HAVE AND TO HOLD this property unto Trustee and Trustee's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

5300000843

-6A(NC) (0207).01                    Page 3 of 15                    Initials: [signature]                    Form 3034   1/01

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. If Borrower has breached any covenant or agreement in this Security Instrument and Lender has accelerated the obligations of Borrower hereunder pursuant to Section 22 the Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and

5390000843

-6A(NC) (0107).01          Page 4 of 15          Initials: RTb  DKg          Form 3034   1/01

assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to

5300000843

VMP®-6A(NC) (0701).01                Page 6 of 15                Initials: _____                Form 3034  1/01

prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any

5300000843

VMP®-6A(NC) (0207).01

Page 6 of 15

Initials: RTL OG

Form 3034  1/01

interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is

5300000843

VMP -6A(NC) (0207).01

Page 7 of 15

Initials: _____

Form 3034 1/01

reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve, if permitted under Applicable Law, in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve, if permitted under Applicable Law. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement

5300000843

®-6A(NC) (0307).01

Page 8 of 15

Initials: _____

Form 3034 1/01

provided that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material

5300000843

VMP®-6A(NC) (0207).01

Page 9 of 15

Initials: _____

Form 3034 1/01

impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time.

5300000843

(XYZ)-6A(NC) (0207).01

Page 10 of 16

initials: RTG
DG

Form 3034  1/01

Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects
5300000843

-6A(NC) (0207).01                  Page 11 of 15         Initials ___         Form 3034   1/01

Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use, or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

5300000043

-6A(NC) (0200).01                    Page 17 of 15                    Initials: EB DJG                    Form 3034  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, and if it is determined in a hearing held in accordance with Applicable Law that Trustee can proceed to sale, Trustee shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5.000 % of the gross sale price; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The interest rate set forth in the Note shall apply whether before or after any judgment on the indebtedness evidenced by the Note.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender or Trustee shall cancel this Security Instrument. If Trustee is requested to release this Security Instrument, all notes evidencing debt secured by this Security Instrument shall be surrendered to Trustee. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Attorneys' Fees. Attorneys' fees must be reasonable.

5300000843

6A(NC) (0201).01          Page 13 of 16          Initials: RTC OVG          Form 3034   1/01

BY SIGNING UNDER SEAL BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                                Rex T. Gilbert, JR          -Borrower

_____        _____ (Seal)
                                                                            -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                   -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                   -Borrower

_____ (Seal)        _____ (Seal)
Daniela L. Gilbert             -Borrower                                     -Borrower

5300000843

-6A(NC) (0707).01                    Page 14 of 15                   Form 3034  1/01

STATE OF NORTH CAROLINA,                    Dare              County ss:
I, LINDA RUSH
a Notary Public of the County of      Dare          , State of North Carolina, do hereby
certify that Rex P. Gilbert, JR & Danielle D. Gilbert

personally appeared before me this day and acknowledged the due execution of the foregoing instrument.
Witness my hand and official seal this        5th        day of    May, 2006        .

My Commission Expires:

                                            Linda Rush
                                            _____
                                            Notary Public

OFFICIAL SEAL
Notary Public, North Carolina
County of Dare
LINDA RUSH
My Commission Expires November 18, 2006

STATE OF NORTH CAROLINA,                           County ss:
    The foregoing certificate of
a Notary Public of the County of          , State of
is certified to be correct.
    This              day of

                                    Registrar of Deeds

                        By _____
                        Deputy Assistant

5300000843

-6A(NC) (0203).01            Page 15 of 15        Initials: DKgRTL        Form 3034  1/01

# ADJUSTABLE RATE RIDER
(LIBOR Six-Month Index (As Published In The Wall Street Journal) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 5th day of May, 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to First National Bank of Arizona

("Lender") of the same date and covering the property described in the Security Instrument and located at: 134 West End Road, Ocracoke, NC  27960

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 7.375 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may change on the first day of June, 2013 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of

5300000843

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL) - Single Family - Fannie Mae Uniform Instrument

-838R (0402)   Form 3138 1/01
Page 1 of 3      Initials: _____
VMP Mortgage Solutions, Inc.
(800)521-7291

this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 13.375 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one

percentage points
( 1.000 %) from the rate of interest I have been paying for the preceding
6 months. My interest rate will never be greater than 13.375 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

5300000843

-838R (0402)                    Page 2 of 3            Initials: _DVG RTC_    Form 3138 1/01

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)        _____ (Seal)
Rex T. Gilbert, JR          -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                            -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                            -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                            -Borrower                                        -Borrower

5300000843

QMC-838R (0402)                    Page 3 of 3                    Form 3138 1/01

## INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE RIDER

LOAN NUMBER: 1000000001

PROPERTY ADDRESS:

114 West End Road, Comocho, NC 37040

THIS ADDENDUM is made this 5th day of May, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as this Addendum executed by the undersigned and payable to First National Bank of Arizona (the Lender).

