THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
NO. 4:09-CV-00181-D

| | |
|---|---|
| REX T. GILBERT, JR. and | ) |
| DANIELA L. GILBERT, | ) |
|         Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| DEUTSCHE BANK TRUST COMPANY | ) |
| AMERICAS, *As Trustee for*, | ) |
| RESIDENTIAL ACCREDIT LOANS, INC, | ) |
| DAVID A. SIMPSON, P.C., Substitute Trustee, | ) |
| RESIDENTIAL FUNDING, LLC, GMAC | ) |
| MORTGAGE, LLC, and OCWEN LOAN | ) |
| SERVICING, LLC., | ) |
|         Defendants. | ) |

## FIRST AMENDED AND RESTATED COMPLAINT

NOW COME the plaintiffs, Rex T. Gilbert, Jr. and Daniela L. Gilbert, by and through their counsel of record, and allege and say as follows:

## JURISDICTION

This action was instituted pursuant to N.C. Gen. Stat. § 45-21.34 for the purpose of enjoining a foreclosure sale authorized by Order of the Honorable Marvin Blount in Hyde County File 09-SP-09 and raising legal and equitable claims and defenses, including, but not limited to, rescission pursuant to rights granted under the federal Truth in Lending Act, material disclosure violations of the federal Truth in Lending Act, unfair and deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et. seq*, and the charging and collecting of usurious interest in violation of N.C. Gen. Stat. § 24-2, *et. seq*.

This action was removed to this court in October, 2009, based upon federal question jurisdiction. 28 U.S.C. § 1441. On 7 July 2010, this action was dismissed by Order of the court. [D.E. 32] Upon appeal to the United States Court of Appeals for the Fourth Circuit, the dismissal order was affirmed in part, reversed in part and remanded to this court. Before the mandate issued, defendants Residential Funding, LLC. and GMAC Mortgage, LLC. filed for chapter 11 bankruptcy protection. As a result of the bankruptcy filing, the Fourth Circuit stayed the mandate as to defendants Residential Funding, LLC. and GMAC Mortgage, LLC. until 9 April 2015.

## PARTIES

1.　　　The plaintiffs are citizens and residents of Hyde County North Carolina.

2.　　　Defendant Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 (hereinafter Deutsche) is, upon information and belief, an entity that serves as Trustee for securitized pools of mortgage loans that are secured by North Carolina real property and regularly uses the North Carolina Courts for purposes of foreclosing mortgage loans that it holds as Trustee. Defendant Deutsche purports to be the owner and holder of the Adjustable Rate Note (hereinafter Promissory Note) and Deed of Trust that are the subject of this complaint and, upon information and belief, instructed the Substitute Trustee of a Deed of Trust signed by plaintiffs to file the foreclosure action known as 09 SP 09 in the Superior Court of Hyde County, North Carolina.

3.　　　Defendant David A. Simpson, P.C. (hereinafter Simpson) is a professional corporation organized under the laws of the State of North Carolina which, upon information and belief, contracts with financial services companies to provide Substitute Trustee services for prosecution of foreclosures in North Carolina and, upon information and belief, purports to have

been appointed as a Substitute Trustee under the Deed of Trust that secures the mortgage loan that is the subject of this complaint.

4.	Defendant Residential Funding, LLC (hereinafter Residential Funding) was, upon information and belief, a limited liability company which purported to be the master servicer for the Note and Deed of Trust which is the subject of this complaint. This defendant filed for bankruptcy protection in 2012 and, on information and belief, its mortgage servicing platform was acquired by Defendant Ocwen Loan Servicing, LLC.

5.	Defendant GMAC Mortgage, LLC (hereinafter GMAC) was, upon information and belief, a limited liability company which regularly services loans secured by real property located in North Carolina. GMAC purported to be the subservicer of a mortgage obligation which is the subject of this complaint. This defendant filed for bankruptcy protection in 2012 and, on information and belief, its mortgage servicing platform was acquired by defendant Ocwen Loan Servicing, LLC.

6.	Defendant Ocwen Loan Servicing, LLC (hereinafter Ocwen) is, upon information and belief a limited liability company which regularly services loans secured by real property located in North Carolina. Ocwen purports to be the current servicer of a mortgage obligation which is the subject of this complaint.

## FACTUAL ALLEGATIONS

7.	All paragraphs of this complaint are incorporated herein as if fully set forth.

8.	Plaintiffs Rex T. Gilbert, Jr. and Daniela L. Gilbert, husband and wife, reside upon a tract of land that is titled in their name as tenants by the entirety on Ocracoke Island, Hyde County, North Carolina.

9.     During the late winter or early spring of 2006, plaintiff Daniela Gilbert telephoned the office of First Flight Mortgage, LLC located at 2503 North Croatan Highway in Kill Devil Hills, North Carolina to inquire about obtaining a refinance of the mortgage on the plaintiffs' property.

## MORTGAGE LOAN TRANSACTION

10.    During March and April of 2006, plaintiff Daniela L. Gilbert spoke on many occasions with Emily Berry-Belvin who represented herself to be the loan officer for First Flight Mortgage, LLC who would handle the mortgage loan transaction for plaintiffs.

11.    Upon information and belief, Emily Berry-Belvin, was, at all times pertinent to the transactions described in this complaint, the employee or agent of First Flight Mortgage, LLC, with full actual and apparent authority to act for First Flight Mortgage, LLC.

12.    During the spring of 2006, plaintiffs were struggling to make the payments on an adjustable rate mortgage loan and wanted to refinance to cash out money until they were able to sell their home and borrow money to build another home on an adjacent parcel of land.

13.    Plaintiff Daniela L. Gilbert talked with Emily Berry-Belvin and explained that plaintiffs wanted to refinance their mortgage loan with a loan that would allow them to cash out money until they sold their home and built a new lower cost home.

14.    Plaintiff Daniela L. Gilbert provided Emily Berry-Belvin with copies of plaintiffs' bank statements to show their income.

15.    The income documentation provided by plaintiffs does not show monthly income of $10,950.00 each month.

16.     At some point, Emily Berry-Belvin called plaintiffs to advise of the need for an appraisal. After some discussion, Emily Berry Belvin represented to plaintiffs that their home needed to appraise at $700,000.00 in order for them to get the loan.

17.     When plaintiff Daniela L. Gilbert offered to contact John W. Hunter, a licensed appraiser who has considerable experience appraising residential properties on Ocracoke, Emily Berry-Belvin advised plaintiff that they needed someone "more aggressive with the numbers."

18.     On information and belief, Ms. Berry-Belvin contacted Marco P. Garcia with Appraisal Group Outer Banks, Inc. who conducted, prepared and signed a Uniform Residential Appraisal Report which valued the plaintiff's property at $700,000.00.

19.     Plaintiffs did not receive a copy of the aforementioned appraisal until sometime after the loan transaction which is the subject matter of this complaint was completed. The copy received by plaintiffs is inserted into a plastic binder with a green spine which matches the color of the First Flight Mortgage logo and includes a cover sheet with First Flight Mortgage letterhead.

20.     When the appraisal came in, Emily Berry-Belvin represented to plaintiffs that they would close before the end of April, 2006.

21.     Emily Berry-Belvin told plaintiff Daniela L. Gilbert not to make further payments to the lender that currently held plaintiffs' mortgage loan because the refinance loan would be closing during the month of April.

22.     In reasonable reliance upon the statements and assurances of Emily Berry-Belvin that the loan would close during the month of April, plaintiffs followed her instruction and withheld the April 2006 mortgage payment. Plaintiffs proceeded to use the money that would

otherwise have been used for the April mortgage payment for other necessary household expenses.

23.     The mortgage loan finally closed late on the afternoon of 5 May 2006.

24.     During the month of May, 2006 and shortly before the 5 May 2006, loan closing, plaintiff Daniela L. Gilbert received a telephone call from Emily Berry-Belvin who stated that because the plaintiffs were planning to sell their home the refinance they would be getting would be an interest-only loan. No other option was presented to plaintiffs.

25.     Plaintiffs voiced objections to the interest-only loan; however, plaintiffs were reassured by Emily Berry-Belvin that this was the best option for them given their financial situation. She led plaintiffs to believe that they would be able to refinance the terms of the loan in a year or so.

26.     On 5 May 2006, plaintiffs traveled 2-1/2 hours to Nags Head to the office of a lawyer for the loan closing.

27.     Upon arrival at the lawyer's office, plaintiffs were advised that they would have to wait because the paper work had not arrived.

