# EXHIBIT

# 1

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
NO. 4:09-CV-00181-D

REX T. GILBERT, JR. and            )
DANIELA L. GILBERT,                )
                    Plaintiffs,    )
                                   )
v.                                 )
                                   )
                                   )
DEUTSCHE BANK TRUST COMPANY        )
AMERICAS, *As Trustee for*,        )
RESIDENTIAL ACCREDIT LOANS, INC,   )
DAVID A. SIMPSON, P.C., Substitute Trustee, )
RESIDENTIAL FUNDING, LLC, and      )
GMAC MORTGAGE, LLC,                )
                    Defendants.    )
_____)

## AFFIDAVIT OF THOMAS A. COX

I, Thomas A. Cox, being duly sworn, hereby depose and say:

1.    I am Thomas A. Cox, an attorney-at-law licensed to practice before the courts of the State of Maine (Maine Bar No. 1248) and the United States District Court for the District of Maine. I am co-counsel for the Defendant in the matter of *Federal National Mortgage Association v. Bradbury*, BRI-RE-09-65 (Me. Dist. Ct., Dist. 9, Nor. Cumb.) now pending.

2.    In *Federal National Mortgage Association v. Bradbury, id.,* I deposed Jeffrey D. Stephan, a Limited Signing Officer of GMAC Mortgage, LLC, on June 7, 2010 in Narberth, Pennsylvania, Pennsylvania.

3.   I have in my possession the original transcript of the aforesaid deposition of Jeffrey D. Stephan and have read it. A copy of that transcript is attached to this Affidavit as Exhibit A. Said attached deposition transcript accurately sets forth the testimony given under oath in my presence by Jeffrey D. Stephan on June 7, 2010. No signature page or errata sheet for this deposition transcript has been presented or filed on behalf of Mr. Stephan

DATED: October 12, 2010

_____
Thomas A. Cox

STATE OF MAINE
CUMBERLAND, ss

Personally appeared the above signed Thomas A. Cox before me this 11th day of October, 2010 and stated under oath that the foregoing statements made by him are true of his own personal knowledge.

_____ Bar No. 9152
Notary Public/ Attorney at Law

MAINE DISTRICT COURT, DISTRICT NINE
DIVISION OF NORTHERN CUMBERLAND
- - -

| | |
|---|---|
| FEDERAL NATIONAL | : |
| MORTGAGE ASSOCIATION | : DOCKET NO. |
| Plaintiff | : BRI-RE-09-65 |
| | : |
| V. | : |
| | : |
| NICOLE M. BRADBURY | : |
| Defendant | : |
| and | : |
| GMAC MORTGAGE, LLC | : |
| d/b/a DITECH, LLC.COM | : |
| and BANK OF AMERICA, NA | : |
| Parties in Interest | : |

- - -

June 7, 2010

- - -

Oral deposition of JEFFREY D.
STEPHAN, taken pursuant to notice, was
held at the law offices of LUNDY FLITTER
BELDECOS & BERGER, P.C., 450 N. Narberth
Avenue, Narberth, Pennsylvania 19072,
commencing at 10:10 a.m., on the above
date, before Susan B. Berkowitz, a
Registered Professional Reporter and
Notary Public in the Commonwealth of
Pennsylvania.

- - -

Exhibit A

MAINE DISTRICT COURT, DISTRICT NINE
DIVISION OF NORTHERN CUMBERLAND

- - -

FEDERAL NATIONAL          :
MORTGAGE ASSOCIATION  : DOCKET NO.
               Plaintiff  : BRI-RE-09-65
                          :
      V.                  :
                          :
NICOLE M. BRADBURY        :
               Defendant:
      and                 :
GMAC MORTGAGE, LLC        :
d/b/a DITECH, LLC.COM  :
and BANK OF AMERICA, NA:
      Parties in Interest:

- - -

June 7, 2010

- - -

Oral deposition of JEFFREY D. STEPHAN, taken pursuant to notice, was held at the law offices of LUNDY FLITTER BELDECOS & BERGER, P.C., 450 N. Narberth Avenue, Narberth, Pennsylvania 19072, commencing at 10:10 a.m., on the above date, before Susan B. Berkowitz, a Registered Professional Reporter and Notary Public in the Commonwealth of Pennsylvania.

- - -

APPEARANCES:

BRIAN M. FLEISCHER, ESQUIRE
FLEISCHER, FLEISCHER & SUGLIA, P.C.
        Plaza 1000 at Main Street
        Suite 208
        Voorhees, New Jersey  08043
        (856) 489-8977
        bfleischer@fleischerlaw.com
        Counsel for GMAC


THOMAS A. COX, ESQUIRE
LAW OFFICES OF THOMAS A. COX
        P.O. Box 1315
        Portland, Maine 04104
        (207) 749-6671
        tac@gwi.net
        Counsel for Defendant,
        Nicole M. Bradbury


VIA TELEPHONE:
JULIA G. PITNEY, ESQUIRE
DRUMMOND & DRUMMOND
        One Monument Way
        Portland, Maine 04101
        (207) 774-0317
        JPitney@ddlaw.com
        Counsel for GMAC and Fannie Mae

1

2          (Document marked Exhibit-1

3      for identification.)

4                  -   -   -

5          (It is hereby stipulated and

6      agreed by and between counsel that

7      sealing, filing and certification

8      are waived; and that all

9      objections, except as to the form

10     of questions, be reserved until

11     the time of trial.)

12                 -   -   -

13         JEFFREY D. STEPHAN, after

14     having been duly sworn, was

15     examined and testified as follows:

16                 -   -   -

17         MS. PITNEY:  I would like to

18     put on the record that we

19     requested a stipulation, and

20     Attorney Cox has denied our

21     request for that stipulation.  And

22     that would be a stipulation that

23     this deposition transcript be used

24     for this case, FNMA versus

25     Bradbury, only.

STEPHAN

1

2          MR. COX:  Mr. Fleischer, we

3      understand that Julia Pitney

4      represents the plaintiff in this

5      case.  Who do you represent today?

6          MR. FLEISCHER:  I believe

7      Ms. Pitney both represents Fannie

8      Mae and GMAC, and I am here on

9      GMAC's behalf.

10          MR. COX:  GMAC is neither a

11      plaintiff nor defendant in this

12      case, so we may have some issues

13      around that, but we'll cross that

14      bridge when we get to it.

15                    -   -   -

16                  EXAMINATION

17                    -   -   -

18  BY MR. COX:

19          Q.    Mr. Stephan, for the record,

20  would you state your full name, please?

21          A.    Jeffrey Stephan.

22          Q.    How old are you?

23          A.    I am 41, in June.

24          Q.    You live in Sellersville,

25  Pennsylvania?

```
 1                    STEPHAN
 2          A.    That is correct.
 3          Q.    Have you had your deposition
 4    taken previously?
 5          A.    In other cases, yes.
 6          Q.    How many other cases?
 7          A.    This will be my third time.
 8          Q.    What other cases were you
 9    deposed in, to your recollection?
10          A.    In what kind of cases?
11          Q.    Well, can you remember the
12    names of the cases?
13          A.    No, I don't.
14          Q.    When is the last time that
15    you've had your deposition taken?
16          A.    I would approximate two,
17    three months ago.
18          Q.    Was that in Florida?
19          A.    No.   That was in New Jersey.
20          Q.    That would have been in
21    2010?
22          A.    Yes.
23          Q.    Then you were deposed in
24    Florida in December of 2009?
25          A.    That is correct.
```

STEPHAN

1

2      Q.     When was the other

3  deposition, the third deposition?