THIS ADDENDUM supersedes Section 4 (C) of the Rider. None of the other provisions of the Note are changed by this Addendum.

4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

    (C)  Calculation of Changes

        Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage point(s) (2.750%) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During first ten (10) years after the loan closing ("interest-only period"), the Note Holder will determine the amount of the monthly payment that would be sufficient to pay accrued interest on the unpaid principal balance. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the interest only period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the interest-only period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower unpaid principal balance.

At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal balance that I am expected to owe in substantially equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the interest-only period, my payment amount will not be adjusted due to voluntary principal payments.

Dated: _5/5/06_

_____
Rex T. Gilbert, JR

_____
Daniela L. Gilbert

Form 404
6/4/2003

Alt A Interest Only Rider/ ARM (404)
10/30/2005

Exhibit "A"

All that certain lot or parcel of land lying and being in the Village of Ocracoke, in Ocracoke Township, Hyde County, North Carolina, and known and designated as and being Lot No. 81-A, in the subdivision known as Oceanside Extension, as shown and delineated on a map or plat entitled "Recombination Plat of Lot 94-A & 81-A - Beachside Extension - Ocracoke, formerly lot 34 & 20 - Beachside Extension - Ocracoke" made by Seaboard Surveying & Planning, Inc., and recorded in Plat Cabinet C, Slide 395, Hyde County Registry.



BANK OF ARIZONA

1561 W. Alameda Drive
Tempe, AZ 85282
Office (480) 224-8521 Fax 480-224-8522

## ALLONGE TO NOTE

LOAN NUMBER: 5300000843
BORROWER: Gilbert JR
IN THE AMOUNT OF: $525,000.00

PAY TO THE ORDER OF:

First National Bank of
Nevada

WITHOUT RECOURSE BY:

AMY HAWKINS, ASSISTANT VICE PRESIDENT
FIRST NATIONAL BANK OF ARIZONA

Pay to the order Of
RESIDENTIAL FUNDING CORPORATION

Without Recourse
First National Bank of Nevada

By
Deutsche Bank National Trust
Company, f/k/a Bankers Trust
Company of California, N.A.
as Custodian as Attorney In
Fact

Christopher Corcoran
Vice President

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

BY
Judy Faber, Vice President

**EXHIBIT**
4

LENDER OR LENDER'S AGENT

First National Bank of Arizona
1760 Old Meadow Road
Mc Lean, VA 22102

☐ Preliminary  ☒ Final

*DATE:* 05/05/2006
*LOAN NO.:* 5300000843
*Type of Loan:* ARM

BORROWERS:

ADDRESS:
CITY/STATE/ZIP:
PROPERTY: 134 West End Road Ocracoke NC 27960

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.953 % | $ 943,469.57 | $ 507,473.43 | $ 1,450,943.00 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 84 | $3,226.57 | 07/01/2006 | | | |
| 36 | $3,500.00 | 07/01/2013 | | | |
| 239 | $4,391.32 | 07/01/2016 | | | |
| 1 | $4,385.64 | 06/01/2036 | | | |

DEMAND FEATURE:  [X] This loan does not have a Demand Feature.  ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
[X] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY:  You are giving a security interest in the property located at:
134 West End Road Ocracoke NC 27960
ASSUMPTION:  Someone buying this property  ☐ cannot assume the remaining balance due under original mortgage terms
[X] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES:  $ 250.00

PROPERTY INSURANCE:  You may obtain property insurance from anyone you want that is acceptable to Lender.

LATE CHARGES:  If your payment is more than 15 days late, a late charge of 4.000 % of the payment will be assessed.

PREPAYMENT:  If you pay off your loan early, you
☐ may  [X] will not  have to pay a penalty.
☐ may  [X] will not  be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_signature_ 5/5/06
Rex T. Gilbert, JR    BORROWER/DATE

_signature_ 5/5/06
Daniela L. Gilbert    BORROWER/DATE

_____  BORROWER/DATE

_____  BORROWER/DATE

EXHIBIT
5

5300000843

VMP -788 (0412).01    VMP Mortgage Solutions, Inc. (800)521-7291    Page 1 of 2    12/04
© 2005 CBF Systems, Inc.  The contents of this form in whole or in part are protected under the copyright laws of the United States.

## ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate generally higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

## PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-Inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

## FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

## AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

## TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

## PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.



Initials:



-788 (04121.01)    Page 2 of 2

LENDER: First National Bank of Arizona

DATE 5/5/06
LOAN NO. 5300000843
TYPE Conventional

BORROWERS/OWNERS Rex T. Gilbert, JR

ADDRESS     134 West End Road
CITY/STATE/ZIP Ocracoke, NC 27960
PROPERTY    134 West End Road, Ocracoke, NC  27960

## YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1) The date of the transaction, which is
or
(2) The date you received your Truth In Lending disclosures;
or
(3) The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:
**First National Bank of Arizona**
**MS AZ-4003-078**
**1665 W. Alameda Drive**          Or Fax to: (602) 636-7096
**Tempe, AZ 85282-3200**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of
_____ (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____          _____
CONSUMER'S SIGNATURE                                     DATE

---

Each of the borrowers/owners in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective as to all borrowers/owners.

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL

X _____    5/5/06    X _____
BORROWER/OWNER Rex T. Gilbert, JR   DATE    BORROWER/OWNER              DATE

X _____    5/5/06    X _____
BORROWER/OWNER Daniela L. Gilbert   DATE    BORROWER/OWNER              DATE

---

### CONFIRMATION CERTIFICATE
#### DO NOT SIGN UNTIL THREE BUSINESS DAYS HAVE ELAPSED

**Three business days have elapsed** since the undersigned have received two copies of this document. Each of the undersigned hereby certify and warrant that they have not exercised any right which they may have to rescind the transaction, that they do not desire to do so, and that they ratify and confirm the transaction in all respects.

_____          _____
BORROWER/OWNER Rex T. Gilbert, JR   DATE    BORROWER/OWNER              DATE

_____          _____
BORROWER/OWNER Daniela L. Gilbert   DATE    BORROWER/OWNER              DATE

5300000843

-66 (0305).01
VMP Mortgage Solutions (800)521-7291          10/00

**EXHIBIT**

LENDER:    First National Bank of Arizona

VARIABLE RATE LOAN PROGRAM:

*Six (6) Month LIBOR ARM Fixed for the First Seven (7) Years - First (10) Years Interest - Only Payments*

This variable rate loan program disclosure describes the features of the adjustable rate mortgage ("ARM") program you are considering. Information on other ARM programs is available upon request. This is neither a contract nor a commitment to lend. If you do obtain a loan from the Lender, the Note, Security Instrument and related documents will establish your legal rights and obligations.

Because the Lender may sell any loan it makes, the purchaser of the loan ("Noteholder") may enforce the terms of any loan obtained from the Lender. You will be required to make payments to the Noteholder or a servicer the Noteholder designates. For purpose of easy reference the term Lender is used below and refers to the initial Lender or purchaser of the note.

## HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED

- Your interest rate will be based on an index rate plus a margin.
- During the period that you make your payments of interest only, your payments will be based on the interest rate and loan balance. After that period, your payment will be based on the interest rate, loan balance and remaining loan term.
- The index upon which the Interest Rate will be based is the yearly average of interbank offered rate for six-month U.S. Dollar denominated deposits in the London Market ("LIBOR").
- Information about the current index is published in the Wall Street Journal.
- This ARM loan may have a discount feature, and your initial interest rate may not be based on the index used to make later adjustments. Ask about our current discount rate.
- Your interest rate will equal the index rate plus your margin unless your interest rate "caps" limit the amount of change in the interest rate.
- During the first ten (10) years, interest only payments will be required to be made. This means that the regular monthly payments will not reduce the principal balance during the first ten (10) years of your loan.
- Beginning in year eleven (11), the payment will be amortized over the remaining term and applied towards principal and interest.

## HOW YOUR INTEREST RATE CAN CHANGE

- Your interest rate can change every six (6) months beginning approximately 7 years after your loan closes. These are known as the "Change Dates".
- Your new interest rate will be equal to the sum of the margin and index value published on the first business day of the month in the month prior to the Change Date subject to the restrictions described below.
- Your interest rate cannot increase or decrease more than six percentage points (6.000%) at the first adjustment (a "cap").
- Your interest rate cannot increase or decrease more than one percentage point (1.000%) at each adjustment thereafter (a "cap").
- Your interest rate can never be less than your margin (a "cap").
- Your interest rate can never increase by more than six percentage points (6.000%) above the start rate (a "cap").
- Your interest rate will be rounded to the nearest .0125% at each adjustment.