28.     After waiting several hours and having to make calls to Ocracoke to arrange for unplanned after-school child care, the plaintiffs were finally ushered into a back office to sign the paper work beginning at approximately 5:50 p.m.

29.     Plaintiffs did not meet the lawyer who was supposed to be handling the closing. Instead, plaintiffs met with an assistant who sat across the table from the plaintiffs with a stack of papers marked with stickies indicating where their signatures were needed.

30.     The assistant did not review the documents with the plaintiffs nor did she explain the contents or purpose of any of the documents. The assistant hurried plaintiffs through the

signing process by showing plaintiffs where to sign and instructing them to sign. Plaintiffs did look at several of the documents but did not have an opportunity to review the full extent of the contents of all of the documents.

31. Once the plaintiffs had signed each of the documents in the place indicated by the assistant, the meeting was over. Plaintiffs did not receive any of the documents or copies of any of the documents after they had completed the signing process.

32. On or about 13 May 2006, plaintiffs received in the mail copies of, among other things, a Promissory Note, Deed of Trust, Truth in Lending Disclosure Statement, and appraisal. The documents were delivered in an 10" X 15" manila envelope, with a postmark date of 11 May 2006. Prior to 13 May 2006, plaintiffs had not received copies of any of the documents that they signed on 5 May 2006.

**MORTGAGE LOAN DOCUMENTS AND TRUTH IN LENDING RESCISSION**

33. Among other documents, plaintiffs executed a Promissory Note in the amount of $525,000.00 and a Deed of Trust securing the Promissory Note for the benefit of the original lender, First National Bank of Arizona.

34. The copy of the Promissory Note presented at the foreclosure hearing in the matter 09 SP 09 in Hyde County Superior Court bore an additional page entitled "Allonge to Note" (hereinafter Allonge) The Allonge purports to meet the requirements of N.C. Gen. Stat. § 25-1-201(21) by showing indorsements, authorized signatures, by the various and multiple entities purporting to assign and transfer the Promissory Note and Deed of Trust from the original lender, First National Bank of Arizona through to present purported holder and owner, Defendant Deutsche. (Exhibit 1)

35.     The Allonge shows an indorsement by First National Bank of Arizona to First National Bank of Nevada.

36.     The Allonge shows an indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact wherein it purports to have authority to indorse on behalf of First National Bank of Nevada to Residential Funding Corporation.

37.     Plaintiffs have requested documentation to substantiate the authority of Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact to act on behalf of First National Bank of Nevada; no such information has been provided; therefore, on information and belief, there is no underlying documentation to substantiate the indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact for First National Bank of Nevada to Residential Funding Corporation.

38.     The Allonge shows an indorsement from Residential Funding Corporation to Deutsche Bank Trust Company Americas as Trustee.

39.     With respect to Residential Accredit Loans, Inc., the Allonge bears no indorsement to Residential Accredit Loans, Inc. which is the entity which purports to be the owner and holder of the note.

40.     The indorsement by Residential Funding Corporation is indorsed to "Deutsche Bank Trust Company of Americas Trustee". The indorsement does not state for whom Deutsche Bank is acting as Trustee.

41.     The Promissory Note executed by plaintiff provides for interest to be charged at a yearly rate of 7.375% and for the first *84 monthly payments in the amount of $4,391.32*. (Exhibit

2) This same Promissory Note indicates on its face that there was an interest-only addendum to the note.

42.    The interest-only addendum states that it superseded certain sections of the Promissory Note; to wit: *the first 120 payments in the amount of $3226.57 and the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the note over the remaining term of the Note in equal monthly payments*. (Exhibit 3)

43.    The federal Truth in Lending Disclosure Statement signed by plaintiffs at closing disclosed the following:

| APR: | Finance charge | Amount Financed | Total of Payments |
|------|----------------|-----------------|-------------------|
| 7.953% | $943469.57 | $507,473.43 | $1,450,943.00 |

Payment Schedule:

84 payments @ $3226.57
36 payments @ $3500.00
239 payments @ $4391.32
1 payment @ $4385.64

(Exhibit 4)

44.    The Truth in Lending Act (TILA) APR is "derived" from the relationship of the TILA-defined amount financed to the TILA-defined finance charges once those have been calculated, given the payment schedule. Thus the APR can only be calculated after the finance charge, amount financed, and payment schedule are known or can be reasonably estimated. *See* Rohner, The Law of Truth in Lending ¶ 4.01[2][c][i] (1984).

45.    Pursuant to Regulation Z, 12 C.F.R. § 226.22(a) using the actuarial method to check the disclosed annual percentage rate reveals that the accurate annual percentage rate is 8.8478%.  To be accurate, the annual percentage rate must be correct within 1/8[th] of 1%.

46.     The payment schedule disclosed on the Truth in Lending Disclosure Statement does not accurately disclose the payment schedule because the disclosed payments 36 through 240 are not calculated on the fully indexed rate in effect on the date of consummation. There is no tolerance amount for payment schedule disclosures.

47.     Prior to exercising their extended right to rescind, plaintiffs did not receive a Truth in Lending Disclosure Statement which accurately disclosed the terms of the transaction which is the subject of this Complaint.

48.     The three day right to rescind the transaction is extended until plaintiffs receive accurate Truth in Lending disclosures or the expiration of three years from the date of closing whichever is later.

49.     On April 5, 2009, plaintiffs by and through their counsel exercised their extended right to rescind the loan transaction by giving written notice. (Exhibit 5)

50.     By letter dated April 24, 2009, Kathy Priore, Associate Counsel for GMACM, advised that it "would not rescind the Loan transaction at this time." (Exhibit 6)

51.     The payment schedule set forth on the Truth in Lending Disclosure Statement charges plaintiffs more than $40,000.00 in hidden finance charges.

52.     Whether from 5 April 2009 (rescission letter), 3 May 2012 (date of the published opinion of the United States Court of Appeals holding that plaintiffs' timely exercised their extended right to rescind), 28 June 2012 (partial mandate filing as to Deutsche and Simpson), 9 April 2015 (final mandate filing), more than twenty (20) days have passed.

53.     Defendant Deutsche has failed to take any action necessary or appropriate to reflect the termination of any security interest created under the transaction, including the

security interest described in Paragraph 8, as required by 15 U.S.C. § 1635(b) and Regulation Z § 1026.23(d)(2) [formerly § 226.23(d)(2)].

54. Defendant Deutsche has failed to return to plaintiff any money or property given by the plaintiff to anyone, including defendants, as required by 15 U.S.C. § 1635(b) and Regulation Z § 1026.23(d)(2) [formerly § 226.23(d)(2)].

## ATTEMPTS AT LOAN MODIFICATION

55. Beginning in the summer of 2008, plaintiffs attempted to negotiate with defendant GMAC for a loan modification by submitting detailed financial documentation.

56. Plaintiffs were told that they needed to make two consecutive regular mortgage payments before they would be considered for a loan modification.

57. Plaintiffs spent untold hours on hold on the telephone attempting to contact representatives of defendant GMAC sometimes with success but many times without success. Plaintiffs never spoke to the same representative twice.

58. On or about 27 August 2008, plaintiffs received a letter from defendant GMAC returning their last mortgage payment and informing plaintiffs that they had failed to honor the trial period.

59. In a state of near panic, plaintiff telephoned defendant GMAC and after a long wait on hold plaintiff was told that the representative responsible for processing their request for loan modification had been fired for failing to process loan modifications.

60. Plaintiff was assured by a representative of defendant GMAC that he would place a hold on the foreclosure status and work with them to process the loan modification. Plaintiff was subsequently unable to reach this representative again.

61.     On or after 5 September 2008, plaintiffs received an overnight envelope from defendant GMAC regarding a loan modification.

62.     Plaintiffs learned that they had been approved for a loan modification which modified the interest rate to 5.7500% on a new principal balance of $541,036.08, on a term of 332 months with a maturity date of 1 June 2026.

63.     The loan modification also required plaintiffs to make a lump sum payment of $8051.40 by 1 October 2008 and begin making the modified payments on 1 November 2008.

64.     The loan modification reduced plaintiffs' monthly mortgage payment by $429.99. Plaintiffs were unable to make the lump sum payment required to qualify for the loan modification.