4      A.     This one today is the third.

5      Q.     Have you testified in court

6  as a witness before?

7      A.     No.

8      Q.     Did you review any documents

9  to prepare for this deposition?

10     A.     Yes.

11     Q.     What documents did you

12 review?

13     A.     I looked at the deposition

14 that was sent to me.  And I went over the

15 Complaint with Brian.

16            THE WITNESS:  When was that,

17        Thursday, Wednesday?

18            MR. FLEISCHER:  You're

19        directed not to say anything with

20        regard to what we spoke about,

21        but, yes, you can answer to what

22        you looked at.

23            THE WITNESS:  Yes.

24            MS. PITNEY:  I'm sorry to

25        interrupt.  I'm just having a

```
 1                    STEPHAN
 2         little difficulty hearing you.  Is
 3         there any way to push the phone a
 4         little closer to Mr. Stephan?
 5              MR. FLEISCHER:  Okay.  And,
 6         Julia, let me know during the
 7         course if there's still a problem.
 8              MS. PITNEY:  You were doing
 9         fine, and then it got a little
10         fuzzy.
11              THE WITNESS:  I'll talk
12         louder.
13              MS. PITNEY:  Thank you.
14   BY MR. COX:
15         Q.    What deposition did you look
16   at?
17         A.    The deposition for this
18   case.
19         Q.    The Deposition Notice?
20         A.    Right, the Deposition
21   Notice.
22         Q.    It was not another
23   deposition transcript --
24         A.    No.
25         Q.    -- that you were referring
```

```
 1              STEPHAN
 2  to?
 3        A.    No.
 4              MR. FLEISCHER:  Let him
 5        finish the question, and then
 6        respond, because it makes it
 7        cleaner for the transcript.
 8              THE WITNESS:  Thank you.
 9  BY MR. COX:
10        Q.    What is your educational
11  background?
12        A.    I have a four-year degree at
13  Penn State University in liberal arts.
14        Q.    When did you go to work for
15  GMAC?
16        A.    I began work at GMAC
17  September 30th of '04.
18        Q.    What was your work history,
19  in a summary form, before you went to
20  work for GMAC?
21        A.    I have done collections and
22  mortgage foreclosures for other
23  companies.
24        Q.    Who have you done mortgage
25  foreclosure work for?
```

```
1                    STEPHAN
2         A.    ContiMortgage, Fairbanks
3    Capital, GMAC.
4         Q.    The first one, I'm not sure
5    about.  Is that Conti, C-O-N-T-E (sic)?
6         A.    C-O-N-T-I.
7         Q.    What period of time did you
8    work for ContiMortgage?
9         A.    I began there in '92.  I
10   believe I left there in '98.
11        Q.    What years, approximately,
12   did you work for Fairbanks Capital?
13        A.    '98 to '04.
14        Q.    You work in the GMAC
15   Mortgage office in Fort Washington,
16   Pennsylvania; is that correct?
17        A.    That is correct.
18        Q.    Approximately, how many
19   people work in that office?
20        A.    I can't estimate the number
21   of people.  I can say my department,
22   approximately 50 to 60 people.
23        Q.    What's the name of your
24   department?
25        A.    Foreclosures.
```

1                    STEPHAN

2          Q.     When you began working for

3    GMAC Mortgage in 2004, what position did

4    you begin working in?

5          A.     I was a foreclosure

6    specialist.

7          Q.     What kinds of duties did

8    that involve?

9          A.     That involved the day-to-day

10   handling and servicing of a portfolio of

11   loans that fell into a foreclosure

12   category.

13         Q.     What kinds of duties did you

14   carry out with respect to those matters?

15              MS. PITNEY:  Object to form.

16              MR. COX:  You have to

17         answer.

18              MS. PITNEY:  You can answer

19         the question.

20              THE WITNESS:  The everyday

21         servicing of the file, from

22         contacting the attorney, supplying

23         an attorney who's handling a case

24         within my portfolio with any

25         information they may need, a copy

```
1                    STEPHAN
2          of documents that may be needed
3          through a fax form or e-mail form,
4          the calculation of figures for
5          judgments, reporting sale results
6          at that time, and properly
7          conveying properties to the proper
8          departments for post sale action.
9   BY MR. COX:
10         Q.     How long did you hold the
11   position of foreclosure specialist?
12         A.     With GMAC, three years.
13         Q.     So you would have assumed a
14   new position sometime in 2007?
15         A.     Yes.
16         Q.     What position did you assume
17   in 2007?
18         A.     I became a team lead within
19   the foreclosure department.
20         Q.     What duties did you assume
21   as the team lead in the foreclosure
22   department?
23         A.     At that time, GMAC
24   segregated our department into teams, and
25   I was put into place as the supervisor or
```

```
 1                    STEPHAN
 2    team lead for our bidding team, which
 3    would be a team of individuals who
 4    calculate the bids for sales.
 5          Q.    Calculate the bids for sales
 6    of mortgage --
 7          A.    Foreclosure sales.
 8                MR. FLEISCHER:  Again, let
 9          him finish the question.
10    BY MR. COX:
11          Q.    Just so I can understand it,
12    your role in that position was to help
13    GMAC calculate what it was going to bid
14    at any given foreclosure sale?
15          A.    That would be correct.
16          Q.    The foreclosure
17    department -- is that what it's called?
18          A.    Yes.
19          Q.    That has units within it?
20          A.    Yes.
21          Q.    And when you were doing the
22    bidding work, what unit were you a part
23    of at that time?
24          A.    The bid team.
25          Q.    How long did you serve on
```

STEPHAN

1

2    the bid team?

3        A.    I'm going to estimate six

4    months to a year, at the most.

5        Q.    Does it sound roughly

6    correct that sometime in 2008, you

7    assumed a new position?

8        A.    Yes.

9        Q.    What was the next position

10   that you held after working on the bid

11   team?

12       A.    My present position, which

13   is the team lead of the document

14   execution team.

15       Q.    Is there also a service

16   transfer unit?

17       A.    Yes, there is.

18       Q.    Are you the team lead of

19   that as well?

20       A.    Yes, I am.  That falls into

21   the document execution team.

22       Q.    So I talk your language,

23   there's a foreclosure department?

24       A.    Yes.

25       Q.    And the subdivisions within

```
1                    STEPHAN
2  that, do you call them teams or units?
3        A.    Teams.
4        Q.    So there's a foreclosure
5  department, and then within it are a
6  group of teams that do different
7  functions; is that correct?
8        A.    That is correct.
9        Q.    What does the document
10 execution team do?
11              MR. FLEISCHER:  Objection as
12       to form.
13              THE WITNESS:  Can you
14       rephrase that?
15 BY MR. COX:
16       Q.    What are the functions of
17 the document execution team?
18       A.    The functions of my document
19 execution team is, I have staff that
20 prints documents, from our computer
21 system, that are submitted from our
22 attorney network.  I have staff, also, on
23 that team who prepares the documents
24 which have already received figures from
25 our attorneys.  So there are completed
```

STEPHAN

1

2    documents.  They fill in the blanks, they

3    stamp names.  They ensure that all of the

4    notary lines are completed properly once

5    it's returned from the notary.  And that

6    staff also is in charge of making sure

7    they Federal Express the document back to

8    the designated attorney within our

9    network.

10        Q.    What does the service

11   transfer team do?