## HOW YOUR MONTHLY PAYMENT CAN CHANGE

- Your monthly payment can increase or decrease substantially every 6 months beginning approximately 7 years after your loan closes based on changes to the interest rate. You will begin making your new monthly payments on the first payment due date after each Change Date.
- At each Change Date during the interest-only period the lender will recalculate your monthly payment to be an amount necessary to fully repay the accrued interest at the then current interest rate.
- If you make a voluntary pre-payment of principal during the interest-only period, your payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current rate on the lower unpaid principal balance.
- At each Change Date after the interest-only period, the lender will recalculate your monthly payment based on an amount necessary to fully repay the unpaid principal balance at the then current interest rate on the maturity date in substantially equal monthly payments.
- You will be notified in writing at least 25 calendar days before the monthly adjustment is made. This notice will contain information about your index, interest rate, payment amount and loan balance.
- For example, on a new $10,000, 30 year loan with an initial interest rate of 7.250% in effect in December 2005, the maximum amount that the interest rate could rise under this example is 6.000% over the start rate to 13.250%, and the payment amount could rise from a beginning payment of $60.42 to a maximum of $110.42* in 7 years. (For example, the monthly payment for a mortgage amount of $60,000/$10,000 = 6; 6 x $60.42 = $362.52.)* *The maximum payment amount reflects principal and interest. You will begin making monthly payments of principal and interest in the 11th year.* To compute the above example we used a margin value and interest rate we have used recently. Your margin value and interest rate may be different and you should ask about what is the current margin value and interest rate.

I/We hereby acknowledge receipt of this variable rate program disclosure and a copy of the Consumer Handbook on Adjustable Rate Mortgages on the date indicated below.

Date: _5/5/06_

Rex T. Gilbert, JR

**EXHIBIT**
7



OMB No. 2502-0265

| B. Type of Loan | | | | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
|---|---|---|---|---|---|---|
| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ Conv. Unins. | | | 5300000843 | |
| 4. ☐ VA | 5. ☐ Conv. Ins. | | | | | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME AND ADDRESS OF BORROWER: Rex T. Gilbert, JR

134 West End Road
Ocracoke, NC 27960

E. NAME AND ADDRESS OF SELLER:

F. NAME AND ADDRESS OF LENDER: First National Bank of Arizona
1760 Old Meadow Road
Mc Lean, VA 22102

G. PROPERTY 134 West End Road
LOCATION: Ocracoke NC 27960

H. SETTLEMENT AGENT:

PLACE OF SETTLEMENT: 7531 SOUTH VIRGINIA DARE TRAIL
NAGS HEAD, NC 27959

I. SETTLEMENT DATE: 05/05/2006

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower: | | 403. | |
| (from line 1400) | 22581.02 | | |
| 104. | | 404. | |
| 105. | | 405. | |
| ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | | ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | |
| 106. City/town taxes            to | | 406. City/town taxes            to | |
| 107. County taxes            to | | 407. County taxes            to | |
| 108. Assessments            to | | 408. Assessments            to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER:** ▶ | 22,581.02 | **420. GROSS AMOUNT DUE TO SELLER:** ▶ | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 525000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | | ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | |
| 210. City/town taxes            to | | 510. City/town taxes            to | |
| 211. County taxes            to | | 511. County taxes            to | |
| 212. Assessments            to | | 512. Assessments            to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER:** ▶ | 525,000.00 | **520. TOTAL REDUCTIONS IN AMOUNT DUE SELLER:** ▶ | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross amount due from borrower (line 120) | 22,581.02 | 601. Gross amount due to seller (line 420) | |
| 302. Less amount paid by/for borrower (line 220) | ( 525,000.00 ) | 602. Less total reductions in amount due seller (line 520) | ( ) |
| 303. CASH ( ☐ FROM / ☒ TO ) BORROWER ▶ | 502,418.98 | 603. CASH ( ☐ TO / ☐ FROM ) SELLER ▶ | |