65.     Beginning in October, 2008, plaintiffs attempted by and through counsel to negotiate with defendant GMAC.

66.     On 14 October 2008, plaintiffs faxed releases of information authorizing defendant GMAC to discuss their account with counsel.

67.     Defendant GMAC advised plaintiffs that it would take up to five days for verification of the release of information to post to plaintiff's account and until such time defendant GMAC was not authorized to speak with counsel.

68.     On 20 October 2008, plaintiffs through counsel again attempted without success to speak with representatives of defendant GMAC regarding plaintiff's account.

69.     On 2 November, 2008, plaintiffs through counsel wrote to defendant GMAC regarding options for a real loan modification. Plaintiffs did not receive a response to this letter.

70.     On 14 November 2008, plaintiffs through counsel spoke with defendant GMAC's representative Jay Graves regarding their account. Plaintiffs were advised that the modification had been denied because of the failure to make the lump sum payment.

71.     On 9 January 2009, plaintiffs again through counsel wrote to defendant GMAC regarding a loan modification. Plaintiffs did not receive a response to this letter.

72.     On 10 February 2009, plaintiffs again through counsel wrote to defendant GMAC regarding their account.

73.     On 20 February 2009, defendant GMAC by letter advised plaintiffs' counsel that until she submitted written permission from the plaintiffs, defendant GMAC could not speak with counsel.

## CONTINUED DEBT COLLECTION ACTIVITIES

74.     By September 2009, defendants knew or should have known that plaintiffs were represented by counsel. Defendants had been notified by plaintiffs' counsel through various facsimiles, letters, and court appearances that plaintiffs were represented by counsel.

75.     Representatives of defendant GMACM, despite being on notice by plaintiffs' counsel of her representation, contacted plaintiff by telephone using the number 1-800-850-4622 on at least the following days and times:

    9/12  8:39 am
    9/15  6:41 pm
    9/16  1:20 pm
    9/17  3:13 pm
    9/18  2:02 pm
    9/19  11:35 am

76.     During the 19 September 2009 call, the caller identified herself as being with GMACM, but she provided no name. The caller advised that a foreclosure sale had been set for

27 October 2009 and inquired about plaintiff's interest in a loan modification. When advised by plaintiff that he was represented by counsel, the caller acknowledged that plaintiff was represented by counsel and that she had two telephone numbers for counsel.

77. The above identified calls in violation of N.C. Gen. Stat. 75-50(3) and other additional calls caused plaintiffs emotional distress.

78. By letter dated 22 August 2011, defendants purported to provide to plaintiffs, among other things, a "Note Allonge" to the 5 May 2006 promissory note. This purported "Note Allonge" was not affixed to the 5 May 2006 promissory note when the original promissory note was purportedly presented to the court at either the 2 June 2009 clerk's foreclosure hearing or the 18 August 2009 superior court foreclosure hearing.

79. The rogue "Note Allonge" was prepared and executed outside the chain of indorsements and was not done for the purpose of negotiating the instrument pursuant to N.C. Gen. Stat. 25-2-204.

80. The cover letter accompanying the "Note Allonge" threatened an "upcoming foreclosure suit." (Exhibit 8) The threatened "upcoming foreclosure suit" did not occur.

81. On 3 May 3, 2011, the North Carolina Court of Appeals reversed the order authorizing the substitute trustee to proceed with a foreclosure sale entered by the superior court on 18 August 2009. On 13 June 2011, David A. Simpson, P.C. Substitute Trustee, filed a voluntary dismissal of the foreclosure proceeding identified as Hyde County File 09-sp-09.

82. On or about 15 March 2012, an agent on behalf of defendant Deutsche executed on behalf of David A. Simpson, PC a document entitled "Amended Notice of Substitute Trustee's Foreclosure Sale of Real Property" (hereinafter "Amended Notice") which purported to set for sale on 17 April 2012, the Respondents' real property. (Exhibit 9)

83.     At the time the Amended Notice was signed by David W. Neill no Order was in effect authorizing the substitute trustee to proceed with a foreclosure sale of the Respondents' real property.

84.     On information and belief, a cover letter dated 12 March 2012, and signed by an agent of Defendants requested the Hyde County Clerk of Superior Court staff to stamp filed the Amended Notice, post the Amended Notice on the county courthouse bulletin board, and return the stamp filed copy to defendants' agent.

85.     On or about 23 March 2012, the cover letter, Amended Notice and a Certificate of Service were received in the Office of the Hyde County Clerk of Superior Court.   On information and belief, the Amended Notice was stamped filed, posted on the county courthouse bulletin board and the copies were returned to defendants' agent. On 27 March 2012, plaintiffs received a copy of the Amended Notice.

86.     On 28 March 2012, plaintiffs contacted the Hyde County Clerk of Superior Court to inquire whether the Amended Notice had, despite no order allowing a  foreclosure sale, been posted on the courthouse bulletin board. Counsel was informed that the Amended Notice had been posted. The Hyde County Clerk of Superior Court removed the Amended Notice from the county courthouse bulletin board.

87.     By virtue of plaintiffs' rescission letter dated 5 April 2009 and the decision of the United States Court of Appeals in this case dated 3 May 2012, plaintiffs exercised their extended right to rescind the loan transaction.

88.     On 15 February 2013, Defendant Ocwen completed the acquisition of certain Purchased Assets pursuant to an asset purchase agreement with, among others, defendant GMACM pursuant to a plan under Chapter 11 the United States Bankruptcy Code. On

information and belief, defendant GMACM purportedly represented to defendant Ocwen that it held the servicing rights to an obligation owed by plaintiff.

89.     On or about 15 February 2013, Defendant Ocwen began contacting plaintiff directly in connection with its alleged acquisition of the servicing rights to an obligation owed by plaintiff. By letter dated 13 May 2013, Defendant Ocwen advised plaintiff that the interest rate on his loan would adjust on 1 June 2013, and become effective with the 1 July 2013. By letter dated 13 January 2014, Defendant Ocwen advised plaintiff that the interest rate on his loan would adjust on 1 December 2013, and become effective with the 1 January 2014 payment.

## ROBO-SIGNING

90.     At the Gilberts' 18 August 2009, foreclosure hearing, petitioner Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 (hereinafter "Deutsche Bank") presented two affidavits. One affidavit was signed by Jeffrey Stephan (hereinafter "Stephan") in his capacity as Limited Signing Officer of GMAC Mortgage, LLC, the subservicer for plaintiff's loan and one affidavit was signed by Scott Zeitz (hereinafter "Zeitz") in his capacity as litigation analyst for GMAC Mortgage, LLC. Both affidavits were purportedly based upon the personal knowledge of the affiants and purportedly duly sworn and subscribed before the same notary public.

91.     Jeffrey Stephan in his "Affidavit of Indebtedness" executed on 13 May 2009, averred that:

(a)     "This Affidavit is based upon the personal knowledge of Affiant, who avers his competency to testify as a sworn witness to the matters contained herein."

(b)     "Affiant is familiar with the books and records of GMACM, specifically payments made pursuant to the Note and Deed of Trust described hereinbelow, which books and

records were, and at all times mentioned herein have been, maintained under his supervision in the ordinary course of business of GMACM. Said books were made at or near the time of each such transaction or occurrence."

(c)     "Sworn and subscribed" before a notary.

92.     Stephan purports to provide evidence of plaintiff's default on the loan and evidence of the chain of custody for plaintiff's original promissory note and deed of trust as it was assigned and transferred from the original lender, through at least two failed entities and securitized or bundled into an investment vehicle, to the foreclosing petitioner-defendant Deutsche.

93.     Evidence establishing the chain of custody for the assignment and transfer of the promissory note and deed of trust is crucial to establish that the moving party is in fact the owner and holder of the debt in question at a foreclosure hearing. Mere possession of the original note and deed of trust is not sufficient to prove ownership or holder status under North Carolina law. *See Econo-Travel Motor Hotel Corp. v. Taylor*, 301 N.C. 200, 271 S.E.2d 54 (1980).

94.     Plaintiff's loan was originated by First National Bank of Arizona. The party that sought to foreclose was defendant here Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6. Unlike the situation where the hometown bank loans money to Joe Smith, collects all the payments until default and then hires hometown attorney to foreclose, Deutsche is a foreign corporation acting as a Trustee for the corporate investment vehicle, Residential Accredit Loans, Inc. Series 2006-QA6 wherein hundreds if not thousands of mortgage loans are bundled.