12        A.    The service transfer team

13   receives a list of loans from our

14   transfer management team, which is

15   located in Iowa.  The service transfer

16   team within foreclosure only handles

17   loans that fall into a bankruptcy or

18   foreclosure category.  They prepare files

19   or CDs, and transfer them to the new

20   servicer.  So they're loans that are

21   either acquired, or they're loans that

22   are being transferred to a new servicer

23   for service.

24        Q.    How many employees are on

25   the document execution team?

```
 1                    STEPHAN
 2          A.    14.
 3          Q.    Including yourself?
 4          A.    No; including me, 15.
 5          Q.    What training have you
 6   received from GMAC to function in your
 7   capacity as the team lead for the
 8   document execution team?
 9               MS. PITNEY:  Object to form.
10   BY MR. COX:
11          Q.    Let me restate the question.
12   Have you received any training from GMAC
13   to use in conjunction with your
14   performance as the team lead for the
15   document execution team?
16          A.    Yes.
17          Q.    What training have you
18   received?
19          A.    I received side-by-side
20   training from another team lead to
21   instruct me on how to review the
22   documents when they are received from my
23   staff.
24          Q.    Who was that person?
25          A.    That person, at the time, I
```

STEPHAN

1
2  believe was a gentleman by the name of
3  Kenneth Ugwuadu, U-G-W-U-A-D-U.  He is no
4  longer with GMAC.
5          Q.     How long did that training
6  last?
7          A.     Three days.
8          Q.     Were there any written or
9  printed training materials or manuals
10  used as a part of that training?
11          A.     No.
12          Q.     Again, just so I understand
13  what your testimony was, that training
14  involved your learning how to review the
15  documents that were being processed
16  through your hands; is that correct?
17          A.     That's correct.
18          Q.     What were you trained to do
19  with respect to those documents by that
20  gentleman?
21          A.     Basically, how to review the
22  system, which I already basically knew
23  from preparing documents in my prior
24  position before becoming a team lead.  So
25  it was more or less a rehash, let's say,

1          STEPHAN

2     or retraining, to confirm that I was

3     looking at things correctly in the

4     system.

5          Q.     When you refer to a system,

6     you're referring to a computer system?

7          A.     Yes.

8          Q.     Other than what you might

9     call it when you're not happy, does that

10    system have a name?

11         A.     Yes.  That system is called

12    Fiserv, F-I-S-E-R-V.

13         Q.     Have you received any

14    training on how to use that system?

15         A.     Yes, when I was hired.

16         Q.     Are there any manuals or

17    training materials associated with your

18    training on that system?

19         A.     Yes, there is.

20         Q.     Do you have those manuals in

21    your possession?

22         A.     Presently, no.

23         Q.     Do they exist in your office

24    at GMAC?

25         A.     I honestly don't know.

```
 1                    STEPHAN
 2          Q.     In your role as team lead
 3   for the document execution team, do you
 4   have any duties with respect to the
 5   receipt, application, or counting for
 6   loan payments?
 7          A.     No.
 8                 MS. PITNEY:  Object to the
 9          form of the question.
10   BY MR. COX:
11          Q.     What department has that
12   responsibility?
13          A.     To my understanding, that
14   would be customer service.  And within
15   customer service, I believe there is a
16   cash unit.
17          Q.     Have you ever worked in that
18   cash unit?
19          A.     No.
20          Q.     Have you ever worked in that
21   customer service department?
22          A.     No.
23          Q.     Have you ever had any
24   training in how that department and unit
25   work?
```

1                    STEPHAN

2         A.    No.

3         Q.    In your capacity as team

4  lead for the document execution team, do

5  you have any responsibility for data

6  entry into the computer system regarding

7  payments received by GMAC?

8         A.    No.

9         Q.    In your capacity as the team

10 lead for the document execution team, do

11 you have any role in the foreclosure

12 process at GMAC, other than the signing

13 of documents?

14              MR. FLEISCHER:  Objection as

15       to the form of the question.

16              THE WITNESS:  Can you

17       rephrase?

18 BY MR. COX:

19       Q.    In your capacity as the team

20 lead for the document execution team, do

21 you have any role in the foreclosure

22 process, other than the signing of

23 documents?

24       A.    No.

25       Q.    I'm going to hand you what

```
 1                    STEPHAN
 2   we have marked as Deposition Exhibit
 3   Number 1, which is your affidavit in this
 4   case, dated August 5, 2009.
 5             MS. PITNEY:  Excuse me, Tom.
 6        This is Julia.  Am I to presume
 7        that this is the only exhibit
 8        you're going to be introducing?
 9        Because I haven't received any
10        exhibits that you plan to produce
11        at this deposition today.
12             MR. COX:  I had no idea you
13        were going to be participating
14        today, Julia.
15             MS. PITNEY:  Well, I
16        represent the plaintiff.  It
17        shouldn't come as any surprise.
18             MR. COX:  We're not going to
19        have a debate on the record.  The
20        exhibits are here.  You're welcome
21        to come see them.  I had no idea
22        that you were going to participate
23        in this fashion.
24             MS. PITNEY:  You had no
25        idea?
```

```
1                    STEPHAN

2              MR. COX:  I'm not going to

3        have this exchange on the record

4        with you.  If you want to go off

5        the record for a minute, I'll be

6        happy to do it.

7              MS. PITNEY:  No, we're going

8        to stay right on the record, Tom.

9              MR. COX:  That's fine.

10             MS. PITNEY:  Is it your

11       intent to introduce these exhibits

12       that have not been produced to the

13       opposing party?

14             MR. COX:  I'm not going to

15       respond to that.  I will entertain

16       objections that you are going to

17       make.  But I'm not going to

18       respond to your questions on the

19       record.

20             MS. PITNEY:  I'm going to

21       object to each and every exhibit.

22             MR. COX:  That's your right

23       to do that.

24  BY MR. COX:

25             Q.    I've handed you Deposition
```

STEPHAN

1
2      Exhibit Number 1, Mr. Stephan.  Is that a
3      document signed by you?
4              A.    Yes, that is my signature.
5              Q.    And that's dated August 5,
6      2009?
7              A.    That is correct.
8              Q.    Do you have any memory of
9      signing that document?
10             A.    No, I do not.
11                   MS. PITNEY:  I'd like to
12             take a brief break and speak with
13             Attorney Fleischer separately.
14             There's no question pending.
15                   (Whereupon, a short recess
16             was taken.)
17                   MR. COX:  I gather you have
18             something you want to say on the
19             record, Julia?
20                   MS. PITNEY:  Yes.  I object
21             to not being provided copies of
22             the documents that you intend to
23             introduce in this deposition.  And
24             in an effort to make things more
25             efficient, my proposal is that --

STEPHAN

1

2     I understand there's not a large

3     number of documents.  I propose

4     that we have Attorney Fleischer

5     fax them to me, or e-mail, in

6     bulk, or we're going to have to

7     stop.  I would object.  And each

8     time I'm going to stop and have

9     each document sent to me.

10          MR. COX:  Your objection is

11     noted.

12          MR. FLEISCHER:  Why don't we

13     at least just deal with the one

14     document that's in front of us at

15     this point, which is the

16     affidavit, and then we'll address

17     each one as they come up.

18          MS. PITNEY:  Fair enough.

19  BY MR. COX:

20     Q.    Mr. Stephan, you've

21  testified that in addition to yourself,

22  there are 14 other employees in your

23  document execution team.

24     A.    That is correct.

25     Q.    You have a title of limited

1                    STEPHAN

2    signing officer; is that correct?

3         A.    That is correct.

4         Q.    How long have you been a

5    limited signing officer for GMAC

6    Mortgage?

7         A.    I'm going to estimate, two

8    years.