HUD-1 (3-86)
RESPA, HB 4305.2

PAGE 1

⊕ -601 (0004).01
VMP Mortgage Solutions (800)521-7291


EXHIBIT
8

| | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | FROM ER'S FUNDS AT SETTLEMENT |
|---|---|---|
| **700. TOTAL SALES / BROKER'S COMMISSION:** BASED ON PRICE $ 0.00 @ 0.000 % = 0.00 | | |
| DIVISION OF COMMISSION (LINE 700) AS FOLLOWS: | | |
| 701. $ 0.00 to | | |
| 702. $ 0.00 to | | |
| 703. Commission paid at settlement | | |
| 704. | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN:** | | |
| 801. Loan origination fee 1.000 % FIRST FLIGHT MTG. | 5200.00 | |
| 802. Loan discount 0.000 % | | |
| 803. Appraisal fee to: FIRST FLIGHT MTG. | 400.00 (poc) | |
| 804. Credit report to: FIRST FLIGHT MTG. | 35.00 (poc) | |
| 805. Lender's Inspection fee 2NBA | 35.00 | |
| 806. Mortgage Insurance application fee to | | |
| 807. Assumption fee | | |
| 808. Broker's Discount Fee | | |
| 809. Application Fee COMMITMENT FEE TO FIRST | 300.00 | |
| 810. Buydown Subsidy | | |
| 811. Yield Spread Premium $3,281.25 (poc) | | |
| 812. Underwriting/Commitment Fee FNBA | 699.00 | |
| 813. Document Preparation Fee | | |
| 814. Administration Fee | | |
| 815. Flood Certification Fee FNBA | 13.25 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE:** | | |
| 901. Interest from 05/10/2006 to 06/01/2006 @ $ 106.08 /day | 2333.76 | |
| 902. Mortgage Insurance premium for 0 mos. to | | |
| 903. Hazard Insurance premium for 0 yrs. to | 2031.00 | |
| 904. Flood Insurance Premium for 0 yrs. to | 406.00 | |
| 905. Insurance Premium (Other) | | |
| **1000. RESERVES DEPOSITED WITH LENDER:** | | |
| 1001. Hazard Insurance 7 months @ $ 169.25 per month | 1184.75 | |
| 1002. Mortgage Insurance 0 months @ $ per month | | |
| 1003. City property taxes 0 months @ $ per month | | |
| 1004. County property taxes 11 months @ $ 232.99 per month | 2562.89 | |
| 1005. Annual assessments 0 months @ $ per month | | |
| 1006. Flood Insurance 0 months @ $ per month | | |
| 1007. Insurance Reserves Other 0 months @ $ per month | | |
| 1008. Tax Reserves (Other) | | |
| **1100. TITLE CHARGES:** | | |
| 1101. Settlement or closing fee to TITLE | 695.00 | |
| 1102. Abstract or title search to | | |
| 1103. Title examination to | | |
| 1104. Title Insurance binder to | | |
| 1105. Document preparation to | | |
| 1106. Notary fees to | | |
| 1107. Attorneys' fees to TITLE | 695.00 | |
| 1108. Title Insurance to TITLE | 577.81 | |
| 1109. Lender's coverage $ 0.00 | | |
| 1110. Owner's coverage $ 0.00 | | |
| 1111. Environmental Endorsement TITLE | 300.00 | |
| 1112. Reconveyance Fees | | |
| 1113. | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES:** | | |
| 1201. Recording fees: Deed $ 0.00 ; Mortgage $0.00 ; Releases $ 0.00 | 250.00 | |
| 1202. City/county tax / stamps: Deed $ 0.00 ; Mortgage $ 0.00 | 750.00 | |
| 1203. State tax / stamps Deed $ 0.00 ; Mortgage $ 0.00 | 1500.00 | |
| 1204. Open R.E. 2005 TAX DUES | 3414.75 | |
| 1205. Open | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES:** | | |
| 1301. Survey to | | |
| 1302. Pest Inspection to | | |
| 1303. Courier/Wire Transfer Fee TITLE | 200.00 | |
| 1304. Escrow Holdback Fee | | |
| 1305. Trustee Review Fee | | |
| 1306. County Property Tax | | |
| 1307. City Property Tax | | |
| 1308. Tax (Other) | | |
| **1400. TOTAL SETTLEMENT CHARGES** (Enter on line 103, Section J and line 502, Section K) ▶ | 22,561.02 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower: _____ Date: 5/5/06     Seller: _____ Date: _____
Rex T. Gilbert, JR

Borrower: _____ Date: _____     Seller: _____ Date: _____

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

_____ Date: _____
Settlement Agent:

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

VMP Mortgage Solutions, Inc. (800)521-7291     -6D2R (0509)     PAGE 2     5300000843

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| Rex T. Gilbert, JR | First National Bank of Arizona |
| 194 West End Road<br>Ocracoke, NC 27960 | 1760 Old Meadow Road<br>Mc Lean, VA 22102 |

| Property Location: (if different from above) | Settlement Agent: |
|---|---|
| 234 West End Road<br>Ocracoke NC 27960 | |

| | Place of Settlement: |
|---|---|
| | 7531 SOUTH VIRGINIA DARE TRAIL |
| Loan Number:<br>5300000843 | NAGS HEAD, NC 27959 |

| Application Number: | Settlement Date:<br>05/05/2006 |
|---|---|

| L. Settlement Charges | P.O.C. | Borrower | Seller |
|---|---|---|---|
| 816 Tax Service | FNBA | 79.00 | 0.00 |
| 817 Processing Fee | | 0.00 | 0.00 |
| 818 Open | | 0.00 | 0.00 |
| 819 Open | | 0.00 | 0.00 |
| 1009 Aggregate Adjustment | | -695.19 | 0.00 |

Borrower(s) Signature(s):

X _Rex T. Gilbert Jr_          X _____
Rex T. Gilbert, JR

X _____          X _____

X _____          X _____

X _____          X _____

VMP-502A (0507)                VMP Mortgage Solutions, Inc. (800)521-7291                7/05

# ADDENDUM TO HUD-1 SETTLEMENT STATEMENT

Lender:      First National Bank of Arizona

Loan Number:    5300000843

Title Company:

Escrow Number:

Borrower(s):    Rex T. Gilbert, JR

Property Address:  134 West End Road, Ocracoke, NC 27960

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

**BUYER(S)**

_____    5/5/06        _____
Rex T. Gilbert, JR         Date                       Date

_____        _____
Date                               Date

**SELLER(S)**

_____        _____
Date                               Date

_____        _____
Date                               Date

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

_____    5/5/06
Settlement Agent         Date

[The certifications contained herein may be obtained from the respective parties at different times or may be obtained on separate addenda].