95.     Stephan gave deposition testimony in a case in which he admitted under oath, *inter alia,* that as an employee of defendant GMAC he signed between 6000 and 10,000

affidavits for use in foreclosure actions; that he had no personal knowledge of the contents of any of these affidavits; that at no time did he sign these affidavits in front of the notary public who acknowledged his affidavits; and that he did not review the supporting documents attached to any of these affidavits.

96. Stephan gave deposition testimony on 7 June 2010, in the case of *Federal National Mortgage Association v. Bradbury*, Maine District Court, District Nine, Division of Northern Cumberland, Docket No. BRI-RE-09-65.

97. In the *Bradbury* case, Stephan executed, as Limited Signing Officer for GMAC Mortgage, LLC, an affidavit in support of Plaintiff's Motion for summary judgment in a judicial foreclosure. This affidavit was dated August 5, 2009.

98. During the *Bradbury* deposition, Stephan admitted the following:

(a) that he had previously testified in a Florida state court case in December 2009, that his team brought to him approximately 10,000.00 affidavits and assignments in a month to be used in foreclosure actions;

(b) that at the time of the June, 2010, deposition, he estimated he was signing "anywhere from six to 8,000 documents;"

(c) that he did not sign affidavits in the presence of a notary public;

(d) that he did not read every paragraph of the summary judgment affidavits he signed that were prepared by Lender Processing Services, Inc.;

(e) that he did not check to see if all the exhibits referenced in the affidavit were actually attached to the affidavit at the time he signed the affidavit;

(f) that he did not inspect any of the exhibits attached to the affidavits;

(g)     that he previously testified in the Florida deposition that he relied upon the attorney network requesting the affidavits to ensure the documents that he received and signed were correct and accurate and therefore he had no personal knowledge of the facts he was supposedly averring under oath;

(h)     that he continued to rely upon the attorney network requesting the affidavits to ensure the documents he signed were correct and accurate;

(i)     that other than the due date and balances due, he did not know whether any other part of the affidavits he signed were true;

(j)     that he had no control over and was not responsible for the computer system used to create, maintain and calculate the amounts allegedly due from borrowers;

(k)     that he had no knowledge about how GMAC ensures the accuracy of the data entered into the system;

(l)     that the practice he described in signing affidavits described as summary judgment affidavits was the practice he used for signing ALL (emphasis added) affidavits.

99.     Stephan was deposed six months earlier in December, 2009, in a Florida state court foreclosure case, *GMAC Mortgage, LLC v. Neu, et. als.*, Palm Beach County, Florida, Case No. 50 2008 CA). His Florida court testimony is consistent with the testimony recited above except he did not admit that his signing practices applied to ALL AFFIDAVITS he signed until the deposition given in the Maine case:

(a)     he did not sign the affidavits based on his personal knowledge and that he relied on others;

(b)     his team did not verify the accuracy of the information, he relied on others to ensure that the information in the affidavits was correct and accurate;

(c)      he did not ascertain who the current promissory note holder was even though his affidavits always stated or implied that the moving party was the holder of the note;

(d)      he routinely signed affidavits outside the presence of a notary public.

100.    As early as May, 2006, yet a different Florida state court admonished GMAC, and sanctioned the Plaintiff lender for GMAC's affidavit signing practices. As part of its order, the Florida state court required GMAC to file a Notice of Compliance, indicating its commitment to modify its affidavit signing procedures to conform to proper practices.

101.    On 24 September 2010, the Maine state court in the *Bradbury* case sanctioned the Plaintiff, Federal National Mortgage Company, for the actions of its servicing agent, GMAC Mortgage, LLC, based in part upon the deposition testimony of Jeffrey Stephan finding that the submission of Mr. Stephan's affidavit was an act of bad faith.

102.    Based on his deposition admissions, Stephan was identified as a "robo signer" of foreclosure affidavits who did not review the documents he signed; who did not sign before a notary public and who had no personal knowledge about the documents he signed.

103.    Defendant Deutsche knew or should have known that the Gilbert foreclosure action was based on false affidavits. Defendant submitted these false affidavits despite this knowledge. The order for foreclosure of the Gilberts' home was procured through the use of false affidavits. Stephan having admitted during his deposition testimony that:

(a)      he did not appear in front of a notary to sign ANY affidavits;

(b)       he did not read the affidavits or the exhibits;

(c)      he did not have personal knowledge about the information contained in the affidavits beyond the summary checking of some figures;

104.    The submission of the false affidavits not only in the Gilberts' case but in thousands of foreclosures across the country constitutes a fraud upon the court in which the integrity of the court and its ability to function impartially is directly impinged. This is an improper influence exerted on the court akin to the bribery of a judge or juror.

105.    The admissions of Stephan in two separate depositions; Stephan's admission that his affidavit signing practice applied to ALL affidavits executed in foreclosure actions; and the fact that defendant GMACM has been sanctioned by two different courts for the willful refusal to correct its signing practices establishes a pattern and practice. This pattern and practice calls into serious question not only the false affidavit of Jeffrey Stephan in the case at bar but also the affidavit of Scott Zeitz. Scott Zeitz's Affidavit was notarized by the exact same notary as the affidavit of Jeffrey Stephan.

106.    Defendant Deutsche relied upon two affidavits and the presentation of the original note and certified copy of the deed of trust as its evidence for foreclosure. The two affidavits were not based upon the personal knowledge of the affiants.

107.    Defendant Deutsche's two affiants were not familiar with the payment history of plaintiff. Defendant Deutsche's two affiants were not responsible for applying plaintiff's monthly payments to the loan. Defendant Deutsche's two affiants did not maintain the books and records showing the application of plaintiff's monthly payments. Defendant Deutsche's two affiants did not supervise others who maintained the books and records used to apply the Gilberts' monthly payments. Defendant Deutsche's two affiants did not review the information in the affidavits. Defendant Deutsche's two affiants relied upon the knowledge of those in the attorney network to ensure the accuracy of the information to which they swore. Defendant Deutsche's two affiants swore to the accuracy of the application of payments for a loan which

they had never seen, did not create, did not maintain, did not supervise, and did not know how or who did create, maintain and supervise the information.

108.    Defendant Deutsche's two affiants were not familiar with the assignments and transfer of plaintiff's loan as it passed through multiple entities. Defendant Deutsche's two affiants did not ascertain who the current promissory note holder was. Defendant Deutsche's two affiants did not verify or review the information in the affidavits. Defendant Deutsche's two affiants relied upon the knowledge of those in the attorney network to ensure the accuracy of the information as to the assignments and transfers to which they swore. Defendant Deutsche's two affiants swore to the accuracy of the assignments and transfers for a loan which they had never seen, did not create, did not maintain, did not supervise, and did not know how or who did create, maintain and supervise the information.

109.    Defendant Deutsche's affiant did not check the accuracy of the Truth in Lending disclosures about which the plaintiffs' complained. Defendant Deutsche's affiant did not review the promissory note and the addendum to the note and compare the disclosures in each document against those disclosed on the Truth in Lending Disclosure Statement. Defendant Deutsche's affiant relied upon the knowledge of those in the attorney network to ensure the accuracy of the Truth in Lending Disclosures to which he swore. Defendant Deutsche's affiant swore to the accuracy of the Truth in Lending Disclosures for a loan which he had never seen, did not create, did not maintain, did not supervise, and did not know how or who did create, maintain and supervise the information.

110.    The North Carolina Court of Appeals concluded was no credible evidence before the superior court upon which the court could reasonably conclude that defendant Deutsche had met its burden of proof as required by G.S. 45.21-16 by showing that there was a (i) valid debt of

which the party seeking to foreclose [was] the holder, (ii) default, (iii) right to foreclosure under the instrument, (iv) notice to those entitled to such under subsection (b), and (v) that the underlying mortgage debt [was] not a subprime loan. N.C. Gen. Stat. 45-21.16.

### CLAIMS FOR RELIEF
### STATEMENT OF NATURE OF CLAIMS ASSERTED

111.    This action is filed, in part, to enjoin the mortgage foreclosure sale ordered in 09 SP 09, Hyde County, on equitable and legal grounds pursuant to N.C. Gen. Stat. §45-21.34.  All claims asserted affirmatively by plaintiffs in this action are also asserted, in the alternative, in defense and recoupment against any claim of indebtedness arising from the mortgage loan obligations and transactions that are the subject of this complaint.