9         Q.    Are there any other limited

10   signing officers among the 14 people on

11   your team?

12        A.    No, not amongst my 14

13   people.

14        Q.    Exhibit-1, on the bottom of

15   the first page, says:  I have under my

16   custody and control the records relating

17   to the mortgage transaction referenced

18   below.

19             What records does GMAC

20   maintain with respect to mortgage

21   transactions?

22             MS. PITNEY:  Object to the

23        form.

24             THE WITNESS:  Please

25        rephrase.

STEPHAN

BY MR. COX:

    Q.    What records does GMAC maintain with respect to mortgage loans?

    A.    We keep our records for the foreclosure department and the rest of the company on our Fiserv system for availability throughout our company.

    Q.    Do paper records exist anywhere within GMAC Mortgage?

    A.    Yes, they do.

    Q.    Where do they exist?

    A.    I believe they are housed either in our Iowa office or in Minnesota, or with any of our custodians involved within the company.

    Q.    Do you have any responsibilities for making entries in the Fiserv system?

    A.    Other than just usual notes, no.

    Q.    What kind of usual notes do you enter?

        MS. PITNEY:  Object.  I'm objecting to the form of the

                    STEPHAN

1

2          question.  And, furthermore, I'm

3          objecting to the extent that

4          you're basically asking him an

5          incredibly broad-based question

6          here, Tom.  If you want to ask him

7          about this case and any entries he

8          made with respect to this case,

9          then that's fine.  But your

10         question is pretty sweeping there.

11    BY MR. COX:

12         Q.    What is your usual business

13    practice and routine with respect to

14    making usual notes in the Fiserv system?

15         A.    If a customer were to call

16    in, I would make a note in our computer

17    system.

18         Q.    Do customers call you in

19    your capacity as team lead for the

20    document execution team?

21         A.    No, they do not.

22         Q.    So if that's the only kind

23    of notes that you would make in the

24    system, is it fair to say that you don't

25    make notes in that system?

1                    STEPHAN

2          A.     That would be correct.

3          Q.     And you have no role in the

4     entry of any other data into that system;

5     isn't that correct?

6          A.     That is correct.

7          Q.     What department maintains

8     that system?

9               MR. FLEISCHER:  Objection as

10         to form.

11    BY MR. COX:

12         Q.     Do you know what department

13    maintains that system?

14         A.     The system is used by the

15    entire company.

16         Q.     Do you know what department

17    maintains the security for that system?

18         A.     The IT department.

19         Q.     Where is that located?

20         A.     Throughout the entire

21    country.

22         Q.     Do you know what department

23    makes entries into that system?

24         A.     Numerous departments.

25         Q.     Do you know what departments

STEPHAN

1
2  have the ability to change entries in
3  that system?
4        A.    Nobody has the ability to
5  change an entry in the system, as far as
6  a note would go.
7        Q.    What do you mean by that?
8        A.    Such as if a customer calls
9  in, you type in the system.  Once you
10  type it, it's entered.
11        Q.    Does GMAC keep a paper
12  record of loan payments made by mortgage
13  customers?
14        A.    I do not know.
15        Q.    I think you said that the
16  cash department receives payments --
17  customer payments; is that correct?
18        A.    To my knowledge, yes.
19        Q.    That's the department that
20  you've said you have not worked in; is
21  that correct?
22        A.    That is correct.
23        Q.    So you don't have firsthand
24  knowledge about how it operates; is that
25  correct?

STEPHAN

1

2       A.      That is correct.

3               MS. PITNEY:  Object.

4   BY MR. COX:

5       Q.      Do you have any knowledge

6   about how the data relating to those

7   payments are entered into the system?

8       A.      I do not have that

9   knowledge.

10      Q.      Do you have any knowledge

11  about how GMAC ensures the accuracy of

12  the data entered into the system?

13      A.      No, I do not.

14      Q.      Do you have any knowledge as

15  to what measures GMAC takes to preserve

16  the integrity and security of the system?

17      A.      No, I do not.

18              MS. PITNEY:  Object to the

19          form of that question.

20  BY MR. COX:

21      Q.      In your capacity as team

22  lead for the document execution team,

23  what kinds of documents do you sign?

24      A.      The types of documents I

25  sign are assignments of mortgage,

```
                    STEPHAN
```

1

2  numerous types of affidavits, deeds that

3  need to be done post sale, a substitution

4  of trustees.  And that covers it in a

5  general span.

6          Q.    You said you sign a variety

7  of affidavits.  What kinds of affidavits

8  do you sign?

9          A.    I sign judgment affidavits

10  for judicial foreclosure actions.  I will

11  sign an affidavit verifying military

12  duty.  I sign affidavits in reference to

13  -- if GMAC has exhausted all options

14  through lost mitigation upon reviewing

15  notes in our Fiserv system.  That's a

16  general description of different types

17  of affidavits.

18          Q.    Your document execution team

19  provides documents for foreclosures in

20  what states?

21          A.    Throughout the country.

22          Q.    Are there other document

23  execution teams within the GMAC system?

24          A.    I believe our bankruptcy

25  unit also has a document execution team.

```
1                    STEPHAN

2         Q.    That's the only other

3  document execution team that you're aware

4  of?

5         A.    To my knowledge, yes.

6         Q.    When you referred in one of

7  your answers a few moments ago to

8  judgment affidavits, are you referring to

9  the type of affidavit in front of you, as

10 Deposition Exhibit-1?

11        A.    That is a similar type of

12 affidavit, yes.  This states Affidavit in

13 Support of the Plaintiff's Motion for

14 Summary Judgment.

15        Q.    Have you received any

16 training regarding the summary judgment

17 process in judicial foreclosure states?

18        A.    No.

19        Q.    Do you have any knowledge as

20 to what a summary judgment affidavit is

21 used for in the State of Maine?

22              MR. FLEISCHER:  Objection as

23        to form.

24 BY MR. COX:

25        Q.    Would you please answer the
```

                    STEPHAN

1

2  question?

3        A.    To my knowledge, a borrower

4  would have filed a contested answer.  And

5  this would be our next step within the

6  process, to confirm the amount that is

7  due to support the summary judgment.

8        Q.    Do you understand how the

9  affidavit is used, that is, Deposition

10  Exhibit Number 1?

11            MS. PITNEY:  Objection.

12        Tom, you're getting dangerously

13        close here to the privileged area.

14        I mean, this affidavit, in itself,

15        was prepared in preparation for

16        litigation -- in litigation; not

17        even preparation for it, but

18        during litigation.

19            MR. COX:  I have not the

20        slightest interest in getting into

21        attorney/client privilege.  I'll

22        rephrase the question.

23  BY MR. COX:

24        Q.    Do you have any knowledge of

25  how summary judgment affidavits are used

STEPHAN

1

2    in judicial foreclosure states?

3          A.    No.

4          Q.    Are you aware that they are

5    given to a judge?

6          A.    Yes.

7          Q.    And do you understand that

8    the judge relies upon them?

9          A.    Yes.

10         Q.    At the time that you

11   executed Deposition Exhibit-1 on August

12   5, 2009, you were, at that time, in your

13   position as team lead for the document

14   execution department?

15         A.    Yes.

16         Q.    Has the manner in which you

17   perform your duties as the team lead for

18   the document execution department changed

19   in any way over the period from August 5,

20   2009 to the present date?

21         A.    No.

22         Q.    Has your job description

23   changed in any manner during that time?