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For Details, see: Title 18 U.S.C. Sections 1001 and 1010.

Addendum to HUD - 1 (Conv.) - ALL (205)
6/18/2003

Form 205

## FIRST PAYMENT LETTER

Mortgagor(s):    Rex T. Gilbert, JR

Property Address:   134 West End Road, Ocracoke, NC 27960

Loan Number:   5300000843

Loan Amount:   $ 525,000.00
Rate:             7.375 %
Term:           360   Month

Your payments are scheduled to begin on July 1, 2006 and are to be as follows:

| | |
|---|---:|
| First Payment | $ 3,226.57 |
| City Taxes | $ 0.00 |
| County Taxes | $ 232.99 |
| Hazard Insurance | $ 169.25 |
| Flood Insurance | $ 0.00 |
| FHA/PMI Insurance | $ 0.00 |
| Other Taxes | $ 0.00 |
| Other Insurance | $ 0.00 |
| **TOTAL PAYMENT** | $ 3,628.81 |

In the event you do not receive information from your Servicing Department prior to your first payment, please forward your payments to the address below, including your loan number on your check. Your check should be made payable to: First National Bank of Arizona

       First National Bank of Arizona
       P.O. Box 62768
       Phoenix, AZ   85082-2768

In the event that your mortgage is sold to another mortgage company, please disregard this information and follow any new payment procedures or instructions.

Please sign and date the bottom of this form indicating your receipt of same. Thank you.