### FIRST CLAIM FOR RELIEF
### VIOLATIONS OF TRUTH IN LENDING
### AGAINST DEFENDANT DEUTSCHE

112.    All paragraphs of this complaint are incorporated herein as if fully restated.

113.    This consumer credit transaction was subject to the Plaintiffs' right of rescission as described by 15 U.S.C. § 1635 and Regulation Z § 226.23 (12 C.F.R. § 226.23).

114.    Defendant Deutsche as purported assignee of First National Bank of Arizona and the purported holder of the Promissory Note violated 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b) by failing to timely deliver to the plaintiffs two copies of the notice of the right to rescind which clearly and conspicuously disclosed the date the rescission period expired.

115. Defendant Deutsche as purported assignee of First National Bank of Arizona and holder of the Promissory Note violated 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b) by failing to deliver all ''material'' disclosures required by the Act and Regulation Z, in the following and other respects:

    a. By failing to clearly and accurately disclose the ''annual percentage rate,'' using that term, in violation of Regulation Z § 226.18(e) and 15 U.S.C. § 1638(a)(4).
    b. By failing to properly disclose the number, amounts, and timing of payments scheduled to repay the obligation, in violation of Regulation Z § 226.18(g) and 15

U.S.C. § 1638(a)(6).

c. By failing to clearly and accurately disclose the ''total of payments,'' using that term, in violation of Regulation Z § 226.18(h) and 15 U.S.C. § 1638(a)(5).33.

116.    These material disclosure violations are apparent from the face of the disclosure statement and other documents assigned pursuant to the requirements of 15 U.S.C. § 1641(a).

117.    Plaintiffs have a continuing right to rescind the transaction until the third business day after receiving both the Notice to Right to Cancel and all ''material'' disclosures pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3), up to three years after consummation of the transaction.

118.    On 5 April 2009, plaintiffs by and through counsel rescinded the transaction by sending to a notice of rescission addressed to "Holder of Loan # , c/o Ms. Lauren S. Thurmond, Kellam & Pettit, P.A. , 2701 Coltsgate Road, Suite 300, Charlotte, North Carolina 28211.

119.    Counsel for defendant forwarded the plaintiffs' letter of rescission to defendant GMAC.

120.    More than 20 calendar days have passed since defendant received copies of the plaintiffs' notice of rescission. More than 20 calendar days have passed since the decision issued by the United States Court of Appeals confirming the plaintiffs' exercise of rescission, the entry of the partial mandate and the entry of the final mandate.

121.    Defendant has failed to take any action necessary or appropriate to reflect the termination of the security interest created under this transaction as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

122.    Defendant has failed to return to plaintiffs any money or property given by the plaintiffs to anyone, including the defendants, as required by 15 U.S.C. §1635(b) and Regulation Z § 226.23(d)(2).

123.    As a result of the aforesaid violations of the Act and Regulation Z, pursuant to 15

U.S.C. §§ 1635(a), 1640(a), and 1641(c), defendant is liable to plaintiffs for:

a.  Rescission of this transaction.

b. Termination of any security interest in plaintiff's property created under the transaction.

c.  Return of any money or property given by the plaintiff to anyone, including the Defendant, in connection with this transaction.

d.  Statutory damages of $2000 for defendants' failure to respond properly to plaintiffs' rescission notice.

e.  Forfeiture of return of loan proceeds.

f.  Actual damages in an amount to be determined at trial.

g. Reasonable attorney's fees.

<strong><u>SECOND CLAIM FOR RELIEF</u><br><u>UNFAIR AND DECEPTIVE ACTS AND PRACTICES</u><br><u>PURSUANT TO N.C. GEN. STAT. 75-1.1</u><br><u>AGAINST DEFENDANT DEUTSCHE</u></strong>

124.    All paragraphs of this complaint are incorporated herein as if fully restated.

125.    Defendant has engaged in unfair methods of competition in or affecting

commerce or unfair or deceptive acts or practices in or affecting commerce in the following and

other respects:

- failing to make material disclosures pursuant to the requirements of the federal Truth in Lending Act;

- failing to take affirmative steps to cancel the plaintiffs' Deed of Trust upon their notice of rescission;

- refusing to honor plaintiffs' exercise of rescission;

- falsely representing to be the owner and holder of plaintiff's note and deed of trust;

- presenting false affidavits in plaintiffs' foreclosure proceeding and engaging in a pattern and practice of presenting false affidavits in foreclosure proceedings;

- creating a new allonge outside the chain of transfers;

- attempting to hold a foreclosure sale when no order authorizing a foreclosure was in effect and no foreclosure action was pending

126.    These acts and omissions proximately damaged plaintiffs, are in and affecting commerce, violate public policy, have the capacity to deceive an ordinary consumer, are unscrupulous, immoral, and oppressive, and constitute unfair and/or deceptive practices under N.C. Gen. Stat. § 75-1.1, thereby entitling plaintiffs to three times their actual damages plus a reasonable attorney's fee pursuant to N.C. Gen. Stat.§§ 75-16 and 75-16.1.

### THIRD CLAIM FOR RELIEF
### VIOLATIONS OF NORTH CAROLINA'S PROHIBITED ACTS BY DEBT COLLECTORS
### PURSUANT TO N.C. GEN. STAT. § 75-50 *ET. SEQ.*
### BY DEFENDANT DEUTSCHE

127.    All paragraphs of this complaint are incorporated herein as if fully restated.

128.    Plaintiffs are consumers within the meaning of N.C. Gen. Stat. § 75-50 *et seq*.

129.    Defendant is a debt collector within the meaning of N.C. Gen. Stat. § 75-50 *et. seq.* under general principals of agency for the actions of its agent defendant GMACM and defendant Ocwen.

130.    Defendant has attempted to collect a debt within the meaning of N.C. Gen. Stat. § 75-50(2).

131.    Defendant and it's agent defendant GMACM have engaged in acts of debt collection in violation of N.C. Gen. Stat. § 75-50 et. seq. in the following and other respects:

a.      communicating with plaintiffs after the defendants Deutsche, GMAC, and Ocwen had been notified by the plaintiffs' attorney that she represented said plaintiffs;

b.       falsely representing the character, extent, or amount of debt against a consumer pursuant to N.C. Gen. Stat. § 75-54(4) to wit: all attempts to collect money from plaintiffs after plaintiffs forwarded their notice of rescission to the noteholder;

c.      falsely representing to be the owner and holder of the plaintiffs' Promissory Note;

d.      attempting to foreclose on plaintiffs' property without legal authority.

132.    Defendant is liable to plaintiffs for actual damages and a statutory penalty of $2000.00 for each violation proved at trial and reasonable attorney's fees.

## FOURTH CLAIM FOR RELIEF
## ATTEMPTED WRONGFUL FORECLOSURE
## AGAINST DEFENDANT DEUTSCHE

133.    All paragraphs of this complaint are incorporated herein as if fully restated.

134.    On or about 5 May 2006, plaintiff executed a Promissory Note in favor of First National Bank of Arizona.

135.    Defendant Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. purports to be the owner and holder of the Promissory Note executed by plaintiff to First National Bank of Arizona by and through various indorsements.

136.    Under N.C. Gen. Stat. § 25-3-301, the holder of a negotiable instrument may enforce payment in his own name.

137.    N. C. Gen. Stat. § 25-1-201(21) defines a holder of an instrument as one who is in possession of an instrument "drawn, issued, or indorsed to him or to his order or to bearer or in blank.

138.    Where a negotiable instrument is made payable to order, one becomes a holder of the instrument when it is properly indorsed and delivered.

139.    Mere possession of a note payable to order does not suffice to prove ownership or holder status. *Econo-Travel Motor Hotel Corp. v. Taylor*, 301 N.C. 200, 271 S.E.2d 54 (1980).

140.    The Allonge under and by which defendant Deutsche claims to hold is defective in at least the following:

a.    on information and belief, the indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact on behalf of First National Bank of Nevada is not duly authorized;

b.    the indorsement to Defendant Deutsche is in its representative capacity as trustee not to Defendant Deutsche in its own name. No principal's name appears in the indorsement.

141.    The foreclosure action commenced on behalf of Deutsche was, among other things, supported by fraudulent affidavits executed by persons without personal knowledge of the facts to which they averred and were executed outside the presence of a notary public.

142. Defendant Deutsche is without authority and capacity to enforce the Promissory Note executed by plaintiff to First National Bank of Arizona.