24         A.    I assumed the responsibility

25   at that time of also handling the service

```
 1                    STEPHAN
 2    transfer team as an additional
 3    responsibility; other than document
 4    execution, no.
 5         Q.    In your usual business
 6    practice as a team lead for the document
 7    execution team, how does a summary
 8    judgment affidavit come to you, such as
 9    the one that is Deposition Exhibit Number
10    1?
11              MS. PITNEY:  Objection.
12         Tom, if you'd like to ask him
13         about how this specific affidavit
14         came to him, that's fine.  But,
15         again, you're asking way too
16         broad.
17    BY MR. COX:
18         Q.    Do you know how this
19    specific affidavit got to you, Mr.
20    Stephan?
21         A.    We have a process in place
22    that if our attorney network needs an
23    affidavit, they will upload it into our
24    system, which is called LPS.  We have
25    another system, which is a communication
```

                    STEPHAN

1

2    tool, between our attorneys.  They load

3    it into a process called signature

4    required.

5               MS. PITNEY:  Jeff, I'm going

6          to interrupt you right there.  To

7          the extent that this answer or

8          anything else that you say has to

9          do with your communication between

10         you and your attorney -- GMAC and

11         its attorney, it's attorney/client

12         privilege.

13              THE WITNESS:  So I won't

14         answer.

15              MR. COX:  Well, let's go

16         back and ask the question again.

17              MS. PITNEY:  He's answered

18         the question.  He gets the

19         affidavit from the attorney.

20   BY MR. COX:

21         Q.    What is the LPS system?

22         A.    That is a communication tool

23   with our attorney network.

24         Q.    Is LPS a separate company?

25         A.    Yes.

```
 1                      STEPHAN
 2              MS. PITNEY:  Objection.  The
 3         means by which he communicates any
 4         details about -- the means by
 5         which he communicates with his
 6         attorneys is privileged.
 7  BY MR. COX:
 8         Q.    What does LPS do?
 9              MS. PITNEY:  I'm going to
10         object again on privilege grounds.
11         Same objection.  Do not answer
12         that question.
13              THE WITNESS:  Okay.
14  BY MR. COX:
15         Q.    Is the source of what you
16  know about what LPS does based upon any
17  communication that you've had with
18  lawyers?
19         A.    Sorry.  Please rephrase
20  that.  I don't understand your question.
21         Q.    Do you know what LPS does
22  with respect to documents processed by
23  your unit?
24              MS. PITNEY:  Objection.
25         Same objection.
```

```
1                    STEPHAN
2              MR. COX:  He can answer that
3         yes or no.
4              THE WITNESS:  I still don't
5         understand what you're asking.
6  BY MR. COX:
7         Q.    You've mentioned LPS.
8         A.    Right.
9         Q.    That's a separate company;
10 is that correct?
11        A.    It's a system that we have
12 acquired from a company by the name of
13 Fidelity, in order to have communication
14 between our attorneys.
15        Q.    Do you have any memory of
16 specifically receiving Deposition
17 Exhibit-1?
18        A.    No.
19        Q.    Again, I'm asking you, based
20 upon that, to describe what the usual
21 business practice is within your unit, as
22 far as how affidavits, such as Deposition
23 Exhibit-1, come to you.
24        A.    Our attorney will load it to
25 the LPS system.  Members of my team will
```

STEPHAN

print it.  Other members will prepare it.
The figures have already been loaded from
our network of attorneys.  So my team
does not have any input on the affidavit,
other than filling in my name.  They
bring it to me.  I review it against our
Fiserv system, execute it, hand it back.
They get it notarized.  It's Federal
Expressed back to the individual attorney
asking.

          Q.    Do you keep a log of any
sort of what documents you execute?

                MS. PITNEY:  I'm sorry.  Can
          you repeat the question, Tom?  I
          could not hear that.
BY MR. COX:

          Q.    Do you keep a log of any
sort of what documents you execute?

                MS. PITNEY:  Objection.
          Work product.  Any type of log
          that he keeps relative to these
          affidavits is prepared in
          preparation for litigation; to the
          extent that one even exists.

```
1                    STEPHAN
2              MR. COX:  He can answer the
3         question of whether or not he
4         keeps a log, before I ask him what
5         goes into the log.
6              MS. PITNEY:  Fine.
7              THE WITNESS:  No, I don't
8         have a log.
9    BY MR. COX:
10        Q.    Does anybody keep a log of
11   what documents you sign?
12             MS. PITNEY:  Object to the
13        form of that question.
14             THE WITNESS:  Please
15        rephrase.
16   BY MR. COX:
17        Q.    Do you know if anybody keeps
18   a log of what documents you execute?
19        A.    We have notaries in our
20   department, approximately six, who keep a
21   log for what they notarize.
22        Q.    These are notaries within
23   your department?
24        A.    That is correct.
25        Q.    As I understand it, the
```

```
 1                    STEPHAN
 2   first step is, in your department, a
 3   document comes in on the LPS system from
 4   the outside lawyer; is that correct?
 5        A.    That is correct.
 6        Q.    And then an employee in your
 7   department prints it out; is that
 8   correct?
 9        A.    That is correct.
10        Q.    And then you said that the
11   employee prepares the document.  What
12   does that mean?
13             MS. PITNEY:  Objection.  The
14        document is prepared for
15        litigation.  It is privileged.
16        How it is prepared is privileged.
17        Do not answer that question.
18   BY MR. COX:
19        Q.    Do your employees have any
20   direct communication with outside
21   counsel?
22        A.    Yes, through the LPS system.
23             MS. PITNEY:  Objection.  How
24        and what he communicates with his
25        attorney is privileged, Tom.
```

```
 1                    STEPHAN
 2              MR. COX:  I haven't asked
 3         for the content.  I asked if it
 4         happens.
 5    BY MR. COX:
 6         Q.    Would you answer the
 7    question, please?
 8         A.    Yes, through the LPS system.
 9         Q.    Is anything done to a
10    document submitted to the LPS system by
11    an outside lawyer before it reaches your
12    hands?
13              MS. PITNEY:  Objection.
14         Preparation of the document is
15         privileged.  It's for litigation.
16         Do not answer the question.
17    BY MR. COX:
18         Q.    Is the document that is
19    received in the LPS system from outside
20    counsel presented to you in exactly the
21    form that it is received in from outside
22    counsel?
23              MS. PITNEY:  Objection.
24         Same objection.
25              MR. COX:  Is it an
```