_____  5/5/06          _____
Rex T. Gilbert, JR     Date              Date

_____          _____
         Date              Date

**EXHIBIT**
9

First Payment Letter - ALL (1018)
11/11/2004

LOAN# 1001...310
Borrower: Gilbert

PAYMENT HISTORY

ORIGINAL UPB $55000.00
ORIGINAL INT R: 7.375%
ORIGINAL P&I 3126.56

14-May-09
RS

INTEREST ONLY ARM

| Comments / Closing Source | Date Pmt Due | Date Pmt Received | Amount Received | PMT # | New PMT # | INT RATE % | Total | INT | Princ | Pmt Contra | Late Contra | UPB | Escrow Pmt | Escrow History | Suspense Bal | Suspense History | Late Charge Bal | Late Charge History | Property Tax Bal w/ Res % | Property Tax | Corporate Advance | Other Advance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transferred in OMACM | 7/1/2006 | | | 360 | | | | | | | | 235000.00 | | | | | | | | | | |
| | 8/1/2006 | 8/22/2006 | 3,662.64 | 1 | 359 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 235000.00 | 436.08 | 436.08 | 872.16 | 872.16 | 0 | | 0 | 0 | 0 | 0 |
| First Circle Tax Disbursement | 9/1/2006 | 9/14/2006 | 3,662.65 | 2 | 358 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 235000.00 | 436.08 | | 1308.24 | 1308.24 | 0 | | 0 | 0 | 0 | 0 |
| | 10/1/2006 | 10/14/2006 | 3,662.64 | 3 | 357 | 7.375% | 3226.56 | 3226.56 | | 0.01 | | 235000.00 | 436.08 | 436.08 | 1744.32 | 1744.32 | 0 | | 0 | 0 | 0 | 0 |
| Hazard Ins Disbursement | 11/1/2006 | 11/10/2006 | 3,662.64 | 4 | 356 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 436.08 | -2240.24 | 2180.4 | 2180.4 | 0 | | 0 | 0 | 0 | 0 |
| | 12/1/2006 | 12/14/2006 | 3,662.64 | 5 | 355 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 436.08 | | -1068.88 | -1068.88 | 0 | | 0 | 0 | 0 | 0 |
| Hazard Ins Disbursement | 1/1/2007 | 1/16/2007 | 3,662.64 | 6 | 354 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 436.08 | | -632.8 | -632.8 | 0 | | 0 | 0 | 0 | 0 |
| Hazard Ins Disbursement | | | | | | | | | | | | 234999.99 | 436.08 | | -416.72 | -416.72 | 0 | | 0 | 0 | 0 | 0 |
| Hazard Ins Disbursement | 2/1/2007 | 2/16/2007 | 3,662.64 | 7 | 353 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 436.08 | | 339.36 | 339.36 | 0 | | 0 | 0 | 0 | 0 |
| Escrow Disbursement | | | | | | | | | | | | 234999.99 | -406 | -406 | -166.64 | -166.64 | 0 | | 0 | 0 | 0 | 0 |
| | 2/1/2007 | | | | | | | | | | | 234999.99 | -2215 | | 269.44 | 269.44 | 0 | | 0 | 0 | 0 | 0 |
| | 2/15/2007 | | 51,091.00 | 8 | 352 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | -2215 | | -2045.16 | -2045.16 | 0 | | 0 | 0 | 0 | 0 |
| | 3/1/2007 | 3/12/2007 | 3,662.64 | 9 | 351 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 1091 | | -809.16 | -809.16 | 0 | | 0 | 0 | 0 | 0 |
| | 4/1/2007 | 4/12/2007 | 3,662.64 | 10 | 350 | 7.375% | 3226.55 | 3226.56 | | 0.00 | | 234999.99 | 436.08 | | -2178.16 | -2178.16 | 0 | | 0 | 0 | 0 | 0 |
| Funds sent to/back to apply toward to payment | | | | | | | | | | | | 234999.99 | 436.08 | | -2142.48 | -2142.48 | 0 | | 0 | 0 | 0 | 0 |
| Funds placed in suspense | 5/14/2007 | 5/14/2007 | 3,662.64 | | | | | | | | | 234999.99 | 436.08 | | -2306.4 | -2306.4 | 0 | | 0 | 0 | 0 | 0 |
| Late Charge Assessed on the 07/01/07 payment | | | | | | | | | | | | 234999.99 | | | -1870.32 | -1870.32 | 3662.64 | 3662.64 | 0 | | 0 | 0 |
| Funds coming out of suspense and applied towards the 05/01/07 payment | | | | | | | | | | | | 234999.99 | | | -1870.32 | -1870.32 | 3662.64 | 3662.64 | -129 | -129 | 0 | 0 |
| | 5/1/2007 | 6/22/2007 | 3,662.56 | 11 | 349 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 994.44 | 994.44 | -1470.32 | -487.5 | 2975.14 | | -129.06 | -129 | 0 | 0 |
| Funds coming out of suspense and applied towards the 06/01/07 payment | | | | | | | | | | | | 234999.99 | | | -475.88 | | 3925.14 | | 129.06 | -129 | 0 | 0 |
| | 6/1/2007 | 7/07/2007 | 3,662.56 | 12 | 348 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 994.44 | | -475.88 | | 2975.14 | | -129.06 | -129 | 0 | 0 |
| Property Inspection Fee Assessed | | | | | | | | | | | | 234999.99 | | | -475.88 | -558.44 | 2416.7 | | -129 | -129 | 0 | 0 |
| Late Charge Assessed on the 07/01/07 payment | | | | | | | | | | | | 234999.99 | | | 113.56 | | 2416.7 | | -129 | -129 | 0 | 0 |
| Funds coming out of suspense and applied towards the 07/01/07 payment | | | | | | | | | | | | 234999.99 | | | 113.56 | | 2416.7 | | -129 | -129 | 0 | 0 |
| | 7/1/2007 | 8/27/2007 | 3,662.56 | 13 | 347 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 994.44 | | 113.56 | | 2416.7 | | -129.04 | -129 | -11.75 | 11.75 | 0 |
| Late Charge Assessed on the 08/01/07 payment | | | | | | | | | | | | 234999.99 | | | 113.56 | -558.44 | 1858.26 | | -129 | -258 | -113 | 0 |
| Funds coming out of suspense and applied towards the 08/01/07 payment | | | | | | | | | | | | 234999.99 | | | 113.56 | | 1858.26 | | -129.06 | -258 | -113 | 0 |
| | 8/1/2007 | 9/11/2007 | 3,662.56 | 14 | 346 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 994.44 | | 1113 | -558.44 | 1858.26 | | -129.06 | -387 | -113 | 0 |
| Late Charge Assessed on the 09/01/07 payment | | | | | | | | | | | | 234999.99 | | | 1113 | | 1299.82 | | -129 | -387 | -113 | 0 |
| Funds coming out of suspense and applied towards the 09/01/07 payment | | | | | | | | | | | | 234999.99 | | | 2107.44 | | 1299.82 | | -129.06 | -516 | -113 | 0 |
| | 9/1/2007 | 10/26/2007 | 3,662.56 | 15 | 345 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 994.44 | -558.44 | 2107.44 | -558.44 | 1299.82 | | -129.06 | -516 | -113 | 0 |
| Late Charge Assessed on the 10/01/07 payment | | | | | | | | | | | | 234999.99 | 3101.88 | | 2107.41 | | 741.38 | | | -516 | -113 | 0 |
| Funds coming out of suspense and applied towards the 10/01/07 payment | | | | | | | | | | | | 234999.99 | -3199.33 | | -297.4 | | 741.38 | | | -516 | -113 | 0 |
| | 10/1/2007 | 11/21/2007 | 3,662.56 | 16 | 344 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 994.44 | | -297.1 | | 741.38 | | -129.06 | -516 | -113 | 0 |
| Funds coming out of suspense and applied towards the 11/01/07 payment | | 12/24/2007 | 3,500.00 | | | | | | | | | 234999.99 | | -538.44 | 697.04 | -538.44 | 182.94 | | | -645 | -113 | 0 |
| Hazard Insurance Disbursement | | | | | | | | | | | | 234999.99 | | | 697.04 | | 182.94 | | | -645 | -113 | 0 |
| Hazard Insurance Disbursement | | | | | | | | | | | | 234999.99 | -406 | 3500 | 697.04 | | 3682.94 | | | -645 | -113 | 0 |
| Funds coming out of suspense and applied towards the 11/01/07 and 12/01/07 payments | | | | | | | | | | | | 234999.99 | -2846 | | -2291.04 | | 3682.94 | | | -645 | -113 | 0 |
| Funds coming out of suspense and applied towards the 12/01/07 payment | | | | | | | | | | | | 234999.99 | | | -2354.96 | | 3682.94 | | | -645 | -113 | 0 |
| | 11/1/2007 | 1/17/2008 | $531.06 | 17 | 343 | 7.375% | 3226.56 | 3226.56 | | 0.00 | | 234999.99 | 994.44 | -538.44 | -2554.94 | 3482.94 | | | -258.12 | 993 | -111 | 0 |
| | 12/1/2007 | | | | | | | | | | | | 234999.99 | | | -2554.96 | -3682.94 | 0 | | -903 | -903 | 0 | 0 |
| | | | | | | | | | | | | 234999.99 | 994.44 | | -1560.52 | | 0 | | -903 | | 0 | 0 |