143.    The promissory note and the affidavits were false representations, made by defendant Deutsche with the intent to deceive the plaintiffs, did in fact deceive the plaintiffs, they were damaged.

144.    Defendant Deutsche is liable to plaintiffs for an amount to be proven at trial.

**FIFTH CLAIM**
**VIOLATIONS OF NORTH CAROLINA'S PROHIBITED ACTS BY DEBT COLLECTORS**
**PURSUANT TO N.C. GEN. STAT. § 75-50 *ET. SEQ.***
**BY DEFENDANT OCWEN**

145. All paragraphs of this complaint are incorporated herein as if fully restated.

146. Plaintiffs are consumers within the meaning of N.C. Gen. Stat. § 75-50(1).

147. Defendant Ocwen is a debt collector within the meaning of N.C. Gen. Stat. § 75-50(3).

148. Defendant Ocwen has attempted to collect a debt within the meaning of N.C. Gen. Stat. § 75-50(2).

149. Defendant Ocwen has engaged in acts of debt collection in violation of N.C. Gen. Stat. § 75-50 *et. seq.* in the following and other respects:

a. communicating with plaintiffs after the defendants Deutsche, GMAC, and Ocwen had been notified by the plaintiffs' attorney that she represents said plaintiffs;

b. falsely representing the character, extent, or amount of debt against a consumer pursuant to N.C. Gen. Stat. § 75-54(4) to wit: all attempts to collect money from plaintiffs after plaintiffs forwarded their notice of rescission to the noteholder;

c. falsely representing to be the servicer of the plaintiffs' Promissory Note;

150. Defendant Ocwen is liable to plaintiffs for actual damages, statutory penalties of $2000.00 for each violation proved at trial, and reasonable attorney's fees.

## SIXTH CLAIM
## UNFAIR AND/OR DECEPTIVE ACTS AND PRACTICES
## IN VIOLATION OF N.C. GEN. STAT. § 75-1.1
## AGAINST DEFENDANT OCWEN

151 All paragraphs of this complaint are incorporated herein as if fully restated.

152. Defendant has engaged in unfair methods of competition in or affecting commerce or unfair or deceptive acts or practices in or affecting commerce in the following and other respects:

- attempting to service and/or servicing a loan that was timely rescinded as required under the Truth in Lending Act

153.     These acts and omissions proximately damaged plaintiffs, are in and affecting commerce, violate public policy, have the capacity to deceive an ordinary consumer, are unscrupulous, immoral, and oppressive, and constitute unfair and/or deceptive practices under N.C. Gen. Stat. § 75-1.1, thereby entitling plaintiffs to three times their actual damages plus a reasonable attorney's fee pursuant to N.C. Gen. Stat.§§ 75-16 and 75-16.1.

**PLAINTIFFS' FIRST MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANTS**
TO PRESERVE THE STATUS QUO AND TO PREVENT DELAYING TACTICS BY
PROHIBITING THE ASSIGNMENT OF THE MORTGAGE OR SERVICING
RIGHTS DURING THE COURSE OF THE LITIGATION

154.     All paragraphs of this complaint are incorporated herein as if fully restated.

155.     Plaintiffs, pursuant to Rule 65(b) of the North Carolina Rules of Civil Procedure, move this Court for an Order granting a Preliminary Injunction, enjoining these defendants from conveying or assigning any interest in the mortgage loan that is the subject of this litigation until and unless otherwise allowed by Court Order.

156.     As grounds for said Motion, plaintiffs reallege and incorporate herein by reference the facts of this verified complaint and state  additionally that they will suffer immediate and irreparable harm if said defendants undertake to delay these proceedings by forcing addition or joinder of parties who may subsequently obtain an interest in plaintiffs' loan. The prospect of prolonged delay by virtue of sale or assignment of interests in this loan is not without precedent by similarly situated lender-defendants and would cause great harm to the plaintiffs.

157.     Plaintiffs show the court that the relief requested is for the purpose of preserving the status quo and that the burden imposed upon the defendants is reasonable and necessary for

purposes of preserving the status quo and that the burden is far less than would be suffered by the plaintiffs if the status quo is not maintained during the course of the litigation.

158.     Plaintiffs respectfully request that the Court accept this verified complaint as their affidavit for purposes of this Motion for Preliminary Injunction.

## PLAINTIFFS' SECOND MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANTS
### TO PRESERVE THE STATUS QUO AND TO RESTRAIN A FORECLOSURE SALE DURING THE COURSE OF THIS LITIGATION, WHICH WOULD OTHERWISE CAUSE IRREPARABLE HARM TO PLAINTIFFS.

159.     All paragraphs of this complaint are incorporated herein as if fully restated.

160.     Plaintiffs, through counsel and pursuant to Rule 65 of the North Carolina Rules of Civil Procedure, respectfully move this Court for a Temporary Restraining Order prohibiting defendants  from proceeding toward the foreclosure sale of plaintiffs' home and, in support of this motion, show the following: (i) plaintiffs have shown through their Complaint and Affidavit, and will show at the hearing of this Motion, claims which have a substantial likelihood of success on the merits; (ii) that plaintiffs will suffer immediate and irreparable harm by virtue of losing title to their home through foreclosure sale before the adverse parties or their counsel can be heard in opposition to this Motion; (iii) that the potential injury to the plaintiffs is of such a nature that compensation alone will not make plaintiffs whole; (iii) that the restraint ordered imposes no undue burden or risk of harm to defendants; (iv)  that balancing the risk of harm between the parties favors injunctive relief in favor of plaintiffs; (v)  that time is of the essence, and that the bond, if applicable, will adequately  protect defendants from any reasonable risk of harm by the restraint ordered while the underlying claims determining the rights of the parties are decided.

161.    Plaintiffs' counsel undersigned certifies to the Court the efforts that have been made to give notice of this Motion to the adverse parties and the reasons supporting the claim that notice should not be required as follows:

162.    Wherefore plaintiffs respectfully request that a Temporary Restraining Order be entered by the Court prohibiting the defendants from pursuing further proceedings toward the foreclosure sale of plaintiffs' home or otherwise ordering relief as the Court determines appropriate.

163.    Plaintiffs were granted a Temporary Restraining Order and a Preliminary Injunction by the presiding superior court judge when this matter was pending within the jurisdiction of the North Carolina Superior Court.

## REQUEST FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1.    Assume jurisdiction of this case;

2.    Declare the security interest in Plaintiff's home void;

3.    Rescind the transaction of 5 May 2006;

4.    Order defendants to take all action necessary to terminate any security interest in plaintiffs' property created under the transaction and that the Court declare all such security interests void, including but not limited to the mortgage related to the transaction of 5 May 2006;

5.    Order the return to the plaintiff of any money or property given by the plaintiff to anyone, including the defendants, in connection with the transaction;

6.    Enjoin defendants during the pendency of this action, and permanently thereafter, from instituting, prosecuting, or maintaining foreclosure proceedings on the plaintiffs' property,

from recording any deeds or mortgages regarding the property or from otherwise taking any steps to deprive plaintiffs of ownership of that property;

7.      Award the plaintiffs statutory damages for defendant's failure to respond properly to the plaintiffs' rescission notice, in the amount of twice the finance charge in connection with this transaction, but not less than $200 or more than $2000 as provided under 15 U.S.C. § 1640(a);

8.      Order that, because the defendants failed to respond to the plaintiffs' notice of rescission, plaintiffs have no duty to tender, but, in the alternative, if tender is required, determine the amount of the tender obligation in light of all of the defendants' actions and plaintiffs' claims, and order the defendants to accept tender on reasonable terms and over a reasonable period of time;

9.      Award actual damages in an amount to be established at trial;

10.     Award the plaintiffs costs and a reasonable attorney fee as provided under 15 U.S.C. § 1640(a);

11.     Award treble damages pursuant to N.C. Gen. Stat. §75-16;

12.     Order a forfeiture of all interest under the loan transaction;

13.     Award twice the amount of usurious interest pursuant to N.C. Gen. Stat. § 24-2, et. seq.;

14.     Award plaintiffs punitive damages;

15.     Grant plaintiffs injunctive relief as requested above;

16.     Award such other and further relief as the Court deems just and proper.

This the ___ day of September 2015.