STEPHAN

1
2          objection, or are you instructing
3          him not to answer?
4                MS. PITNEY:  I'm instructing
5          him not to answer, to the extent
6          you're asking him questions about
7          a document that was prepared
8          specifically during the course of
9          litigation.  It's protected by
10         privilege, and you can't ask him
11         questions about it.
12   BY MR. COX:
13         Q.     Deposition Exhibit-1 has
14   your name stamped on it with a stamp; is
15   that correct?
16         A.     That is correct.
17         Q.     And below your name, the
18   words "limited signing officer" appear;
19   is that correct?
20         A.     That is correct.
21         Q.     Who puts that stamp on these
22   affidavits?
23         A.     My team.
24         Q.     On this particular
25   affidavit, your name and title is stamped

```
1                    STEPHAN
2    twice on the first page, and once on the
3    signature page for you; is that correct?
4         A.    That is correct.
5         Q.    And then it's stamped again
6    on the notary page; is that correct?
7         A.    That is correct.
8         Q.    So as I understand it, an
9    affidavit, such as Deposition Exhibit-1,
10   is initially prepared by outside counsel?
11              MS. PITNEY:  Objection.
12   BY MR. COX:
13        Q.    Is that correct?
14        A.    Yes, that is correct.
15        Q.    Does anybody on your team
16   verify the accuracy of any of the
17   contents of the affidavit before it
18   reaches your hands?
19              MS. PITNEY:  Objection
20              again.  How the document is
21              prepared -- you can ask him
22              questions about the document and
23              what's stated in the document.
24              The preparation of the document,
25              which is prepared for litigation,
```

```
 1                STEPHAN
 2         is privileged.  Do not answer the
 3         question, Jeff.
 4  BY MR. COX:
 5         Q.    Mr. Stephan, do you recall
 6  testifying in your Florida deposition in
 7  December, with regard to your employees,
 8  and you said, quote, they do not go into
 9  the system and verify the information as
10  accurate?
11         A.    That is correct.
12              MS. PITNEY:  I'm sorry.
13         Tom, could you please repeat what
14         you just said?  I just couldn't
15         hear.
16              MR. COX:  Quote:  They do
17         not go into the system and verify
18         the information as accurate.
19  BY MR. COX:
20         Q.    Is that correct?
21         A.    That is correct.
22              MR. FLEISCHER:  Tom, can you
23         reference what litigation that was
24         in, do you know?
25              MR. COX:  The Florida case
```

```
1                    STEPHAN
2         that he testified in.
3              MR. FLEISCHER:  I just
4         thought you might have a reference
5         there.
6              MR. COX:  I'll get it
7         shortly.
8    BY MR. COX:
9         Q.    Do you and your 14-person
10   team all work in the same physical space?
11        A.    Yes.  We're all in the same
12   department.
13        Q.    Do you have an office or a
14   cubicle, or what?
15        A.    Cubicle.
16        Q.    Do the employees bring
17   documents to you to sign?
18        A.    That is correct.
19        Q.    How many do they bring to
20   you at a time, on average?
21        A.    For a month, anywhere from
22   six to 8,000 documents.
23        Q.    Do you recall testifying in
24   your Florida deposition in December that
25   you estimated it was 10,000 documents a
```

```
 1              STEPHAN
 2   month?
 3        A.    I do not recall.  I'm going
 4   off of numbers within the past month or
 5   so.
 6        Q.    Have those numbers gone down
 7   in the past month or so?
 8        A.    There has been a decrease.
 9        Q.    Back in December, were you
10   signing in the range of 10,000 documents
11   a month?
12        A.    I may have been.
13        Q.    Back in August of 2009,
14   roughly, how many documents a month were
15   you signing?
16        A.    I cannot estimate.  I don't
17   know.
18        Q.    Do you believe that it was
19   more or less than the number you were
20   signing in December?
21        A.    I'm going to assume, more.
22        Q.    And on a given day, I
23   understand an employee brings you a group
24   of documents for you to sign; is that
25   correct?
```

STEPHAN

1

2          A.      That would be correct.

3          Q.      Roughly, how many are

4    brought to you in a group, on average?

5          A.      Throughout a day, I believe

6    we are averaging approximately 400 new

7    requests coming in from our attorney

8    network.  So I would say approximately

9    400 per day.

10         Q.      This sounds very basic.

11   But, physically, are you handed a pile of

12   100 documents, 300 documents?  How does

13   that work?

14         A.      They bring them to me in

15   individual folders from each one of the

16   members of my team.  I do not count how

17   many are in the files.

18         Q.      So each team employee has a

19   folder of document; is that correct?

20         A.      That is correct.

21         Q.      When you receive a summary

22   judgment affidavit to be signed by you,

23   is it accompanied by any other documents

24   relating to the loan?

25                 MS. PITNEY:  Objection.  The

STEPHAN

1

2     document is prepared for

3     litigation.  And anything he does

4     when he's preparing it is

5     privileged.

6         MR. COX:  Are you telling

7     him not to answer?

8         MS. PITNEY:  I am.  Tom, if

9     you want to ask him about general

10     procedures, which you have been,

11     then I'm not going to object as

12     much.  But if you want to ask him

13     about what goes into preparing a

14     document that was used for summary

15     judgment, that's clearly prepared

16     for litigation, and it's

17     privileged and protected.

18         MR. COX:  I think you

19     haven't heard my question, Julia.

20     I'll state it again.

21 BY MR. COX:

22     Q.  When you receive a summary

23 judgment document for your execution, is

24 it accompanied by any other documents?

25         MS. PITNEY:  My objection is

```
 1                    STEPHAN
 2         -- you can answer that question,
 3         Jeff.
 4               THE WITNESS:  There are
 5         times when it has the Complaint
 6         connected.  There are times when
 7         it is brought to me just as the
 8         affidavit.
 9    BY MR. COX:
10         Q.    When you say that there are
11    times when it comes to you with a
12    Complaint connected, you mean attached as
13    an exhibit?
14         A.    Such as this one, yes.
15         Q.    When you say "this one,"
16    you're referring to Deposition Exhibit-1?
17         A.    Yes, that is correct.
18         Q.    Deposition Exhibit-1 has
19    several exhibits attached to it; is that
20    correct?
21               MS. PITNEY:  Could you
22         please tell me what the exhibits
23         that are attached are, because I
24         don't have the benefit of having
25         them in front of me?
```

```
 1                    STEPHAN
 2              THE WITNESS:  Exhibit-A is a
 3         copy of the note and the --
 4              MR. COX:  Julia, this is
 5         your summary judgment affidavit.
 6              MS. PITNEY:  I'm not
 7         doubting that it is.  I just don't
 8         know what these other exhibits
 9         attached are.
10              MR. COX:  Don't you have
11         your copy?
12              MS. PITNEY:  You're the one
13         verifying if they're the same as
14         the one I'm looking at, Tom.
15              THE WITNESS:  Exhibit-B is
16         the mortgage.  Exhibit-C is the
17         assignment of note and mortgage.
18         Exhibit-D -- I believe we're
19         looking at the demand, or the
20         breach letter.  And those are the
21         four documents that are connected
22         to this affidavit of summary
23         judgment.
24    BY MR. COX:
25              Q.   In your usual practice, are
```

```
 1                    STEPHAN
 2   those exhibits attached to the affidavit
 3   at the time that you sign them?
 4              MS. PITNEY:  Objection.
 5          You're asking about a document
 6          that was prepared by an attorney.
 7          Anything that comes with it that
 8          he's asked to review is
 9          privileged -- the communication
10          between a client and an attorney.
11          Do not answer the question.
12   BY MR. COX:
13          Q.    Mr. Stephan, would you
14   please look at Paragraph 3 of Exhibit-1.
15   Do you see there the statement:  That a
16   true and correct copy of which is
17   attached hereto is Exhibit-A?
18          A.    Where are you looking?
19          Q.    Paragraph 3.  Do you see
20   that statement?
21          A.    Yes, I do.
22          Q.    When you sign an affidavit
23   such as Exhibit-1, are the exhibits
24   attached to it?
25              MS. PITNEY:  Objection.  A
```

```
 1                    STEPHAN
 2         document that's provided to him by
 3         an attorney is privileged.
 4              MR. COX:  Are you telling
 5         him not to answer that question?
 6              MS. PITNEY:  Yes.  I'll say
 7         again, Tom, if you would like to
 8         ask him about the facts that are
 9         in the affidavit, the details
10         about this loan -- which I might
11         remind you involves a woman by the
12         name of Nicole Bradbury -- then
13         I'm sure Jeff will answer your
14         question?
15              MR. COX:  Well, he has the
16         affidavit in front of him in this
17         case.  And the affidavit which he
18         swore to says a true and correct
19         copy of the note is attached to
20         it.  And I'm asking him if that
21         document was attached to it at the
22         time that he signed it.
23  BY MR. COX:
24         Q.   Would you please answer that
25  question?
```

                    STEPHAN

1

2          A.    To my knowledge, I do not

3     recall.