EXHIBIT
10

Case 4:09-cv-00181-D Document ... 10/23/09 Page ... of 100

STATE OF NORTH CAROLINA

COUNTY OF HYDE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 70

REX T. GILBERT, JR. AND )
DANIELA L. GILBERT, )
                 Plaintiffs, )
v. )
  )
DEUTSCHE BANK TRUST COMPANY )
AMERICAS, As Trustee for )
RESIDENTIAL ACCREDIT LOANS, INC. )
DAVID A. SIMPSON, PC., Substitute )
Trustee, RESIDENTIAL FUNDING, LLC, )
And GMAC MORTGAGE, LLC, )
               Defendants, )

PRELIMINARY INJUNCTION

This case was heard before the Court on the 1st day of October, 2009, upon the application of the plaintiffs for a preliminary injunction, and after notice and hearing and considering the verified complaint, the affidavits filed, and the evidence presented, the court finds the following facts:

1. Plaintiffs have set forth through their Complaint, Affidavit and the evidence presented claims for violations of the Federal Truth in Lending Act, usury and unfair acts and/or practices under G.S. 75-1.1, et seq.

2. The Court finds that the Plaintiffs did not carry their burden with respect to any of the claims that the Holder of the Note

was not the foreclosing party. This issue has been determined in the Special Proceeding.

3. The Court finds that the Plaintiffs have met their burden for purposes of the preliminary injunction hearing on the TILA claims. The Court finds that the Plaintiffs have tendered sufficient evidence to establish that they are likely to succeed on the merits of these claims.

4. Plaintiffs will suffer immediate and irreparable loss, injury and damage by virtue of losing title to their home unless an injunction is issued against the pending foreclosure sale noticed for October 27, 2009.

5. The injunction ordered imposes no undue burden or risk of harm to defendants.

6. Balancing the risk of harm between the parties favors injunctive relief in favor of Plaintiffs.

The Court concludes as a matter of law:

1. That the foreclosure sale of Plaintiffs' real property should be enjoined pending the resolution of this matter.

IT IS THEREFORE ORDERED that plaintiffs' motion for preliminary injunction be and hereby is GRANTED; and

It is further ordered that the foreclosure sale of Plaintiffs' real property located at 134 West End Road, Ocracoke, North Carolina 27960, scheduled for Tuesday, October 27, 2009 at 10:00 AM be and hereby is STAYED; and defendants are hereby ENJOINED

from re-advertising and re-noticing said sale, foreclosing upon or otherwise transferring title to the property located at 134 West End Road, Ocracoke, North Carolina 27960, pending resolution of this matter,

IT IS FURTHER ORDERED that plaintiffs shall post bond in the amount of TEN THOUSAND ($10,000.00) DOLLARS by 5 PM Friday, October 2, 2009, to indemnify and save harmless the Defendants pursuant to G.S. § 45-21.34. This bond shall be separate and apart from the three thousand dollars ($3,000.00) that was previously posted. If this bond is not posted in accordance with this Order the Injunction shall dissolve and be of no further force and effect.

This the 9th day of October, 2009.

_____
The Honorable Wayland J. Sermons, Jr.
Resident Superior Court Judge Presiding