_____
Katherine S. Parker-Lowe

33

Attorney for Plaintiffs
NC Bar # 13318
35 Miss Elecia Lane, Suite 101
Post Office Box 730
Ocracoke, North Carolina 27960
Phone: 252-928-1000
Fax: 252-928-3037

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
NO. 4:09-CV-00181-D

| | |
|---|---|
| REX T. GILBERT, JR. and | ) |
| DANIELA L. GILBERT, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DEUTSCHE BANK TRUST COMPANY | ) |
| AMERICAS, *As Trustee for*, | ) |
| RESIDENTIAL ACCREDIT LOANS, INC, | ) |
| DAVID A. SIMPSON, P.C., Substitute Trustee, | ) |
| RESIDENTIAL FUNDING, LLC, GMAC | ) |
| MORTGAGE, LLC, and OCWEN LOAN | ) |
| SERVICING, LLC., | ) |
| Defendants. | ) |
| | ) |

CERTIFICATE OF SERVICE

I hereby certify that on 15 September 2015 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Nicholas Voelker and Christian W. Hancock and I hereby certify that I have mailed the document to the following non CM/ECF participant:

David A. Simpson, P.C.
c/o David A. Simpson
501 Minuet Lane, Suite 104A
Charlotte, NC 28217

This the 15th day September 2015.

/s/Katherine S. Parker-Lowe
Katherine S. Parker-Lowe
Attorney for Plaintiffs

34

VERIFICATION

Rex T. Gilbert, Jr. and Daniela L. Gilbert, being duly sworn, depose and say the following:

That the contents of the foregoing instrument are true to my own knowledge except matters stated on information and belief and as to those matters I believe them to be true.

This the _14_ day of _September_, 2015

_____
Rex T. Gilbert, Jr.

_____
Daniela L. Gilbert

Sworn and subscribed to before me

this _14th_ day of _Sept._, 20 _15_.

_____
Notary Public

My Commission Expires:

_____



## BANK OF ARIZONA

1665 W. Alameda Drive
Tempe, AZ 85282
Office (480) 224-8321 Fax 480-224-8522

### ALLONGE TO NOTE

LOAN NUMBER: 5300000843
BORROWER: Gilbert JR
IN THE AMOUNT OF: $525,000.00

PAY TO THE ORDER OF:

**First National Bank of
Nevada**

WITHOUT RECOURSE BY:

_[signature]_

AMY HAWKINS, ASSISTANT VICE PRESIDENT
FIRST NATIONAL BANK OF ARIZONA

---

Pay to The order Of
**RESIDENTIAL FUNDING CORPORATION**

Without Recourse
First National Bank of Nevada

By: _[signature]_
Deutsche Bank National Trust
Company, F/K/A Bankers Trust
Company of California, N. A.
as Custodian as Attorney In
Fact

Christopher Corcoran
Vice President

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

BY _[signature]_
Judy Faber, Vice President

EXHIBIT
P Ex 1
Blumberg No. 5116

# ADJUSTABLE RATE NOTE

(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

May 5, 2006          MCLEAN          VA
[Date]               [City]          [State]

134 West End Road, Ocracoke, NC  27960
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 525,000.00          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **First National Bank of Arizona**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          7.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **July 1, 2006** .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **June 1, 2036** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. BOX 62768, PHOENIX, AZ 85085-2768**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments  See Attached Interest-Only Addendum here to and made a part here of.

Each of my initial monthly payments will be in the amount of U.S. $ 4,391.32 . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.
5300000843

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) -
Single Family - Fannie Mae UNIFORM INSTRUMENT

VMP®-838N (0210)          Form 3520 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 4          Initials: _____



## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of June, 2013 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 13.375 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.375 %, OR LESS THAN 2.750 .

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

5300000843

Form 3520 1/01
Initials: RTL

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **4.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

5300000843

-838N (0210)

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CAUTION—IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
Rex T. Gilbert, JR    -Borrower                                      -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                      -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                      -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                      -Borrower

*[Sign Original Only]*


Case 4:09-cv-00181-D   Document 74   Filed 09/15/15   Page 40 of 49

# INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE PROMISSORY NOTE

Loan Number: __5300000843__

Property Address: __134 West End Road, Ocracoke, NC  27960__

**THIS ADDENDUM** is made this 5th day of May, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed by the undersigned and payable to First National Bank of Arizona (the "Lender").

**THIS ADDENDUM** supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note. None of the other provisions of the Note are changed by this addendum.

## 3.    PAYMENTS

### (A)    Time and Place of Payments

I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. I will pay principal and interest by making payments every month thereafter for the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

I will make my monthly payments on the first day of each month beginning on July 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on June 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my payments at 1165 West Alameda Drive, Tempe, AZ 85282 or at a different place if required by the Note Holder.

### (B)    Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $3,226.57. This payment amount is based on the original principal balance of the Note. This payment amount may change.

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (C)    Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage point(s) (2.750%) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance. At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

## 7.    BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)    A Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 4.000% of my overdue payment of interest during the interest-only period, 4.000% of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

EXHIBIT

PEX 3

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:

First National Bank of Arizona
1760 Old Meadow Road
Mc Lean, VA 22102

BORROWERS:

☐ Preliminary  ☒ Final

DATE: 05/05/2006
LOAN NO.: 5300000843
Type of Loan: ARM

ADDRESS:
CITY/STATE/ZIP:
PROPERTY: 134 West End Road Ocracoke NC 27960

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.953 % | $ 943,469.57 | $ 507,473.43 | $ 1,450,943.00 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE<br>MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE<br>MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 84 | $3,226.57 | 07/01/2006 | | | |
| 36 | $3,500.00 | 07/01/2013 | | | |
| 239 | $4,391.32 | 07/01/2016 | | | |
| 1 | $4,385.64 | 06/01/2036 | | | |

DEMAND FEATURE: ☒ This loan does not have a Demand Feature.   ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☒ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY:   You are giving a security interest in the property located at:
134 West End Road Ocracoke NC 27960

ASSUMPTION:   Someone buying this property ☐ cannot assume the remaining balance due under original mortgage terms
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES:   $ 250.00

PROPERTY INSURANCE:   You may obtain property insurance from anyone you want that is acceptable to Lender.

LATE CHARGES:   If your payment is more than 15 days late, a late charge of 4.000 % of the
payment will be assessed.

PREPAYMENT:   If you pay off your loan early, you
☐ may  ☒ will not   have to pay a penalty.
☐ may  ☒ will not   be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_Rex T. Gilbert, JR_    5/5/06
Rex T. Gilbert, JR                BORROWER/DATE                    BORROWER/DATE

_Daniela L. Gilbert_    5/5/06
Daniela L. Gilbert                BORROWER/DATE                    BORROWER/DATE

5300000843

VMP -788 (0412).01                VMP Mortgage Solutions, Inc. (800)521-7291        Page 1 of 2            12/04
© 2005 CBF Systems, Inc.  The contents of this form in whole or in part are protected under the copyright laws of the United States.

EXHIBIT
P Ex 4

# KATHERINE S. PARKER-LOWE

ATTORNEY AT LAW
2 BEACH LANE
OCRACOKE, NORTH CAROLINA 27960

MAILING ADDRESS
POST OFFICE BOX 730
OCRACOKE, NC 27960
E-MAIL: katherine@parker-lowe.net

TELEPHONE
(252) 928-1000
FACSIMILE
(252) 928-3037

April 5, 2009

Holder of Loan # 0810012713
c/o Ms. Lauren S. Thurmond
Kellam & Pettit, P.A.
2701 Coltsgate Road
Suite 300
Charlotte, North Carolina 28211

Re:   In the Matter of the Foreclosure....Gilbert
      Hyde County File 09-SP-9
      Rex T. Gilbert, Jr.
      134 West End Road
      Post Office Box 754
      Ocracoke, North Carolina 27960

Dear Ms. Thurmond:

As you are aware, I represent Mr. Gilbert concerning the loan transaction which he entered into with First National Bank of Arizona on May 5, 2006. I have been authorized by my clients to rescind this transaction and hereby exercise that right pursuant to the Federal Truth in Lending Act, 15 U.S.C. § 1635, Regulation Z § 226.23.

The disclosure statement failed to provide all the required material disclosures correctly, including, but not limited to:

(a)   The disclosed payment schedule does not match the note;
(b)   The stated APR is more than one-eighth of one-percent off;
(c)   The total of payments is not correct;
(d)   The total of payments results in a higher APR than the disclosed APR
(e)   The disclosures do not match the note or the addendum to the note.