4          Q.    Is it your usual business

5     practice to have exhibits attached to

6     affidavits that you sign?

7          A.    Yes.

8          Q.    All exhibits?

9                MS. PITNEY:  Object to form.

10               THE WITNESS:  I do not know.

11    BY MR. COX:

12         Q.    When you sign a summary

13    judgment affidavit, do you check to see

14    if all the exhibits are attached to it?

15         A.    No.

16         Q.    Does anybody in your

17    department check to see if all the

18    exhibits are attached to it at the time

19    that it is presented to you for your

20    signature?

21         A.    No.

22         Q.    When you sign a summary

23    judgment affidavit, do you inspect any

24    exhibits attached to it?

25         A.    No.

```
1                    STEPHAN
2              MS. PITNEY:  Could you
3         repeat the question, Tom?  Did you
4         say -- or can you have it read
5         back, please?
6              (Whereupon, the pertinent
7         portion of the record was read.)
8              MS. PITNEY:  Object to the
9         form.
10  BY MR. COX:
11        Q.   What happens to an affidavit
12  in your department after you sign it?
13             MS. PITNEY:  Objection.
14        What happens to the document
15        afterwards is -- it's in the
16        course of litigation.  The same
17        objection as I said before.  Where
18        it goes is privileged.
19             MR. COX:  Where it goes is
20        not a communication.  It is not
21        privileged.
22             MS. PITNEY:  You don't know
23        that.
24             MR. COX:  Pardon me?
25             MS. PITNEY:  You don't
```

```
 1                        STEPHAN
 2           necessarily know that.
 3                MR. COX:  The physical
 4           movement of a document is not a
 5           communication.  It's a fact.
 6  BY MR. COX:
 7           Q.    My question to you is, where
 8  does a summary judgment go after you sign
 9  it?
10           A.    After I sign it, it is
11  handed back to my staff.  My staff hands
12  it to a notary for notarization.  It is
13  then handed back to my staff.  They send
14  it back to the network attorney
15  requesting any type of affidavit.
16           Q.    So you do not appear before
17  the notary; is that correct?
18           A.    I do not.
19           Q.    What does your staff do with
20  a summary judgment affidavit, such as
21  Deposition Exhibit-1, after it receives
22  it back from the notary?
23           A.    They go into our LPS system,
24  close out process, stating it's being
25  sent back to --
```

```
 1                    STEPHAN
 2             MS. PITNEY:  Objection.
 3        Sorry.  I don't mean to interrupt
 4        you, Jeff.  I'm going to instruct
 5        you not to answer anything else,
 6        because you've already testified
 7        that the LPS system is the means
 8        by which you communicate with your
 9        attorney.  The attorney/client
10        communication is privileged.  So
11        don't continue to answer the
12        question.
13             Actually, if there is no
14        question, pending, I'd like to
15        take a brief break to discuss
16        something with Brian Fleischer.
17             (Whereupon, a short recess
18        was taken.)
19   BY MR. COX:
20        Q.   Mr. Stephan, do you recall
21   testifying in your Florida deposition in
22   December that you rely on your attorney
23   network to ensure that the documents that
24   you receive are correct and accurate?
25        A.   That is correct.
```

1                    STEPHAN

2          Q.     And is that, in fact, the

3     case?

4          A.     Yes.

5          Q.     And your department does not

6     do any independent accuracy check of

7     those records; isn't that correct?

8              MR. FLEISCHER:  Objection as

9          form.

10             THE WITNESS:  Can you

11         rephrase?

12    BY MR. COX:

13         Q.     Your department does not do

14    any independent check of the accuracy of

15    the information on the summary judgments

16    coming to you; isn't that correct?

17         A.     I review, quickly, the

18    figures.  Other than that, that's about

19    it.

20         Q.     Do you recall testifying in

21    your Florida deposition in December, that

22    the affidavits that you sign are not

23    based upon your own personal knowledge?

24         A.     I do not recall.

25             MS. PITNEY:  Objection to

```
 1                    STEPHAN
 2          the form.
 3  BY MR. COX:
 4          Q.    You do not recall that?
 5          A.    I do not recall.
 6          Q.    When you receive a summary
 7  judgment affidavit from one of your staff
 8  members, what do you do with it?
 9          A.    I will first review it
10  against our computer system, which is
11  Fiserv, in general terms, to verify that
12  the figures are correct.  And then I will
13  execute it and hand it back to my staff
14  to have it notarized.
15          Q.    You say "in general terms"
16  you review it.  What do you mean?
17                 MS. PITNEY:  Objection.
18                 THE WITNESS:  I compare the
19          principal balance.  I review the
20          interests.  I take a look at the
21          late charges.  I look at the
22          outstanding escrow amounts.  When
23          I say "general terms," I mean I'm
24          not looking at the escrow and
25          breaking it down to the penny.
```

```
 1                    STEPHAN
 2         I'm saying, yes, it looks correct
 3         in my computer system.
 4  BY MR. COX:
 5         Q.    Is there anything else that
 6  you look at in your computer system when
 7  you're signing a summary judgment
 8  affidavit?
 9              MS. PITNEY:  I'm sorry.  I
10         couldn't hear the last part of
11         that.
12  BY MR. COX:
13         Q.    Is there anything else that
14  you look at in your computer system at
15  the time that you sign a summary judgment
16  affidavit?
17         A.    The only other thing I
18  can --
19              MS. PITNEY:  One second.
20         Are we talking about the computer
21         system, the communication system?
22         I just was asking for
23         clarification of --
24              MR. COX:  Let me clarify it.
25              MS. PITNEY:  What computer
```

```
 1                    STEPHAN

 2          communication system Tom was

 3          asking him about.

 4  BY MR. COX:

 5          Q.     You testify that you go into

 6  the First Serve (sic) system; is that

 7  correct?

 8          A.     Yes, Fiserv.

 9          Q.     Fiserv.  Do you go into any

10  other computer system at the time that

11  you're signing a summary judgment

12  affidavit?

13          A.     No.

14          Q.     And you just testified that

15  you look at principal, interest, late

16  charges and escrow; is that correct?

17          A.     That is correct.

18          Q.     Is there anything else that

19  you look at in your computer system when

20  you're signing a summary judgment

21  affidavit?

22          A.     The only thing I review,

23  other than that, is who the borrower is.

24          Q.     When you receive a summary

25  judgment affidavit to sign, do you read
```

```
 1                    STEPHAN
 2    every paragraph of it?
 3          A.    No.
 4          Q.    What do you read?
 5          A.    I look for the figures.
 6          Q.    That's all that you look at
 7    when you sign a summary judgment
 8    affidavit?
 9          A.    Yes, to ensure that the
10    figures are correct.
11          Q.    Is it fair to say then that
12    when you sign a summary judgment
13    affidavit, you do not know what it says,
14    other than what the figures are that are
15    contained within it?
16                MR. FLEISCHER:  Objection as
17          to form.
18                MS. PITNEY:  Objection to
19          the form of the question.
20                THE WITNESS:  Please
21          rephrase.
22    BY MR. COX:
23          Q.    It fair to say that when you
24    sign a summary judgment affidavit, you
25    don't know what information it contains,
```

```
                    STEPHAN
```

1    STEPHAN

2    other than the figures that are set forth

3    within it?

4         A.    Other than the borrower's

5    name, and if I have signing authority for

6    that entity.  That is correct.