The security interest is void upon our rescission. See 15 U.S.C. § 1635; Regulation Z § 226.23. Pursuant to the Regulation, you have twenty days after receipt of this notice of rescission to return to my client all monies paid and to take action necessary or appropriate to reflect termination of the security interest.

We are prepared to discuss a tender obligation, should it arise, and satisfactory ways in which my client may meet this obligation. Please be advised that if you do not cancel



EXHIBIT
P Ex 5

the security interest and return all consideration paid by my client within 20 days of receipt of this letter, you will be responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).

Please send me a copy of my client's payment history and other documents showing the loan disbursements, loan charges, payments made, and current principal balance due.

Sincerely,

Katherine S. Parker-Lowe

KPL/mpc

cc: Mr. and Mrs. Rex T. Gilbert, Jr.

**GMAC ResCap**

April 24, 2009

Katherine Parker-Lowe
Attorney at Law
2 Beach Lane
Ocracoke, NC 27960

Re:    Rex Gilbert, Jr.
        Loan number #0810012713 ("Loan")

Dear Ms. Parker-Lowe:

We are writing in response to your correspondence to GMAC Mortgage, LLC requesting rescission of the loan transaction your client entered into with First National Bank of Arizona on May 5, 2006.

We have reviewed your client's loan file and find no basis to conclude that there were any material disclosure errors that would give rise to an extended right of rescission.

Consequently, we will not rescind the Loan transaction at this time.

If you have any documents or further information that sets forth the basis of the demand, please contact me at the address below.

Sincerely,

Kathy Priore
Associate Counsel

cc: Lauren Thurmond, Kellam & Pettit, PA

GMAC ResCap
One Meridian Crossings  Suite 100  Richfield, MN 55423
952.857.7000  gmacrescap.com



Blumberg No. 5118
EXHIBIT
P GX 6

# NOTICE OF RIGHT TO CANCEL

LENDER: First National Bank of Arizona

DATE 5/5/06
LOAN NO. 5300000843
TYPE Conventional

BORROWERS/OWNERS Rex T. Gilbert, JR

ADDRESS          134 West End Road
CITY/STATE/ZIP   Ocracoke, NC 27960
PROPERTY         134 West End Road, Ocracoke, NC  27960

## YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1) The date of the transaction, which is
or
(2) The date you received your Truth In Lending disclosures;
or
(3) The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:
**First National Bank of Arizona**
**MS AZ-4003-078**
**1665 W. Alameda Drive**                Or Fax to:  (602) 636-7096
**Tempe, AZ  85282-3200**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of
(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

## I WISH TO CANCEL

_____          _____
CONSUMER'S SIGNATURE                                       DATE

Each of the borrowers/owners in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective as to all borrowers/owners.

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL

X _____     5/5/06    X _____
BORROWER/OWNER Rex T. Gilbert, JR     DATE     BORROWER/OWNER          DATE

X _____     5/5/06    X _____
BORROWER/OWNER  Daniela L. Gilbert     DATE     BORROWER/OWNER          DATE

---

## CONFIRMATION CERTIFICATE

### DO NOT SIGN UNTIL THREE BUSINESS DAYS HAVE ELAPSED

**Three business days have elapsed** since the undersigned have received two copies of this document. Each of the undersigned hereby certify and warrant that they have not exercised any right which they may have to rescind the transaction, that they do not desire to do so, and that they ratify and confirm the transaction in all respects.

_____          _____
BORROWER/OWNER Rex T. Gilbert, JR     DATE     BORROWER/OWNER          DATE

_____          _____
BORROWER/OWNER Daniela L. Gilbert     DATE     BORROWER/OWNER          DATE

5300000843

VMP -66 (0305).01
VMP Mortgage Solutions (800)521-7291          10/00

EXHIBIT
P EX 7

## NOTE ALLONGE

Note Date:      May 5, 2006

Borrower:       Rex T. Gilbert, Jr.

Address:        134 West End Road, Ocracoke NC 27960

Loan Amt:       $525,000.00


Pay to the Order of

Deutsche Bank Trust Company Americas as Trustee for

Residential Accredit Loans, Inc. Series 2006-QA6

Without Recourse

By: _____

Lisa Magnuson, Authorized Officer
Residential Funding Company, LLC as attorney in fact
For Deutsche Bank Trust Company Americas as Trustee
For Residential Accredit Loans, Inc. Series 2006-QA6

EXHIBIT
P Ex 8
Blumberg No. 5118

## AMENDED NOTICE OF SUBSTITUTE TRUSTEE'S FORECLOSURE SALE OF REAL PROPERTY

UNDER AND BY VIRTUE of the power and authority contained in that certain Deed of Trust executed and delivered by Rex T. Gilbert, Jr. and Daniela L. Gilbert, dated May 5, 2006 and recorded on May 10, 2006, in Book No. 219, at Page 53 in the Office of the Register of Deeds of Hyde County, North Carolina; and because of default in the payment of the indebtedness secured thereby and failure to carry out and perform the stipulations and agreements contained therein and, pursuant to demand of the holder of the indebtedness secured by said Deed of Trust, the undersigned Substitute Trustee will place for sale, at public auction, to the highest bidder for cash at the usual place of sale at Hyde County Courthouse, Swanquarter, North Carolina on **April 17, 2012** at **10:00 AM** that parcel of land, including improvements thereon, situated, lying and being in the City of Ocracoke, County of Hyde, State of North Carolina, and being more particularly described in the above referenced Deed of Trust.

Address of property:

Tax Parcel ID:

Present Record Owners:

134 West End Road, Ocracoke, NC 27960

9500-48-9384

Rex T. Gilbert, Jr.; Daniela L. Gilbert

The terms of the sale are that the real property hereinbefore described will be sold for cash to the highest bidder. A deposit of five percent (5%) of the amount of the bid or Seven Hundred Fifty Dollars ($750.00), whichever is greater, is required and must be tendered in the form of certified funds at the time of the sale. In the event that the Owner and Holder or its intended assignee is exempt from paying the same, the successful bidder shall be required to pay revenue stamps on the Trustee's Deed, and any Land Transfer Tax.

The real property hereinabove described is being offered for sale "AS IS, WHERE IS" and will be sold subject to all superior liens, unpaid taxes, and special assessments. Other conditions will be announced at the sale. The sale will be held open for ten (10) days for upset bids as by law required. If a third party is the high bidder at the time of sale confirmation, the third party will have fifteen (15) days following the sale confirmation to remit the balance of his/her bid to the Trustee. In the sole discretion of the Trustee, an extension may be granted, but in that instance, if required by the noteholder or loan servicer, the bidder shall be required to pay per diem interest at the current rate on the note secured by the deed of trust described herein until the day he/she remits the balance of his/her bid to the Trustee.

If for any reason the Trustee is unable to convey title to this property or the sale is set aside, the sole remedy of the purchaser is the return of the deposit. Furthermore, if the validity of the sale is challenged by any party, the Trustee, in it's sole discretion, if it believes the challenge to have merit, may declare the sale to be void and return the deposit. In either event the purchaser will have no further recourse against the Mortgagor, the Mortgagee, the Mortgagee's attorney or the Trustee.





<u>Additional Notice Where the Real Property is Residential With Less Than 15 Rental Units</u>:

An order for possession of the property may be issued pursuant to G.S. 45-21.29 in favor of the purchaser and against the party or parties in possession by the clerk of superior court of the county in which the property is sold. Any person who occupies the property pursuant to a rental agreement entered into or renewed on or after October 1, 2007, may, after receiving the notice of sale, terminate the rental agreement upon 10 days' written notice to the landlord. Upon termination of a rental agreement, the tenant is liable for rent due under the rental agreement prorated to the effective date of the termination.

Any person who occupies the property pursuant to a bona fide lease or tenancy may have additional rights pursuant to Title VII of 5.896 - Protecting Tenants at Foreclosure Act which became effective on May 20, 2009.

Posted:_____

Witness:_____
   Assistant/Deputy Clerk of Superior Court

David A. Simpson, P.C., Substitute Trustee

By:_____

    **David W. Neill**

_____
Attorney at Law
Rogers Townsend & Thomas, PC
Attorneys for David A. Simpson, P.C.
Substitute Trustee
2550 West Tyvola Road
Suite 520
Charlotte, NC 28217
(704) 442-9500