7         Q.    The practice that you've

8    just described for signing summary

9    judgment affidavits is the practice that

10   you use signing all summary judgment

11   affidavits that you handle; is that

12   correct?

13              MR. FLEISCHER:  Again, I'm

14        going to object to the form of the

15        question.

16   BY MR. COX:

17        Q.    Is that correct?

18        A.    The practice that I use for

19   summary judgment affidavits is the same

20   practice that I use for all affidavits.

21        Q.    And that's the one that

22   you've just described?

23        A.    Yes.

24        Q.    Is any part of your

25   compensation at GMAC Mortgage tied to the

```
1                    STEPHAN
2    volume of documents that you sign?
3         A.    No.
4         Q.    Is any part of your
5    compensation tied to the volume of
6    documents that your department processes?
7         A.    No.
8         Q.    Is it your understanding
9    that the process that you follow in
10   signing summary judgment affidavits is
11   in accordance with the policies and
12   procedures required of you by GMAC
13   Mortgage?
14        A.    Yes.
15        Q.    Does GMAC do any quality
16   assurance training for your department?
17        A.    Presently, no.
18        Q.    Has it in the past?
19        A.    I do not know.
20        Q.    You don't recall any?
21        A.    I never received any.
22        Q.    Do you have any memory of
23   checking the numbers on the Bradbury
24   affidavit that's in front of you as
25   Deposition Exhibit-1?
```

STEPHAN

1

2          A.     I do not recall.

3          Q.     If a loan has been modified,

4     does that show up in the Fiserv system

5     that you look at?

6          A.     When you say "modified," are

7     you stating a loan modification?

8          Q.     Yes.

9          A.     Yes.

10         Q.     Does that show up?

11         A.     Yes.

12         Q.     If a loan has been modified,

13    is any information put in the summary

14    judgment affidavits that you sign about

15    that?

16              MR. FLEISCHER:  Objection.

17         Are you talking about modified, or

18         his term was loan modification.  I

19         just want to make sure we're

20         clear.

21              MR. COX:  That's fine.

22    BY MR. COX:

23         Q.     If there's a loan

24    modification, does information about a

25    loan modification appear in the summary

```
 1                        STEPHAN
 2     judgment affidavits that you sign?
 3              A.     I do not know.
 4                     MS. PITNEY:  In all of them,
 5              or in this one?
 6                     MR. COX:  In any of them.
 7                     THE WITNESS:  I don't know.
 8     BY MR. COX:
 9              Q.     Based upon your testimony,
10     Mr. Stephan, is it correct that when you
11     sign a summary judgment affidavit, such
12     as Deposition Exhibit-1 that is in front
13     of you, you don't know whether any
14     portion of it is true, other than the
15     paragraph containing the numbers that
16     you just described; is that correct?
17                     MS. PITNEY:  Object to the
18              form.  Tom, are you asking him
19              about this affidavit?
20                     MR. COX:  Well, he's
21              testified that doesn't recall
22              signing this particular affidavit,
23              so that was not my question.  Let
24              me restate it.
25     BY MR. COX:
```

STEPHAN

1

2      Q.    In your practice of signing

3  summary judgment affidavits, Mr. Stephan,

4  is it correct that they always have a

5  paragraph containing the numbers of the

6  amounts claiming to be due?

7      A.    That would be correct.

8      Q.    And is it correct that when

9  you sign those affidavits, you don't know

10  whether any other part of the affidavit

11  is true or correct?

12      A.    Please advise me.  What do

13  you mean by "any other part"?

14      Q.    Any other paragraph, other

15  than the one containing the numbers.

16      A.    I review it for the due

17  date, if that's included in there.

18      Q.    So all of them --

19      A.    So that would be the

20  numbers.

21      Q.    So other than the due date

22  and the balances due, is it correct that

23  you do not know whether any other part of

24  the affidavit that you sign is true?

25      A.    That could be correct.

```
 1                    STEPHAN
 2          Q.    Is it correct?
 3          A.    That is correct.
 4          Q.    And isn't it also correct
 5    that you do not check the numbers on
 6    every single summary judgment affidavit
 7    that you sign?
 8          A.    That is not correct.
 9          Q.    You check every single one?
10          A.    Yes.
11          Q.    How long does it take you,
12    on average, to process the execution of a
13    summary judgment affidavit?
14               MS. PITNEY:  Object to the
15          form.
16               MR. COX:  Please answer.
17               THE WITNESS:  Anywhere from
18          five to 10 minutes, off the top of
19          my head.
20               MR. COX:  If we can take a
21          break.  I may be done, but we can
22          take a break for five minutes.
23               (Whereupon, a short recess
24          was taken.)
25    BY MR. COX:
```

```
 1                    STEPHAN
 2        Q.    Mr. Stephan, referring you
 3   again to the bottom line on Page 1 of
 4   Exhibit-1, it states:  I have under my
 5   custody and control, the records relating
 6   to the mortgage transaction referenced
 7   below.
 8             It's correct, is it not,
 9   that you did not have in your custody any
10   records of GMAC at the time that you
11   signed a summary judgment affidavit?
12             MS. PITNEY:  Objection to
13        the form.
14             THE WITNESS:  I have the
15        electronic record.  I do not have
16        papers.
17   BY MR. COX:
18        Q.    You have access to a
19   computer.  Is that what you mean?
20        A.    Yes.
21        Q.    You have no control over
22   that system, do you?
23             MR. FLEISCHER:  Objection as
24        to form.
25   BY MR. COX:
```

```
 1                    STEPHAN
 2        Q.    You have no control over
 3   that Fiserv computer system, do you?
 4        A.    No, I do not.
 5        Q.    And someone else within GMAC
 6   is responsible for ensuring the accuracy
 7   of that system; isn't that correct?
 8        A.    That would be correct.
 9            MR. COX:  I have no further
10        questions.
11            MR. FLEISCHER:  We're done,
12        Julia, unless you have something
13        to add.
14            MS. PITNEY:  No.
15            (Witness excused.)
16                 -  -  -
17            (Whereupon, the deposition
18        concluded at 11:45 a.m.)
19
20
21
22
23
24
25
```

1

2                   I N D E X

3    Testimony of:  Jeffrey Stephan

4    By Mr. Cox . . . . . . . . . 4

5

6

7                      -    -    -

8                 E X H I B I T S

9                      -    -    -

10

11   NO.          DESCRIPTION              PAGE

12

13   1            Affidavit                3

14                August 5, 2009

15

16

17

18

19

20

21

22

23

24

25

1

2          I have read the foregoing transcript

3    of my deposition given on June 7, 2010,

4    and it is true, correct and complete, to the

5    best of my knowledge, recollection and belief,

6    except for the corrections noted hereon and/or

7    list of corrections, if any, attached on a

8    separate sheet herewith.

9

10

11                              _____

12                              JEFFREY STEPHAN

13

14

15

16

17   Subscribed and sworn to

18   before me this ____ day

19   of _____, 2010.

20

21

22   _____

23   Notary Public

24

25

1

2               CERTIFICATE

3        I HEREBY CERTIFY that the witness

4    was duly sworn by me and that the

5    deposition is a true record of the

6    testimony given by the witness.

7

8

9

10

          Susan B. Berkowitz, a

11        Registered Professional Reporter

          and Notary Public

12        Dated:  June 9, 2010

13

14

15

16

17

18              (The foregoing certification

19    of this transcript does not apply to any

20    reproduction of the same by any means,

21    unless under the direct control and/or

22    supervision of the certifying

23    reporter.)

24

25